UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

FINANCIAL FIDUCIARIES, LLC, a
Wisconsin limited liability company, and
THOMAS BATTERMAN, a Wisconsin
resident,

                Plaintiffs,

    v.

GANNETT CO., INC., a foreign corporation,

                Defendant.

Case No. 3:19-CV-0874

---

## BRIEF IN SUPPORT OF DEFENDANT GANNETT CO., INC.'S MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Federal Rule of Civil Procedure 56, Defendant Gannett Co., Inc. ("Gannett") respectfully submits this brief in support of its motion for summary judgment.

## INTRODUCTION

This Court's forty-three-page, June 1, 2020 Order granted virtually all of Gannett's motion to dismiss. The only remaining issue is Plaintiffs' claim that, based solely on a hyperlink to a separate story, the Gannett article at issue, published in the *Wausau Daily Herald* on August 21, 2018 and updated on September 19, 2018 (the "Article"), falsely implied that Plaintiffs were involved in elder abuse. The Article concerns a judicial proceeding in Marathon County Circuit Court, involving a dispute over the Revocable Living Trust of Joseph R. Geisler (the "Geisler Trust"). *See In the Matter of the Joseph R. Geisler Revocable Trust*, Marathon County Circuit Court, Case No. 15-PR-32 (the "*Geisler Trust* litigation"). Based on the undisputed facts, Plaintiffs' libel-by-implication claim fails as a matter of law and should be dismissed for several reasons – each of which provide an independent basis for granting Gannett's motion for summary judgment.

The Court has already ruled that "the Article accurately and fairly described the allegations of the [American Cancer Society] petition, the proceedings before the Marathon County circuit court, and the court's ultimate findings about Batterman's conduct [in the "*Geisler Trust* litigation]." *See* June 1, 2020 Order, Dkt. No. 32 at 32. The Court, however, did not dismiss Plaintiffs' claim that a hyperlink referring to a separate story about elder abuse as "Related" to the Article could create the false impression that Batterman himself was engaged in "elder abuse" through "financial exploitation". Importantly, in allowing Plaintiffs to pursue that sole claim, the Court noted that at the dismissal stage, the Court was generously accepting Batterman's allegation that the implication is *false*, even though Plaintiffs did not specifically allege in the complaint that they have *not* exploited elders for financial gain. *Id*. at 34.

The Court need not so generously accept Plaintiffs' claim today, particularly after extensive discovery. Plaintiffs must establish that there are genuine issues of material fact supporting the claim that the hyperlink *falsely* implied a defamatory meaning and that Gannett maliciously and intentionally endorsed that false implication. They cannot do so based on this record. Nor can Plaintiffs establish that the hyperlink was "of and concerning" Plaintiffs. The constitutional privileges secured by the First and Fourteenth Amendments ensure that a claim like Plaintiffs' does not have a "chilling effect" on the freedoms of speech and the press.

## FACTS

In 1988, Joseph Geisler established the Geisler Trust and designated himself as the primary trustee with Vigil Asset Management Group as the successor trustee.[1] (Def. PFOF ¶ 7.) Vigil Asset Management Group was owned by Batterman. (Def. PFOF ¶ 8.) The Geisler Trust provided that, upon Geisler's death, if his spouse did not survive him, the assets remaining in the

---

[1] Citations are to Gannett's Rule 56 Proposed Findings of Fact ("Def. PFOF".)

Trust, together with any assets received into the Trust, should be distributed to four identified charities. (Def. PFOF ¶ 9.) Specifically, Geisler instructed that $3 million be distributed equally – approximately $750,000 each to four charitable organizations – the Superior Diocese of the Catholic Church; Bruce High School in northwestern Wisconsin; the Alzheimer's Association; and, the American Cancer Society ("ACS"). (Def. PFOF ¶ 10.) Geisler died on December 27, 2014, at the age of eighty-eight, with his wife predeceasing him. (Def. PFOF ¶ 11.)

The Article concerns a judicial proceeding involving a dispute over the Revocable Living Trust of Joseph R. Geisler that, as of the date the Article was published, had been pending for nearly three years in Marathon County Circuit Court. *See Geisler Trust* litigation. On September 9, 2015, the ACS brought a verified petition in the Circuit Court for Marathon County seeking, among other things, to remove Vigil as successor trustee of the Geisler Trust. (Def. PFOF ¶ 13.) The petition had five claims: 1) breach of duty to administer trust in good faith; 2) breach of duty of loyalty; 3) breach of duty of prudent administration; 4) breach of duty to inform and report; and 5) removal of trustee. (Def. PFOF ¶ 14.) The School District of Bruce, the Roman Catholic Diocese of Superior, and the Alzheimer's Association each followed the ACS by filing their own petitions on October 2, 2015, October 5, 2015 and October 6, 2015, respectively. (Def. PFOF ¶ 15.)

Together, Petitioners alleged that, as successor trustee, Vigil, through Batterman, breached fiduciary duties owed to the Trust and its four charitable beneficiaries. (Def. PFOF ¶ 16.) The ACS emphasized in its petition that "[m]ultiple red flags relating to Vigil Trust's administration of the Geisler Trust – ***both before and after Geisler's death*** – give ACS serious concern that Vigil Trust has inappropriately used assets for Batterman's and his corporate entities' own benefit and to the detriment of the remainder charitable beneficiaries." (Def. PFOF

¶ 17) (emphasis added.)  The ACS also alleged that Batterman had "concocted a plan" to distribute the Geisler Trust funds in a way that would personally benefit both Batterman and his fiancée.  (Def. PFOF ¶ 19.)  The ACS alleged that Batterman's misconduct and mishandling of client assets were not isolated events.  (Def. PFOF ¶ 21.)

On October 23, 2015, approximately one month after the ACS petition was filed, the court removed Vigil and Thomas Batterman as trustee of the Geisler Trust and appointed Terrance Byrne as the new trustee.  (Def. PFOF ¶ 24.)  Later in the proceeding, following a multi-day trial, the Successor Trustee submitted a post-trial brief, a portion of which would later be quoted in the Article.  In that brief, the Successor Trustee stated:

> The inexplicable inconsistencies between the treatment of the beneficiaries, as well as the differences in the form and content of the notices that were provided, especially in light of the fact that no provision in the trust instrument authorizes different treatment among the beneficiaries, indicates that both Vigil and ***Batterman knew of their wrongdoing and that they intentionally attempted to deceive the beneficiaries in order to derive a different financial benefit.  In other words, both Vigil and Batterman placed their own financial interests before the interests of the beneficiaries.***

(Def. PFOF ¶ 26) (emphasis added.)  The Successor Trustee's brief also noted that "Mr. Batterman cannot rely upon § 701.1012 for protection against personal liability for the trustee's breach because Mr. Batterman failed to act in good faith in his dealings with the trustee and he knew, or should have known, that the trustee is acting beyond the scope of the trustee's powers. After all, Batterman had personal knowledge of Vigil's wrongdoing because he was the person who communicated with the beneficiaries on behalf of Vigil."  (Def. PFOF ¶ 27.).

The Successor Trustee emphasized that the paramount object of the trust's construction was to carry out Mr. Geisler's intent, which Batterman failed to do.  (Def. PFOF ¶ 28.)

On October 27, 2015, the Wisconsin Department of Justice ("DOJ") filed a Statement of Position in the *Geisler Trust* litigation. (Def. PFOF ¶ 22.) The DOJ noted, "[t]he proposed removal of the trustee affects the enforcement of the trust, making the Attorney General an interested party." (*Id.*) The DOJ made clear to the court that Batterman had "seized power the Geisler trust did not confer" and by establishing and funding an unauthorized new trust, Batterman had diverted money to which the four beneficiaries were entitled. (Def. PFOF ¶ 23.)

After more than two years of litigation following Vigil's and Batterman's removal as trustee, the *Geisler Trust* litigation culminated with the state court issuing lengthy opinions from the bench. (Def. PFOF ¶ 29.) On September 18, 2017, Judge Michael K. Moran noted it was alleged that Vigil committed numerous breaches of trust by breaching its duty of loyalty as well as the duty to inform and report. (Def. PFOF ¶ 30.) The court emphasized that "so much of this litigation could have been avoided had Vigil followed the plain language of the trust document or even attempted to communicate with the school district or other beneficiaries." (Def. PFOF ¶ 31.) The court concluded:

> [T]he trustee in this case breached his trust and abused his discretion for the reasons I stated and it doesn't – it's not escaping this court that the beneficiaries would have this mistrust and would, based upon it, want to clarify and get more information and do due diligence to find out exactly what was going on here.

(*Id.*)

On March 19, 2018, the parties appeared again for a ruling assigning responsibility for the significant attorneys' fees incurred as a result of the *Geisler Trust* litigation. Before that hearing, the Successor Trustee submitted another letter brief on issues "that the Successor Trustee deems particularly important for the court to consider when determining the amount of damages to be awarded for the breach of trust and the extent of liability of Batterman and Vigil

for the damages resulting from the breach." (Def. PFOF ¶ 33.) The Successor Trustee stated:

"As a result of Vigil's and Batterman's misconduct, which misconduct was the driving factor

behind this litigation, the trust res was significantly depleted because the trust incurred numerous

damages and expense[.]" (Def. PFOF ¶ 34.) The Successor Trustee also noted that the Geisler

Trust had incurred *$82,354.96* in damages that directly resulted from Vigil's and Batterman's

misconduct. (Def. PFOF ¶ 35) (emphasis added.)

    During the hearing on damages, the court stated:

> [T]he petitioners have urged this court to find intentional fraud,
> bad faith or deliberate dishonesty on the part of Mr. Batterman.
> This court has struggled, admittedly, with that issue since the
> beginning when the trustee was removed.
>
> I believe the manner in which this trustee acted in this case was
> certainly intentional. I believe it clearly created mistrust among
> the beneficiaries and certainly caused them to feel as though the
> information they received when they finally received it well past
> the time, in the Court's opinion they should have been given notice
> of the trust, was misrepresentative and deceptive. I can certainly
> understand the position of the beneficiaries that there is a
> perception that the trustee engaged in self-dealing and was at times
> arrogant and exhibited an I-know-best approach to dealings with
> each of the beneficiaries. I can see where there could be a
> perception that the trustee was dishonest in his handling of the
> trust.

(Def. PFOF ¶ 36.) Accordingly, the court ruled:

> Mr. Batterman's actions amounted to a significant breach of trust –
> of the trust. The record is replete with instances where information
> was intentionally withheld and actions taken contrary to the plain
> language of the trust document, specifically with the Bruce School
> Districts and others. Some of the beneficiaries were not notified of
> the trust for at least six months and only heard about the trust from
> others. Bruce School District was treated as if they had no right to
> have any say whatsoever in a trust that left more directly to the
> District.
>
> …

> [T]hese examples as well as others in this record certainly do not amount to good faith dealing with the beneficiaries. Are they outrageous acts and do they evince an evil motive? Is there intentional dishonesty? Is there fraud? One can make a strong argument that there is bad faith here.

(Def. PFOF ¶ 36.)

On August 21, 2018, the *Wausau Daily Herald* reported on the judicial proceeding under the headline, "Wisconsin financial advisor accused of violating a dead man's trust, mishandling $3 million." (Def. PFOF ¶ 38.) The *Herald's* investigation into the *Geisler Trust* litigation was prompted by an anonymous tip received by Gannett's News Director for publications in Central/ East Wisconsin, Mark Treinen, on June 15, 2018. (Def. PFOF ¶ 39.) After receiving the anonymous tip, Treinen assigned Sam Wisneski, a paid summer intern reporter, to look into the *Geisler Trust* litigation. (Def. PFOF ¶ 42.)

Wisneski familiarized himself with the complex trust and legal issues involved in the case. (Def. PFOF ¶ 51.) He traveled to the Marathon County Courthouse fifteen or more times to review hundreds of court records and conducted a number of interviews, including an interview of John Herbers, a shareholder in the Reinhart Boerner Van Deuren Law Firm's Trusts and Estates Practice in Milwaukee who Wisneski specifically sought out to learn more about how a trust or estate should be properly distributed. (Def. PFOF ¶ 52.)

Wisneski also interviewed two of Joseph Geisler's nephews. In describing the *Geisler Trust* litigation, Gary Geisler is quoted in the Article: "You just expect that everyone is doing the right thing." (Def. PFOF ¶ 55.) The Article goes on to state Mr. Geisler's nephews said "that Joe Geisler didn't have anyone to make sure he was making good financial decisions . . . . You think about his intentions for that money that he saved up: He wanted it to go to good causes, and instead someone else was taking advantage of that." (*Id.*)

Wisneski also made several attempts to interview Batterman for the story. (Def. PFOF ¶ 57.) On July 26, 2018, Wisneski spoke to Batterman about the issues he hoped to discuss. (Def. PFOF ¶ 62.) Wisneski later informed Treinen that Batterman had told Wisneski that he would get back to him the following week to set up a time to talk further. (*Id.*) Ultimately, the lead editor responsible for the Article, Treinen, "didn't believe that a completed interview [of Batterman] was going to happen, or if it was going to happen, it was [not] going to happen in a reasonable time frame." (Def. PFOF ¶ 65.) Treinen gave Wisneski a Tuesday, July 31, 2018, deadline to complete the story. (*Id.*)

At that point, on July 27, 2018, Treinen felt that Batterman's after-the-fact comments were not essential for a reader to understand what took place in the litigation "because [Batterman's view point] existed within the court records that the reporter had access to." (Def. PFOF ¶ 66.) Treinen also believed, based on his years of experience, that Batterman's delays in scheduling his interview were intentional. (Def. PFOF ¶ 67.) Treinen's decision to publish the Article without a completed interview of Batterman was consistent with USA TODAY NETWORK'S Principles of Ethical Conduct for Newsrooms which state, in pertinent part, that "[w]e will *strive* to include all sides relevant to a story. When news develops and we can't include important perspective immediately, we will share updates, including additional sources, when possible. We also will share attempts to reach sources who add value to the story." (Def. PFOF ¶ 50) (emphasis added.)

The Article was published on August 21, 2018. (Def. PFOF ¶ 69.) "In several emails and phone conversations over the course of three weeks," the Article noted, "Batterman was offered the chance to respond to allegations in the case of Geisler's trust, but he has not yet consented to an interview on that issue." (Def. PFOF ¶ 68.) Referring to proceedings involving

Batterman and his company before the SEC, the Article also stated that "[i]n an email to USA TODAY NETWORK-Wisconsin, Batterman said that [Financial Fiduciaries] had hired compliance professionals who found no problem with their handling of funds, but the SEC disagreed. 'No client was harmed in any way by the matters involved in the fine,' Batterman said." (Def. PFOF ¶ 58.)

Prior to publication, the Article was reviewed internally by both Treinen and Robert Mentzer, editors with a combined 35 years of experience. (Def. PFOF ¶ 70.) The electronic version of the Article contains a number of hyperlinks, including a hyperlink that reads, "RELATED: Five ways to fight elder abuse, financial exploitation" (Def. PFOF ¶ 74.) That hyperlink is contained within the section of the Article underneath a header, "What has been alleged" (Def. PFOF ¶ 75.) While neither Treinen, Wisneski or Mentzer recalls who initially suggested adding the hyperlink referencing "elder abuse, financial exploitation," Treinen was the editor responsible for the Article and ultimately decided to include the hyperlink. (Def. PFOF ¶ 81.) It has been the longstanding practice of the USA TODAY NETWORK -Wisconsin websites, such as the *Wausau Daily Herald's* site, to use the terminology "RELATED: [link]" to signify a link to a story that a reader might also be interested in – not necessarily a story on the same precise topic as the one they are reading. (Def. PFOF ¶ 82.)

This litigation followed on October 24, 2019, when Plaintiffs filed their complaint.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56; *see also Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996). The

party opposing the motion may not rest on the allegations of the complaint and has the burden of establishing a triable issue of material fact. A case only presents a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). To meet this burden, an adverse party must file affidavits or other supporting papers that outline specific facts showing that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also* Wis. Stat. § 802.08(3) (2017-18).

A court does not decide issues of fact, but rather decides whether a genuine issue of material fact exists to be tried. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980) (overruled on other grounds). If no genuine issue of material fact exists or if reasonable inferences may not be drawn from the undisputed facts, the motion for summary judgment must be granted. *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 512, 383 N.W.2d 916 (Ct. App. 1986). The purpose of summary judgment motions is to avoid trials when there is nothing to try and, here, there is nothing to try. The undisputed material facts demonstrate that Plaintiffs' implication claim fails as a matter of law and should be dismissed.

## ARGUMENT

### I.   SUMMARY JUDGMENT IS FAVORED IN FIRST AMENDMENT CASES.

In recognition of the constitutional privileges secured by the First and Fourteenth Amendments, courts in libel actions have recognized the need for summary relief to defendants to avoid the "chilling effect" on freedom of speech and press. *See Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 539, 563 N.W.2d 472 (1997). The U.S. Supreme Court has warned that freedom of expression must have adequate "breathing space," lest fear of litigation expense causes speakers to "steer far wider of the unlawful zone." *New York Times Co. v. Sullivan*, 376 U.S. 254, 272, 279 (1964). The existence and application of defenses and privileges, such as

substantial truth and the privilege afforded to fair and accurate reporting of judicial proceedings, are matters of law for the court, not issues of fact for a jury. *See Vultaggio v. Yasko*, 215 Wis. 2d 326, 330, 572 N.W.2d 450 (1998) (holding application of privilege in defamation action is a question of law).

Defamation-by-implication claims face an even higher constitutional hurdle. As the Seventh Circuit has observed –

> [R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern. A publisher reporting on matters of general or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendos that could be drawn from the article.

*Woods v. Evansville Press Co.*, 791 F.2d 480, 487-88 (7th Cir. 1986). This case should be decided on summary judgment because the Court can decide, as a matter of law, whether an allegedly false implication is fairly and reasonably conveyed by the hyperlink within the Article. *See Mach v. Allison*, 2003 WI App 11, ¶ 31, 259 Wis.2d 686, 656 N.W.2d 766 (citing *Puhr v. Press Publ'g Co.*, 249 Wis. 456, 460, 25 N.W.2d 62 (1946)).

## II.   PLAINTIFFS' ONLY REMAINING CLAIM FAILS AS A MATTER OF LAW BECAUSE THE ALLEGED IMPLICATION IS SUBSTANTIALLY TRUE.

A plaintiff alleging defamation-by-implication must still prove falsity. Were that not the case, a plaintiff would be allowed to recover without a showing of falsity in contravention of the rule announced in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986). "[T]his requirement is imposed in order to avoid the chilling effect that would be 'antithetical to the First Amendment's protection of true speech on matters of public concern.'" *Mach*, 2003 WI App 11, ¶ 13 (quoting *Hepps*, 475 U.S. at 777.)) Here, Plaintiffs' implication claim is that the Article's inclusion of the hyperlink "unfairly and irresponsibly suggests that Mr. Batterman and Financial

Fiduciaries were involved in "elder abuse.'" (Compl. ¶ 56.l.)  If the Article's alleged innuendo is substantially true, however, Plaintiffs' claim fails as a matter of law.  *See Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417 (1966).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal citations and quotations omitted).  In assessing whether Plaintiffs can meet their burden of establishing falsity, the Court necessarily will consider the Article's reporting of the *Geisler Trust* litigation as a whole, not in detached fragments.  *Woods v. Sentinel-News Co.*, 216 Wis. 627, 630, 258 N.W. 166 (1935).

Here, the Court has already ruled that the Article fairly and accurately reported on the *Geisler Trust* litigation.  *See* June 1, 2020 Order, Dkt. No. 32.  The litigation squarely raised elder abuse and financial exploitation issues.  As the Wisconsin Department of Health Services noted in 2018, in Wisconsin, financial exploitation is the largest category of elder abuse after self-neglect.[2]  Moreover, a trust, like the one at issue in the *Geisler Trust* litigation, is a "legal arrangement in which a person or an institution agrees to manage an adult's assets for the benefit of that adult or someone else named by that adult." Lori A. Stiegel,  ABA Comm'n on Law and Aging, Legal Issues Related to Elder Abuse: A Pocket Guide for Law Enforcement 45 (2014), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/ABA-ElderAbuseGuide.pdf (last visited on October 29, 2020).

The ABA Commission on Law and Aging long has warned that a trust can be used as a tool for financial exploitation.  *Id.* at 45-47.  Whether the trustee or the trust holds the trust assets, trustees have a legal duty to act as a fiduciary. This means, generally, that a trustee must act in a totally trustworthy manner in the interest of the beneficiary and trust and must manage

---

[2] https://www.dhs.wisconsin.gov/publications/p00124-18.pdf (See slide 5/37)

the trust's assets as instructed by trust documents. *Id.* "[F]inancial exploitation" related to trusts can occur if a trustee changes a trust without having legal authority to do so or in ways that undermine the grantor's plans. *Id.*

According to the ABA Commission financial exploitation related to trusts also can occur when a trustee uses trust assets for his or her own benefit or the benefit of others against the wishes of the grantor or the trust document. *Id.* Problems may become evident before or after the grantor dies. There may be multiple victims: the grantor whose assets may have been stolen or whose estate plan may have been altered, and beneficiaries whose assets or inheritance may have been stolen. *Id.*

Here, all of the petitioners, the Successor Trustee, the DOJ and the court each raised elder abuse issues concerning Plaintiffs multiple times during the *Geisler Trust* litigation, consistent with the core principle that fiduciaries have the duty to avoid financial exploitation, a form of elder abuse. For instance, the ACS alleged that –

> Multiple red flags relating to Vigil Trust's administration of the Geisler Trust – both before and after Geisler's death – give ACS serious concern that Vigil Trust inappropriately used assets for Batterman's and his corporate entities' own benefit and to the detriment of the remainder charitable beneficiaries. (Def. PFOF ¶ 17.)

> The facts also evidence that, upon Geisler's death, Batterman **concocted a plan** to distribute ACS' funds over a 10-year period, rather than as an outright gift to ACS as required by the trust instrument. (Def. PFOF ¶ 19.)

> ACS is also concerned that Batterman misused Trust assets – *both during the period of Geisler's incapacity and after his death*. (Def. PFOF ¶ 20) (emphasis added.)

The ACS also alleged that Batterman's misconduct and mishandling of clients' assets were not isolated events. (Def. PFOF ¶ 21.) Their research into Batterman and the various corporate entities associated with him had "revealed additional red flags relating to Batterman's past

conduct – including his mishandling of clients' assets, failure to provide required disclosures, and fees charged to clients – *conduct similar to that which Batterman has engaged in with ACS*." (*Id*.) (emphasis added.)

The DOJ's statement in the *Geisler Trust* litigation included similar themes of elder abuse in the form of financial exploitation. For example, the DOJ stated –

> The Batterman affidavit's exhibit 21 proves that Vigil seized power the Geisler trust did not confer. By that exhibit, Vigil purported to have the original Geisler trust establish a completely new trust called the "Joseph Geisler Scholarship Trust, dated June 1, 2015," with Vigil also as the trustee for the new entity.

> The new trust could only be funded by *diverting money* to which the four beneficiaries hold an immediate entitlement. (Def. PFOF ¶ 23.) (emphasis added.)

On June 6, 2017, the Successor Trustee submitted a brief, a portion of which would later be quoted in the Article. As with the ACS allegations and the DOJ position statement, the Successor Trustee's arguments to the court sounded the same themes of financial exploitation by Plaintiffs.

> The inexplicable inconsistencies between the treatment of the beneficiaries, as well as the differences in the form and content of the notices that were provided, especially in light of the fact that no provision in the trust instrument authorizes different treatment among the beneficiaries, indicates that both Vigil and Batterman knew of their wrongdoing and that they intentionally attempted to deceive the beneficiaries in order to derive a different financial benefit. *In other words, both Vigil and Batterman placed their own financial interests before the interests of the beneficiaries.*

(Def. PFOF ¶ 26.) (emphasis added.) The Successor Trustee noted that the Geisler Trust incurred $82,354.96 in damages that directly resulted from Batterman's breach of trust. (Def. PFOF ¶ 35.)

Finally, in ordering that Batterman pay damages to the beneficiaries, the

court ruled in the *Geisler Trust* litigation that –

> Mr. Batterman's actions amounted to a significant breach of trust – of the trust. The record is replete with instances where information was intentionally withheld and actions taken contrary to the plain language of the trust document, specifically with the Bruce School Districts and others. Some of the beneficiaries were not notified of the trust for at least six months and only heard about the trust from others. Bruce School District was treated as if they had no right to have any say whatsoever in a trust that left more directly to the District.
>
> …
>
> [T]hese examples as well as others in this record certainly do not amount to good faith dealing with the beneficiaries. Are they outrageous acts and do they evince an evil motive? Is there intentional dishonesty? Is there fraud? **One can make a strong argument that there is bad faith here**.

(Def. PFOF ¶ 36) (emphasis added.)

Accordingly, taking into consideration all of the pleadings in the *Geisler Trust* litigation,

Plaintiffs cannot establish that an implication fairly drawn from the hyperlink is false. The

Article truthfully summarized the issues in the *Geisler Trust* litigation:

> And that's the essence of the charities' case against Batterman: They say he sought to hold on to Geisler's money for as long as he could in order to profit from it through monthly fees.

(Def. PFOF ¶ 78.) Issues of elder abuse and financial exploitation were an indispensable and

unavoidable part of the case. The context and circumstances in which the statements were made

reinforce that conclusion. *See Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 19, 351 Wis.

2d 479, 840 N.W.2d 255 (citing *Frinzi v. Hanson*, 30 Wis. 2d 271, 276, 140 N.W.2d 259

(1966)).

Here, not only did the DOJ and Successor Trustee argue that Batterman inappropriately seized power that the Geiser Trust did not confer, placing his own financial interest before the interest of the beneficiaries, Joseph Geisler's own nephew, Gary, also told the *Wausau Daily Herald* how he viewed the issues present in the *Geisler Trust* litigation –

> You think about [Joseph Geisler's] intentions for that money that he saved up: He wanted it to go to good causes, and instead someone else was taking advantage of that.
>
> I would tell anybody that has older parents, older relatives getting financial advice, that they should be checking in on it and getting second opinions just like I did.

(Def. PFOF ¶¶ 55-56.)   Accordingly, to the extent that the hyperlink can be read to imply that issues of elder abuse and financial exploitation were part of the *Geisler Trust* litigation, that implication is substantially true.  "Truth is a complete defense to a libel action."  *Lathan v. Journal Co*., 30 Wis. 2d at 158; *see Denny v. Mertz*, 106 Wis. 2d 636, 643, 318 N.W.2d 141 (1982).

It is Plaintiffs' burden, as a matter of First Amendment law, and their burden alone, to prove material falsity.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. at 777; *Masson v. New Yorker Magazine. Inc*., 501 U.S. at 517 ("the burden is upon petitioner to prove falsity"). On this evidentiary record, Plaintiffs cannot meet that burden.

III.    **PLAINTIFFS' IMPLICATION CLAIM FAILS AS A MATTER OF LAW BECAUSE THE ARTICLES' REFERENCE TO ELDER ABUSE AND FINANCIAL EXPLOITATION IS A FAIR AND ACCURATE REPORT OF A JUDICAL PROCEEDING.**

In addition to establishing falsity, Plaintiffs must also independently establish that the communication at issue is unprivileged to prevail on their defamation-by-implication claim. Wis. Stat. § 895.05(1); *Terry*, 351 Wis. 2d 479.  Plaintiffs' direct involvement in the *Geisler Trust* litigation is a matter of public record.  Even assuming *arguendo* that this Court were to find

that the hyperlink *falsely* implies that Plaintiffs also were involved in elder abuse, taken as a whole, the Article is still a fair report of judicial proceedings that include multiple references to issues involving elder abuse and financial exploitation. "The point of the privilege is that it covers the reporting of both true and false factual matters." *Bell v. Associated Press*, 584 F. Supp. 128, 130 (D.D.C. 1984).

Put another way, it is not the Article that suggests that Batterman and Financial Fiduciaries were involved in "elder abuse," it is the pleadings in the *Geisler Trust* litigation. If the implication is substantially true, it is privileged under Wis. Stat. § 895.05(1). "Reports of the contents of pleadings on file with a court are generally privileged [under the Fair Report privilege]." *See* 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 7:3.5[B][4] (5th ed. 2019). In general, "[t]o qualify for the fair report privilege, an article or broadcast summarizing an official action or proceeding must be accurate and complete or a 'fair abridgement' of the proceeding." *Id.*, § 7:3.5[B][6].

> There is no requirement that the publisher describe the proceedings completely or in detail in order for the privilege to attach. The fair reporting privilege reaches not only comprehensive accounts of judicial proceedings, but accounts focusing more narrowly on important parts of such proceedings.

*Id.*, § 7:3.5[B][7] (citation omitted).

Here, the Article's introduction accurately summarizes the events that led to the *Geisler Trust* litigation, stating that, "[w]hen [Mr. Geisler] died at 88 with over $3 million to his name, his final wish, detailed in his trust, was to leave it all to charities that were important to him." (Def. PFOF. ¶ 38.) The Article also fairly and accurately states that "the financial adviser Joe Geisler entrusted to administer his trust put that money in jeopardy, according to a lawsuit filed in Marathon County. The adviser, Thomas Batterman of Wausau, was accused of defrauding the

charities, committing numerous breaches of trust and conspiring with his fiancée to milk the fund for trustee fees."  (Def. PFOF. ¶ 38.)

Under a heading, "What has been alleged," the Article then introduces its reporting of events by stating, "[a]ccording to accusations and judgments made in the court documents, this is what happened …."  The Article accurately reports that the DOJ and the ACS said that Batterman and his fiancée went beyond the provisions of Joe Geisler's trust.  (Def. PFOF. ¶¶ 19, 23.)  "A payout over 10 years could have earned Batterman tens of thousands in fees," the Article reported.  "And that's the essence of the charities' case against Batterman: They sought to hold on to Geisler's money for as long as he could in order to profit from it through monthly fees." (Def. PFOF. ¶ 78.)  It was the Successor Trustee who stated in court papers, as quoted in the Article, that "both Vigil and Batterman knew of their wrongdoing and that they intentionally attempted to deceive the beneficiaries in order to derive financial benefit."  *Id.*

The "fair report" privilege only is concerned with whether the defendant accurately republished the allegations in the proceedings – *not* whether one side or the other disputes that the allegations are, in fact, true.  Indeed, there seldom is a civil or criminal proceeding in which the underlying facts are not disputed and yet, under Wisconsin law, allegations contained in such proceedings are privileged where, as here, the Article accurately summarizes those allegations as allegations.

In its June 1, 2020 Order granting most of Gannett's motion to dismiss, the Court dismissed Plaintiffs' claim that the Article falsely implied that Batterman was a thief who "defrauded" the beneficiaries and "embezzled" trust funds.  June 1, 2020 Order, Dkt. 32 at 27.  "[T]he Article does not fairly and reasonably convey the impression that Batterman engaged in theft, fraud, or embezzlement."  (*Id.*)  The Court reasoned that, insofar as the Article referred to

fraud, it made clear that such conduct was only what Batterman had been "accused of" by ACS. *Id.* More importantly, as the Court noted, the Article specifically stated that "a judge found that Batterman had not committed fraud, theft or embezzlement." The Court, therefore, concluded that that statement expressly negated any implication that Batterman had embezzled or stolen trust funds, whether that implication created by the reporting on the ACS's allegations, the hyperlink, or otherwise.

That same reasoning applies to Plaintiffs' allegation that the hyperlink, in the context of the Article as a whole, falsely implies that Batterman was involved with elder abuse. (Compl. ¶ 56.l.) The hyperlink at issue is contained in the "What has been alleged" section of the Article. (Def. PFOF. ¶ 75.) Here, the ACS alleged in the *Geisler Trust* litigation that multiple red flags relating to the administration of the trust both before and after Geisler's death – "give ACS serious concern that Vigil Trust has inappropriately used assets for Batterman's and his corporate entities' own benefit and to the detriment of the remainder charitable beneficiaries." (Def. PFOF. ¶ 17.) The ACS also alleged that Batterman's misconduct and mishandling of clients' assets were not isolated events. (Def. PFOF. ¶ 21.) Accordingly, insofar as the hyperlink references elder abuse and financial exploitation within the section of the Article reporting on what was alleged in the *Geisler Trust* litigation, that reference is consistent with what Batterman had been accused of by the ACS. As importantly, in Wisconsin, elder abuse is a crime (*see* Wis. Stat. § 940.285), and the Article explicitly states that "[n]either Batterman nor Richards has been charged with any criminal wrongdoing in the Geisler case." (Def. PFOF. ¶ 79.) That statement expressly negates any implication that Batterman was charged with any wrongdoing in the *Geisler Trust* litigation.

Here, while the hyperlink is not to be found in the *Geisler Trust* litigation pleadings, it would be the proverbial tail wagging the dog to conclude that the hyperlink standing alone supports Plaintiffs' libel-by-implication claim when the Article as a whole is privileged under Wisconsin law. Plaintiffs' implication claim, therefore, fails as a matter of law because the defamatory innuendo that forms the basis of their claim is privileged as a fair and accurate report of a judicial proceeding. *See* Wis. Stat. § 895.05(1).

IV. **PLAINTIFFS CANNOT ESTABLISH THAT GANNETT INTENDED OR ENDORSED ANY PROVABLY FALSE IMPLICATION, NOR DOES IT SATISFY BASIC DEFAMATION STANDARDS.**

Based on the record, even *if* the Court were to find that Plaintiffs have set forth evidence that establishes both that --1) the alleged implication is false; and 2) the alleged implication is not privileged -- Plaintiffs' libel-by-implication claim *still* fails as a matter of law. Here, Plaintiffs must prove Gannett endorsed the allegedly defamatory implication and that it did so maliciously. On this record, they can prove neither.

While Wisconsin courts have recognized defamation-by-implication claims,[3] the Wisconsin Supreme Court has held that "[e]very written or printed publication which *implies*, or may be generally understood to imply, reproach, dishonesty, scandal, or ridicule of the person is a libel [only] if false *and maliciously published*." *Shaw v. Crandon Printing Co.*, 154 Wis. 601, 143 N.W. 698, 700 (1913) (emphasis added). The common law malice standard set forth in

---

[3] Because defamation-by-implication claims based on the reporting of accurate facts about matters of public concern necessarily implicate First Amendment freedoms, a number of courts have declined to recognize such a cause of action. *See, e.g., Fitzgerald v. Tucker*, 737 So. 2d 706, 717 (La. 1999); *Collins v. WAFB, LLC*, No. 16-15648, 2017 WL 1383948, at * 8 (E.D. La. Apr. 18, 2017).

*Shaw*, [4] -- ill will or wanton disregard of the rights of the plaintiff -- remains the law in Wisconsin more than 100 years later. *Id.*

In a libel-by-implication claim, the plaintiff attempts to assert a cause of action despite the fact that "the reported facts are materially true and the alleged defamation is *not* stated explicitly." *White v. Fraternal Order of Police (White II)*, 909 F.2d 512, 518-19 (D.C. Cir. 1990) (emphasis added). Implication claims are, therefore, "fraught with subtle complexities," precisely because of the inherent risk that, unless the cause of action is narrowly tailored, liability will not only be imposed as a result of alleged implications that are "manufactured" from fair and accurate reporting about public matters, but valuable speech will inevitably be inhibited. *Id.* As one leading treatise has explained:

> The defendant's right to state the truth … might be undermined or destroyed if the defendant were held liable for the defamatory implications of complete and truthful statements of fact.

3 Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, *The Law of Torts* § 566 (2d ed. 2011).

The heightened standard for libel-by-implication in Wisconsin is not alone. Courts around the country have held that "because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author *intends or endorses the inference*." *Chapin v. Knight-Ridder, Inc*., 993 F.2d 1087, 1092–93 (4th Cir. 1993) (emphasis added); *see also White II*, 909 F.2d at 520. More specifically, the particular manner or language in which the true facts are conveyed must supply additional, affirmative evidence suggesting that the defendant intended or endorsed the defamatory inference. *White II*, 909 F.2d at 520.

---

[4] Common law malice is distinguishable from "constitutional malice," *i.e.*, actual knowledge of falsity or reckless disregard as to truth or falsity, as set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254.

In this case, even if the hyperlink could be read to falsely communicate that Plaintiffs were involved in elder abuse, they can point to no additional, affirmative evidence suggesting that Gannett intended or endorsed the defamatory inference let alone included the hyperlink maliciously.  Instead, the undisputed facts demonstrate that the *Wausau Daily Herald* staff responsible for investigating, reporting and publishing the Article acted in good faith and consistent with the USA TODAY NETWORK'S Principles of Ethical Conduct for Newsrooms. (Def. PFOF. ¶ 50, "Principles of Ethical Conduct.")  As the Court already has held, any defamatory implication in this case would be based on statements in the Article that are *all true and accurate reports of a judicial proceeding.* (June 1, 2020 Order, Dkt. 32 at 30.)  That finding, in and of itself, indicates that no reasonable jury could conclude, even if the hyperlink is found to falsely imply Plaintiffs were involved in elder abuse of an 88 year-old client, that Gannett acted maliciously.

While neither Treinen, Wisneski or Mentzer recall who initially suggested the hyperlink referencing "elder abuse, financial exploitation," as the editor responsible for the Article, Treinen, an editor with over twenty-five years of experience, ultimately decided to include it. (Def. PFOF. ¶ 81.)  Importantly, inclusion of the hyperlink was consistent with the USA Today Network-Wisconsin's longstanding practice to use the terminology "RELATED: [link]" to signify a link to a story that a reader might also be interested in – not necessarily a story on the same exact topic as the one they are reading. (Def. PFOF. ¶ 82.)  Inclusion of the terminology "RELATED: [link]" in the Article, therefore, is not evidence that Gannett affirmatively intended or endorsed a defamatory inference.

Moreover, no part of Gannett's process for investigating, writing, editing and publishing the Article indicate in any way that it endorsed the allegedly defamatory implication and that it

did so maliciously. Wisneski had materials from the beginning of his employment on how to access and review Wisconsin court and criminal records. (Def. PFOF ¶ 45.) He received frequent on-the-job training including feedback on his work from Treinen and Mentzer. (Def. PFOF ¶¶ 41, 47.) Wisneski specifically reached out to a trust and estates professional as part of his investigation to learn more about how a trust should be properly distributed. (Def. PFOF ¶ 51.)

Wisneski also received specific feedback from Mentzer with respect to appropriately providing sources to statements in the Article. (Def. PFOF ¶ 53.) In Mentzer's mind, the Article discussed "serious claims, and [it was] important to be transparent with readers about where they are coming from, what our – what the sources are." (Def. PFOF ¶ 54.) That transparency, in Mentzer's mind, is a tenet of journalistic integrity. (*Id.*) It is simply unreasonable to infer, based on these undisputed facts, that either Wisneski, Treinen or Mentzer (or anyone else at Gannett) chose to include the hyperlink to maliciously endorse an implication that Batterman had committed elder abuse.

Nor does Gannett's unsuccessful attempts to complete an interview of Batterman prove malice. The Principles of Ethical Conduct include a section titled, "Exercising Fair Play," which states, in part: "[w]e will *strive* to include all sides relevant to a story. When news develops and we can't include important perspective immediately, we will share updates, including additional sources, when possible. We also will share attempts to reach sources who add value to the story." (Def. PFOF ¶ 50.) As the Article states and as emails in the record demonstrate, "[i]n several emails and phone conversations over the course of three weeks, Batterman was offered the chance to respond to allegations in the case of Geisler's trust, but he has not yet consented to

an interview on that issue." (Def. PFOF ¶¶ 57, 68.) He did, however, respond by e-mail. (Def. PFOF ¶ 58.).

In his July 10, 2018 review of the Article, Mentzer explicitly suggested to Wisneski that he question Batterman about whether Batterman "sincerely thought he had freedom to distribute funds as he saw fit?" (Def. PFOF ¶ 60.). Of course, both the Successor Trustee and the court in the *Geisler Trust* litigation made clear that Batterman knew of his wrongdoing and intentionally attempted to deceive the beneficiaries to derive a personal financial benefit. (Def. PFOF ¶¶ 26, 36.). On July 26, 2018, Wisneski spoke to Batterman about the issues he hoped to discuss with him. (*Id.*) Wisneski and Batterman exchanged text and email messages on July 26 and 27, 2018 regarding those issues and potential dates for an in-person interview. (*Id.*) As the Articles states with respect to the SEC proceedings involving Batterman and his company, Financial Fiduciaries, "[i]n an email to USA TODAY NETWORK-Wisconsin, Batterman said that [Financial Fiduciaries] had hired compliance professionals who found no problem with their handling of funds, but the SEC disagreed. 'No client was harmed in any way by the matters involved in the fine,' Batterman said." (Def. PFOF ¶ 58.). The Article also stated that, "[t]he SEC declined to comment on whether the fines and violations were related to the Geisler trust." (Def. PFOF ¶ 59.).

Based on his email and text exchange with Batterman, Wisneski spoke to his supervising editors because of the accusatory nature of Batterman's message. (Def. PFOF. ¶ 64.) Wisneski had been working closely with his editors throughout the summer, and this was "something that [Wisneski] wanted to make sure [he] handled correctly." (*Id.*) Wisneski, therefore, wanted to bring the issue of Batterman's potential interview to Treinen and Mentzer who had more experience. (*Id.*) Ultimately, the lead editor responsible for the Article, Mark Treinen, "didn't

believe that a completed interview [of Batterman] was going to happen, or if it was going to happen, it was [not] going to happen in a reasonable time frame." (Def. PFOF ¶ 65.) Treinen believed, based on his years of experience with stories of this nature, that the delays in being able to speak to Batterman were intentional on Batterman's part. (Def. PFOF ¶ 67.) Treinen's decision to proceed without a completed interview of Batterman was consistent with Gannett's Principles of Ethical Conduct. (Def. PFOF ¶ 69.)

Accordingly, Gannett's decision to publish the Article without completing an interview of Batterman is not evidence of malice. Defamation defendants act with express malice when motivated by "ill will, spite, envy, revenge, or other bad or corrupt motives." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006) (citation omitted). There is simply no evidence in the record to suggest that Gannett acted with express malice. Nor was Gannett's decision to publish the Article without completing an interview of Batterman even negligent.[5] *See Crescenz v. Penguin Group (USA), Inc*., 561 F. App'x 173, 178 (3d Cir. 2014) (ruling that defendant was not negligent in failing to provide plaintiff an opportunity to respond to allegedly false published statements); *see also Kendrick v. Fox Television*, 659 A.2d 814, 823–24 (D.C. 1995). In *Kendrick*, plaintiff alleged that defendants were negligent in failing to obtain "his side" of the story before reporting the allegedly defamatory statements on air. The court noted that it was "undisputed that the media defendants' reporters made good faith attempts to

---

[5] Plaintiffs will undoubtedly focus on defamation law outside the implication context to argue that the Court should apply a negligence standard. Even were the Court to conclude, *arguendo,* that Plaintiffs must merely prove that Gannett was negligent as to the allegedly false implication, however, Plaintiffs' claim still fails. In negligence suits, professional writers are "held to the skill and experience normally possessed by members of that profession." Restatement (Second) of Torts § 580B cmt. g (Am. Law Inst. 1977). Here, reporters and editors at Gannett, including the *Wausau Daily Herald*, are guided by the Principles of Ethical Conduct. (Def. PFOF. ¶ 50.) There is no evidence that Gannett acted inconsistent with the Principles of Ethical Conduct or other accepted standards of care for the news media.

reach [Plaintiff] before the initial broadcasts." *Id*. at 823. Based on that effort, the court concluded that "as a matter of law [] the media defendants have shown they were not negligent under the circumstances in publishing [the allegedly defamatory statements] before they could reach [Plaintiff] for comment." *Id*. at 824.

Many commentators agree that a motion for summary judgment should be available regardless of the applicable standard of care. *See Sisler v. Gannett Co*., 516 A.2d 1083, 1104 (N.J. 1986) (Garibaldi, J. concurring). Here, as there simply is no evidence that Gannett maliciously endorsed the allegedly defamatory implication, Plaintiffs' claim fails as a matter of law. Indeed, to reiterate, there is not even any evidence of negligence.[6]

## V. PLAINTIFFS' IMPLICATION CLAIM FAILS AS A MATTER OF LAW BECAUSE NEITHER THE HYPERLINK NOR THE LINKED ARTICLE ARE "OF OR CONCERNING" PLAINTIFFS.

In an action for defamation, the allegedly defamatory statement must be "of and concerning" the plaintiff. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d at 534 (identifying the third element of a defamation claim as requiring that "the communication is unprivileged and tends to harm [the plaintiff's] reputation so as to lower [the plaintiff] in the estimation of the community . . . . The "of and concerning" element remains essential even in defamation-by-implication cases); *see Westby v. Madison Newspapers, Inc.*, 81 Wis. 2d 1, 8, 259 N.W.2d 691 (1977); *Frinzi*, 30 Wis. 2d at 277; *see also Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 386 (8th Cir. 1996) (identifying the elements of a defamation by implication claim as "(1) published a statement of fact; (2) of and concerning him; (3) which was false; and (4) damaged his reputation and lowered his estimation in the community.").

---

[6] Gannett reserves its right to put forth evidence and argue that Plaintiffs are limited-purpose public figures for purposes of applying the heightened, actual malice standard to Plaintiffs' claim should the Court deny its motion for summary judgment.

Plaintiffs allege that "[t]his link in the middle of the on-line article unfairly and irresponsibly suggests that Mr. Batterman and Financial Fiduciaries were involved in 'elder abuse.'" (Compl. ¶ 56.l.) However, neither the hyperlink nor the linked article references Plaintiffs in any way. "In determining whether language is defamatory, the words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered." *Frinzi*, 30 Wis. 2d at 276.

Here, the hyperlink takes the reader to an article from the *Manitowoc Senior News* titled, "Manitowoc senior news: Five ways to fight elder abuse, neglect, financial exploitation" (the "Manitowoc article"). (Def. PFOF ¶ 76.) Neither Plaintiffs, Joseph Geisler, nor the *Geisler Trust* litigation are mentioned in the Manitowoc article. (Def. PFOF. ¶ 77.)

As the Article's author testified, the purpose of the hyperlinks embedded in the Article was simply to allow people who were interested in the Article to read other stories "related" to the same subject. (Def. PFOF ¶ 83.) It simply is not reasonable to assume a reader would conclude the hyperlink concerned Plaintiffs. The undisputed facts include no evidence to suggest the hyperlink is "of and concerning" Plaintiffs and, therefore, the implication claim fails as a matter of law.

## CONCLUSION

For any of the foregoing reasons, Gannett requests the Court enter an order granting its Motion for Summary Judgment and dismissing the entire lawsuit with prejudice.

Dated this 2nd day of November, 2020.

GODFREY & KAHN, S.C.

By: *s/ Brian C. Spahn*
    Brian C. Spahn
    State Bar No. 1060080
    Brady C. Williamson
    State Bar No. 1013896
    James A. Friedman
    State Bar No. 1020756

    Attorneys for Defendant Gannett Co., Inc.

P.O. ADDRESS:
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
bspahn@gklaw.com
bwilliam@gklaw.com
jfriedman@gklaw.com

23100346.