**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| FINANCIAL FIDUCIARIES, LLC, | ) | |
| a Wisconsin limited liability company, | ) | |
| and THOMAS BATTERMAN, | ) | |
| A Wisconsin resident, | ) | |
| | ) | Case No.  3:19-cv-0874 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Crocker, Presiding |
| | ) | |
| GANNETT CO., INC., | ) | |
| a foreign corporation, | ) | Jury Demanded |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Financial Fiduciaries, LLC and Thomas Batterman (collectively "Plaintiffs"), by and through their counsel of record, submit this response to defendant Gannett Co. Inc.'s ("Gannett") Motion For Summary Judgment ("Motion") (Dkts. 55, 56 and 57):

**INTRODUCTION**

The elements of plaintiffs' claim for defamation are:

(1) A false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 14, 351 Wis. 2d 479, 498, 840 N.W.2d 255, 263. There is a material factual dispute as to each element, and Gannett's Motion must be denied.

***First,*** as set forth in Section II below, the Article falsely states that Plaintiffs engage in elder abuse. Gannett argues that this implication is true, relying on *Geisler Litigation* court documents, inadmissible expert reports, and hearsay statements from its own Article. Plaintiffs

dispute that contention, relying on specific, relevant, admissible facts from the Declaration of Thomas. (Pl. PFOF ¶¶ 85-92; *see also* Dkt. 59)

**Second,** there is no dispute that the Wausau Daily Herald published the Article first on August 21, 2018, and then again on September 19, 2018. (Def. PFOF ¶ 1; Dkt. 57 (Spahn Dec.) ¶ 2)

**Third,** as set forth in Section III below, the Article was not privileged. Gannett argues that the **entire** Article is privilege merely because some portion of it reports on a judicial proceeding. But much of the Article has nothing to do with the *Geisler Litigation* (or Joe Geisler, for that matter). Thus, this Court already found, "to the extent Gannett implied that Batterman committed elder abuse, that statement is not privileged under Wis. Stat. § 895.05(1), insofar as it is not a 'true and fair' report of a judicial or other governmental proceeding." (Dkt. 32 at 38) That ruling is consistent with the plain language of the privilege statute, which provides that the privilege "shall not be construed to exempt [a publisher …] from liability for [..] libelous remarks or comments added or interpolated in any such report or made and published concerning the same, which remarks or comments were not uttered by the person libeled or spoken concerning the person libeled in the course of such proceeding by some other person." Wis. Stat. § 895(1).

Gannett also does not, and could not, dispute that the Article defamed Plaintiffs. Damages here are presumed here. *Kennedy v. Children's Serv. Soc. of Wisconsin*, 17 F.3d 980, 984 (7th Cir. 1994) ("In a libel case (where the defamatory words are written or printed), there is a presumption that the defamed person suffered general damages such as injury to reputation.") (applying Wisconsin law). Two categories of *per se* defamation—statements affecting the plaintiffs' business and imputing commission of a crime—are also applicable. *Lietz v. Frost*, 2018 WI App 39, ¶ 18, 382 Wis. 2d 829, 917 N.W.2d 232.

**Fourth**, as set forth in Section IV below, Gannett acted with the requisite degree of fault. Gannett argues that Plaintiffs must establish "actual malice"; but this Court already found "private figures who bring defamation actions against the news media need only show negligence" which suggests that "Batterman need make a less rigorous showing than" in actual malice cases. (Dkt. 32 at 37) Regardless of the applicable standard, Plaintiffs can readily meet it.

The Court already found that there is evidence that Gannett endorsed the false innuendo by telling readers that Plaintiffs' conduct was "RELATED" to elder abuse. (Dkt. 32 at 37-38 ("Gannett did something more: it told its readers in capitalized, bold letters that another article about 'elder abuse' was 'related' to the story about Batterman.")) Moreover, it is undisputed that Gannett published the defamatory innuendo at least twice (August 21, 2018 and September 19, 2018) and Plaintiffs told Gannett before each instance that it was publishing false innuendo. Under Wisconsin law, where a defamatory statement has been published multiple times, malice is a jury question. *Hacker v. Heiney*, 111 Wis. 313, 87 N.W. 249, 251 (1901).

**Finally,** Plaintiffs were not required to come forward with the defamatory statement until this point in the proceeding. Wis. Stat. § 802.03; *Schindler v. Marshfield Clinic*, No. 05-C-705 C, 2007 WL 60924, at *11 (W.D. Wis. Jan. 4, 2007). As such, Plaintiffs wish to proceed based on the Original Publication (as published on August 21, 2018), rather than the Revised Publication (as published on September 19, 2018), and respectfully submit that the Court erred in prohibiting Plaintiffs from doing so. (Dkt. 49) Plaintiffs therefore request that the Court deny Gannett's Motion and allow the case to proceed to trial based on the Original Publication.

**ARGUMENT**

I.    **Legal Standards And Procedural Posture.**

A.    **The Summary Judgment Standard.**

"Summary judgment is appropriate if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013) (quoting Fed. R. Civ. P. 56(e)).   On a motion for summary judgment, the district court must construe all facts and draw all reasonable inferences in favor of the non-movant. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 948 (7th Cir. 2009).

B.    **Gannett Incorrectly Claims That The Motion For Summary Judgment Standard In A Defamation Case Is Different From The Normal Standard.**

In Section I of Gannett's brief, it argues that "summary judgment is favored in First Amendment cases." (Dkt. 56 at 10) Gannett is wrong. The Wisconsin Court of Appeals rejected precisely that argument in *Mach*:

> Channel 15 suggests that courts are to view summary judgments differently and more favorably in a defamation case because of First Amendment concerns. However, the authorities Channel 15 cites for this proposition are cases addressing public figure defamation actions. [...] Channel 15 has not provided any authority for applying a different standard in our review of the issues presented by the appeal of the two summary judgments in this case than that which we ordinarily apply, and we have discovered none. Accordingly, save for the defamation pleading requirements we have already mentioned, *see* WIS. STAT. § 802.03(6), *we apply the same standards for summary judgment and for review of summary judgments that we apply in other types of actions.*

*Mach v. Allison*, 2003 WI App 11, 259 Wis. 2d 686, 701, 656 N.W.2d 766, 773 (emph. added).[1]

---

[1] Wis. Stat. § 802.03(6) provides: "In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their publication and their application to the plaintiff may be stated generally."

4

**C.** **Gannett Misconstrues The Court's Motion To Dismiss Ruling.**

According to Gannett, the "only remaining issue is Plaintiffs' claim that, ***based solely on a hyperlink to a separate story***, the Gannett article at issue […] falsely implied that Plaintiffs were involved in elder abuse." (Dkt. 56 at 1; *see also id.* at 27) Gannett misstates the law: even in defamation by implication claim, the defamatory publication must be considered as a whole. *Mach*, 2003 WI App 11, ¶ 30 (stating that in a defamation by implication "we consider the broadcast as a whole, not in detached fragments") (internal quotations omitted). Gannett is also out of step with the Court's ruling on Gannett's Motion to Dismiss:

> The Article's reporting on the *Geisler Trust* and SEC proceedings depicted Batterman as an unscrupulous financial adviser who mishandles his clients' money, and the quotations from Geisler's nephews alluded to elder abuse when they indicated that Batterman, their uncle's former financial adviser, "took advantage" of the elder Joe Geisler.
>
> Perhaps if Gannett had stopped there and allowed its readers to draw their own conclusions from these statements, dismissal would be appropriate. But Gannett did something more: it told its readers in capitalized, bold letters that another article about "elder abuse" was "related" to the story about Batterman. By doing so, Gannett did not merely present a set of facts that permitted readers to infer that Batterman exploited elderly clients; instead, it drew the inference for them. Gannett's decision to deem an article about elder abuse "related" to the Batterman article "supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference," *White*, 909 F.2d at 520.

(Dkt. 32 at 37-38) As the Court noted, Plaintiffs contend that the hyperlink is part of the Article's consistent elder abuse theme, including:

- The headline accusing Batterman of "violating a dead man's trust;"

- A picture of Joe Geisler taken during his later years that appeared below the headline;

- Statements indicating that Geisler was a hardworking man who entrusted Batterman to administer his trust;

- The reporting on Batterman's "mishandling" of the Geisler Trust; and finally,

- Quotations from Geisler's nephews stating that "Joe Geisler didn't have anyone to make sure he was making good financial decisions" and that Batterman was "taking advantage" of Geisler's good intentions.

(Dkt. 32 (citing Dkt. 18, at 21-22)) Thus, the Court should evaluate the Article as a whole—not just the hyperlink—in considering Gannett's Motion for Summary Judgment.

**D.    The Court Has Effectively Already Decided This Motion.**

As set forth in Section IV below, Gannett acted negligently, recklessly and with knowledge of the false implication of its article. Aside from the question of Gannett's fault, the Court has, for all intents and purpose, already decided this Motion. A motion to dismiss and a motion for summary judgment are different standards, to be sure. However, Gannett attached 396 pages of documents to its motion to dismiss. (Dkts. 6-1 through 6-11) In resolving the motion to dismiss, the Court decided to look beyond Plaintiffs' allegations and rely on those exhibits. (Dkt. 32 at 2-5, 17-19) The Court then evaluated truth, defamatory capability, and privilege based not on what "Batterman has *alleged*" but based on the Gannett's documents:

> Accordingly, this court will not deny Gannett's motion simply because Batterman has *alleged* that certain statements in the Article are false and defamatory. Rather, it is proper to examine Batterman's allegations against the Article and the records from the *Geisler Trust* litigation and the SEC – which are central to the complaint—to determine whether Batterman states a plausible claim for defamation.

(Dkt. 32 at 19 (emphasis by the Court))

In response to this Motion, Plaintiffs' are presenting admissible, material facts as to each element of their claim. Gannett seeks to rebut those facts by invoking, largely, the same evidence it invoked at the Motion to dismiss stage. (*Compare* Dkt. 6 and Dkts. 6-1 through 6-11 with Dkt. 57 and Dkts. 57-1 through 57-9) Those documents have not changed; nor should the Court's judgment about those documents.

6

II.     **Plaintiffs Did Not Engage In Elder Abuse.**

In Section II, Gannett argues that the defamatory statement is true—that Plaintiffs engage in elder abuse and financial exploitation. (Dkt. 54 11-16) Despite dedicating many column inches to this argument, Gannett does not seriously attempt to establish through admissible evidence that Plaintiffs engage in elder abuse. For example, Gannett does not present sworn testimony from the Geisler nephews quoted in the Article. Gannett did not depose or obtain declarations from any of the parties to the *Geisler Litigation*. Gannett presents no evidence of Plaintiffs being investigated for, accused of, or found guilty of elder abuse by any law enforcement or social services agency. And despite taking Batterman's deposition for nearly seven hours, Gannett apparently found no testimony supporting its claims of elder abuse, as it did not file or rely on the transcript.

Gannett relies on three types of evidence: (1) two webpages purportedly published by the Wisconsin Department of Health Services and the American Bar Association (collectively, the "Expert Reports"); (2) court records from the *Geisler* Litigation; and (3) quotes in the article from the Joe Geisler's nephews. None support Gannett's claim that Plaintiffs commit elder abuse. Even if they did, Plaintiffs submit relevant, admissible evidence that they ***do not*** commit elder abuse, such that there is a material factual dispute as to the issue.

A.      **The Court Should Strike The Expert Reports Referred To In Gannett's Brief.**

Gannett relies extensively on the two Expert Reports. (Dkt. 56 at 12-13) However, those reports are inadmissible, and the Court should strike them for the following reasons:

*First,* the Court's Standing Order provides that every fact must be set forth in the Proposed Findings of Fact, and that the "court will not consider facts contained only in a brief." (Standing Order at Page 6, Section I(C)(1)) The Expert Reports are contained only in the brief, and are not mentioned or cited anywhere in Gannett's Proposed Findings of Fact.

**Second,** the Court's standing order sets forth the types of evidence on which a party may rely. (Standing Order at Page 6, § I(C)(1)) The Expert Reports do not meet any of those requirements. Gannett may contend that they are documentary evidence, but such evidence can only be relied upon if it "is shown to be true and correct, either by an affidavit or by stipulation of the parties." (*Id.*, § I(C)(1)(f))

**Third,** to "be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56[ ] and the affiant must be a person through whom the exhibits could be admitted into evidence." *Zirk v. Nationstar Mortg.*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017) (quoting *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006)). "Courts do not treat printouts from internet websites as self-authenticating or admit them without foundation or authentication." *Adobe Sys. Inc. v. Christenson*, No. 2:10-CV-00422-LRH, 2011 WL 540278, at *9 (D. Nev. Feb. 7, 2011); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782 (C.D. Cal. 2004) ("Printouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under Fed.R.Evid. 902. To be authenticated, some statement or affidavit from someone with knowledge is required[.]").

**Fourth,** the Expert Reports assert improper expert opinions. Gannett's deadline to disclose an expert witness was September 1, 2020, and Gannett did not do so. (Dkt. 16 at 2) "A party must disclose the opinions to which an expert will testify at trial, Fed.R.Civ.P. 26(a), and expert reports that fail to comply with disclosure requirements should be excluded unless the violation is justified or harmless. Fed.R.Civ.P. 37(c)(1)." *Sandisk Corp. v. Kingston Tech. Co.*, No. 10-CV-243-BBC, 2011 WL 7121190, at *2 (W.D. Wis. Oct. 27, 2011).

**B.      The Geisler Litigation Records Do Not Establish That Plaintiffs Engaged In
           Elder Abuse.**

Gannett argues that the *Geisler Litigation* records prove that there is no material factual
dispute that Plaintiffs engaged in elder abuse and financial exploitation. (Dkt. 56 at 13-15) But the
opposite is true. Nothing in those records reflect that Plaintiffs were accused, or found guilty, of
engaging in elder abuse or financial exploitation. Gannett attached over 150 pages of records from
the *Geisler Litigation* to its Motion, including what Attorney Spahn says to be the American
Cancer Society Petition, the CCAP Docket, filings by the successor trustee and Department of
Justice, and hearing transcripts. (Dkts. 57-2 through 57-9) The words "elder" and "exploit*" do
not appear ***anywhere*** in those records. (Pl. PFOF. ¶ 78; *see also* Dkt. 57-2 through 57-9)

And it should come as no surprise that the *Geisler Litigation* documents do not discuss
elder abuse; it was not a case about an elderly person at all. In Mentzer's view, the Article could
not be "related to elder abuse" because "it's a story about financial management following a
person's death" and "elder abuse is abuse of a person who is living." (Pl. PFOF. ¶ 79; *see also*
Dkt. 54 (Mentzer Dep.) at 48:18-49:4)

**C.      The Geisler Nephew Interview Does Not Establish That Plaintiff Engage In
           Elder Abuse.**

Gannett cites statements of Joe Geisler's nephews and how they "viewed the issues present
in the *Geisler Trust* litigation" as evidence that Plaintiffs engage in elder abuse. (Dkt. 56 at 16)
But those statements are inadmissible hearsay within hearsay. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st
Cir. 1993), *certified question answered,* 418 Mass. 615, 638 N.E.2d 33 (1994) (Stating that a
newspaper article "should have been stricken" and that "the newspaper account is hearsay within
hearsay."); *Louisiana ex rel. Dep't of Transp. & Dev. v. Kition Shipping Co.*, 653 F. Supp. 2d 633,
648–49 (M.D. La. 2009) ("Statements in newspapers often constitute double hearsay[.]") (citation

omitted). The statements of the Geisler nephews are clearly out of court statements offered for the truth of the matter—Gannett asserts them in support of its argument that "The Alleged Implication Is Substantially True." (Dkt. 56 at 11, § II) Thus, they are inadmissible under F.R.E. 802.

Further, to the extent that Gannett is asserting the Geisler nephews' statements for the truth of what occurred with **Joe** Geisler's finances or the *Geisler Litigation*, there is no indication that they had any personal knowledge of what occurred. On the contrary, the article reports that they were "surprised and disappointed to hear about this legal battle." (Pl. PFOF ¶ 72; Dkt. 57-1 at 7) Thus, the Court should strike all references to statements made by the Geisler nephews.

Even if the Court considers the statements, and the Court should not do so, it merely presents an issue of fact. Immediately after stating that Joe Geisler wanted his money "to go to good causes, and instead some else was taking advantage of that", the Article says: "Batterman handled funds for their father, John Geisler, for years, but when the brothers were concerned about the returns their father was getting, they got a second opinion. When that financial adviser was concerned about Batterman's investment strategy, the brothers tired Batterman, They said the returns have increased drastically since then." (Pl. PFOF ¶ 71; Dkt. 59 (Batterman Dec) ¶ 12; Dkt. 57-1 at 7) Gannett argues that these statements prove that Plaintiffs engage in elder abuse, but Plaintiffs dispute them.

Financial Fiduciaries managed John Geisler's assets from 2008 to early 2015. When John Geisler came to Financial Fiduciaries, it was the peak of the financial crisis, and he was 87 years old. (Pl. PFOF ¶ 73; Dkt. 59 (Batterman Dec) ¶ 14) Financial Fiduciaries provided quarterly statements to John Geisler and his wife, Zola, and their son, Jerry Geisler, attended many of their meetings with Batterman. (Pl. PFOF ¶ 74; Dkt. 59 (Batterman Dec) ¶ 14) John Geisler asked—as is overwhelmingly considered the best approach for a person of his age—for a conservative, but

low-risk, approach. (Pl. PFOF ¶ 75; Dkt. 59 (Batterman Dec) ¶ 15) For the six years during which John Geisler was a Financial Fiduciaries client, he outperformed the market for similar investment approaches by approximately 10%. (Pl. PFOF ¶ 76; Dkt. 59 (Batterman Dec) ¶ 15)

If the Geisler nephews' testimony is considered in this dispute, it will have to be at trial.

### D. Plaintiffs Do Not Engage In Elder Abuse.

Plaintiffs do not engage in elder abuse or financial exploitation. (Pl. PFOF. 85; Dkt. 59 (Batterman Dec) ¶ 3) On the contrary, Batterman and Financial Fiduciaries have spent a significant amount of time and resources contributing to or volunteering with organizations focused on enhancing financial literacy, such as the National Association of Personal Financial Advisors Consumer Education Foundation and a financial education hotline operated by the personal finance magazine Kiplinger. (Pl. PFOF. 86; Dkt. 59 (Batterman Dec) ¶ 3)

Gannett suggests that the definition of "elder abuse" should be guided by Wisconsin Statute 940.285. (Dkt. 56 at 19) The statute defines "abuse" to include: "Physical abuse"; "Emotional abuse"; "Sexual abuse" "Treatment without consent"; "Unreasonable confinement or restraint"; and "Deprivation of a basic need for food, shelter, clothing, or personal or health care". Wis. Stat. § 940.28(1)(ag)1-6.[2] Batterman has not done—or been accused of doing—any of those acts:

- Batterman has never physically abused an elderly person, nor been accused of doing so. (Pl. PFOF 87; Dkt. 59 (Batterman Dec) ¶ 4)

---

[2] Gannett argues that the fact that elder abuse is a crime negates any implication that Batterman committed such a crime. But of course a person can commit a crime without being charged of a crime (or without yet being charged of the crime). Wisconsin statutes therefore define "crime" not as a conviction but as "conduct which is prohibited by state law and punishable by fine or imprisonment or both." Wis. Stat. § 939.12; *Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 23, 351 Wis. 2d 479, 504, 840 N.W.2d 255, 266 (Stating in implied defamation claim that "[w]hile some connotations of [a] word may encompass criminal behavior, others do not.") (internal quotation omitted; alterations by the court). Further, the Article says that Batterman has not been charged with "criminal wrongdoing in the Geisler case." (Def. PFOF. ¶ 79) That leaves open the implication that they have been charged of, or have engaged in criminal conduct, in other contexts

- Batterman has never emotionally abused an elderly person, nor been accused of doing so. (Pl. PFOF 88; Dkt. 59 (Batterman Dec) ¶ 5)

- Batterman has never sexually abused an elderly person, nor been accused of doing so. (Pl. PFOF 89; Dkt. 59 (Batterman Dec) ¶ 6)

- Batterman has never provided medication or medical treatment to an elderly person without consent, nor been accused of doing so. (Pl. PFOF 90; Dkt. 59 (Batterman Dec) ¶ 7)

- Batterman has never unreasonably confined or constrained an elderly person, nor been accused of doing so. (Pl. PFOF 91; Dkt. 59 (Batterman Dec) ¶ 8)

- Batterman has never deprived an elderly person of basic need for food, shelter, clothing, or personal or health care, nor been accused of doing so. (Pl. PFOF 92; Dkt. 59 (Batterman Dec) ¶ 9)

Thus, there is—at the very least—a material factual dispute as to whether Plaintiffs'

commit elder abuse.

## III.    The Judicial Proceedings Privilege Does Not Apply To The Article Generally Or To Gannett's Implication That Plaintiffs engaged In Elder Abuse.

The judicial proceeding does not apply to "mere pleadings and other preliminary papers

which simply have been filed in the clerk's office." *Ilsley v. Sentinel Co.*, 133 Wis. 20, 113 N.W.

425, 426-427 (1907).  Rather, the privilege applies to reports concerning the actions of the Court.

This is because the privilege is not intended to shed light on the actions and statements of private

individuals, but to facilitate scrutiny of the judicial officers themselves:

> There is, however, no right in the public to know that A charges B with unworthy
> or criminal conduct, even in court, as a fact by itself; that is mere gossip or
> scandal. The public at most needs to knew what its court does, and, since this cannot
> be intelligibly reported without stating the charges and issues upon which the
> court's action is based, the latter may be reported also, although as an incidental
> result the fact of defamatory charges against some individual becomes public to his
> injury.

*Ilsley*, 113 N.W. at 426. Because the privilege pertains to the conduct of judicial officers, rather than allegations about private individuals, *Ilsley* expressed concern over application of the privilege to preliminary documents filed with the court.

> In absence of dominating public interest, surely the individual ought not to be subjected to such assaults upon his character and reputation as may result from general publication of charges which may thus be made. ***The author of a pleading is broadly privileged in asserting his claims against his opponent, and may, and often does, make the most damaging charges with little or no foundation.*** He may make them with no expectation of proving them, may, with no purpose of ever proceeding further with his action[.]

*Ilsley*, 113 N.W. at 427 (emphasis added).  Here, the Article is plainly about Plaintiffs, and not about a judicial officer. The Article refers to Judge Moran (by time or title) six times, while referring to "Batterman" ***fifty-five*** times. (Pl. PFOF ¶ 10; Dkt. 57-1) And when the Court did act on ACS's scandalous allegations, they were quickly discredited. In Judge Moran's own words:

> This court acknowledges that there were concerns voiced concerning potential criminal activity at the onset of the litigation but that was not the focus of this case and that was not the issues that were litigated at the court trial.

(Pl. PFOF ¶ 9; Dkt. 6-9, Dkt. 6 (Spahn Aff.) ¶ 10; Dkt. 6-9 at 11:4-8; Dkt. 5 at 7)

Plaintiffs maintain that the judicial proceedings privilege does not apply to the Article because the Article was about Plaintiffs, and not Judge Moran. Plaintiffs acknowledge, however, that the Court found "under *Ilsley*, the privilege would apply to Gannett's reporting on the ACS's petition because it was 'actually brought to the attention' of the court." (Dkt. 32 at 31) However, the privilege does not apply to the elder abuse theme. As the Court found, "to the extent Gannett implied that Batterman committed elder abuse, that statement is not privileged under Wis. Stat. § 895.05(1), insofar as it is not a 'true and fair' report of a judicial or other governmental proceeding." (Dkt. 32 at 38) As the Court noted, Plaintiffs allege that the entire article had an elder abuse theme, including:

- The headline accusing Batterman of "violating a dead man's trust;"

- A picture of Joe Geisler taken during his later years that appeared below the headline;

- Statements indicating that Geisler was a hardworking man who entrusted Batterman to administer his trust;

- The reporting on Batterman's "mishandling" of the Geisler Trust; and finally,

- Quotations from Geisler's nephews stating that "Joe Geisler didn't have anyone to make sure he was making good financial decisions" and that Batterman was "taking advantage" of Geisler's good intentions.

(Dkt. 32 (citing Dkt. 18, at 21-22))

Those themes simply have nothing to do with the *Geisler Litigation.* The photographs of elderly Joe Geisler were not obtained from the *Geisler Litigation*, but were instead provided "Courtesy of Gary Geisler." (Pl. PFOF ¶ 66; Dkt. 57-1 at 2, 7) The statements from Joe Geisler's nephews suggesting that "Joe Geisler didn't have anyone to make sure he was making good financial decisions" and that Batterman was "taking advantage" of Geisler's good intentions also were not based on court records. (Pl. PFOF ¶ 67; Dkt. 57-1 at 7) Similarly, the statements about Joe Geisler's work ethic were not based on Court records, but were instead based on an interview with Gary Geisler. (Pl. PFOF ¶ 68; Dkt. 57-1 at 1) Moreover, the headline accusing Batterman of "violating a dead man's trust" and "mishandling $3 million" cannot be privileged as the privilege does not apply to headlines. Wis. Stat. § 895.05(1).

The article also includes an extensive discussion of Joe Geisler's brother, John Geisler. (Pl. PFOF ¶ 70; *see also* Dkt. 57-1 at 7) The article reports that John Geisler's sons "were concerned about the returns their father was getting, [from Batterman and] they got a second opinion." (Pl. PFOF ¶ 71; *see also* Dkt. 57-1 at 7) The article further reports, that the nephews "fired Batterman" after an unidentified financial adviser "was concerned about Batterman's investment strategy" and

that their returns have increased drastically since then. (Pl. PFOF ¶ 71; *see also* Dkt. 57-1 at 7) That reporting is not about the *Geisler Litigation*. It is not even about Joe Geisler.

"The reporter is not privileged … to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to anyone, nor to indict expressly or by innuendo the veracity or integrity of any of the parties." Robert D. Sack, *Sack on Defamation* (hereinafter "*Sack*") 7:3.5 [B][6] (5th ed. 2019) (collecting cases; internal quotations omitted; ellipses added by the author). Gannett did just that by injecting a consistent theme of elder abuse where none was necessary, fair, or accurate.

## IV.    Gannett Acted Negligently And Maliciously And There Is "Additional, Affirmative Evidence" Suggesting Gannett Endorsed The Defamatory Inference.

### A.    Plaintiffs Need Not Establish "Actual Malice" To Prevail On Their Claims; The Standard Of Care Is Negligence.

As Gannett itself argued in opposition to Plaintiffs' motion for summary judgment, the standard of care applicable here is negligence: "When an action for defamation is brought against a news media defendant, as here, Plaintiffs have the burden of proving that the defendant acted negligently in publishing the allegedly defamatory statements." (Dkt. 34 at 3-4) This Court found as that standard applies as well: "In Wisconsin, private figures who bring defamation actions against the news media need only show negligence, *Denny v. Mertz*, 106 Wis. 2d 636, 657, 318 N.W.2d 141, 151 (1982)[.]" (Dkt. 32 at 37)

Now, Gannett argues that that Plaintiffs must establish "actual malice," meaning that Gannett must have been motivated by "ill will, spite, envy, revenge, or other bad or corrupt motives." (Dkt. 56 at 25 (quoting *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006)) Gannett argues that Plaintiffs must meet this actual malice standard based on a 1913 Wisconsin Supreme Court case that said that defamation by implication must be "false

15

and maliciously published." (Dkt. 56 at 20 (quoting *Shaw v. Crandon Printing Co.*, 154 Wis. 601, 143 N.W. 698, 700 (1913))

However, *Shaw* speaks to malice, and not "actual malice." In the defamation context, "malice" has several different meanings. If the plaintiff is a public figure, he or she must establish the statement was made with "actual malice"—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280; *accord Denny*, 106 Wis. 2d at 643.[3] But, at least for purposes of this Motion, Gannett expressly concedes that Plaintiffs are not public figures. (Dkt. 56 at 26, n. 6) On the other extreme, Wisconsin law implies malice by the mere fact of the publication in some instances. *Denny*, 106 Wis. 2d at 657 ("While malice is an element of actionable libel in Wisconsin, our court has implied the existence of such malice from the libelous publication itself in holding persons involved in the publication of the libel liable."). Neither of those standards apply here.

As Gannett argued (and the Court found) the standard of care is negligence when, as here, a private plaintiff brings claims against a media defendant. (Dkt. 34 at 3-4; Dkt. 32 at 37) *Shaw* does not speak to "actual malice"—the concept of "actual malice" did not arise in earnest until the Supreme Court articulated the principle in *New York Times* some fifty years later. *New York Times*, 376 U.S. at 280. *Shaw* does not purport to create a separate regime for defamation by implication claims, and Wisconsin courts have not treated it as such. For example, *Mach* was a defamation by implication claim brough by a private individual, where news broadcast allegedly "negligently and falsely portrayed and implied" that the plaintiff, a dog trainer, had killed a dog. *Mach*, 2003 WI

---

[3] Though not the applicable standard, Gannett also inaccurately defines "actual malice" as including only purposeful conduct with "bad or corrupt motives." (Dkt. 56 at 25 (quoting *Uebelacker*, 464 F. Supp. 2d at 801)) However "actual malice" includes a statement made recklessly. *New York Times*, 376 U.S. at 280.

App 11, ¶ 3. The Wisconsin Court of Appeals, appeared to apply a negligence or implied malice

standard, saying: "We do not understand Channel 15 to assert that Allison is a public figure; if he

were, the First Amendment would require that he prove actual malice by Channel 15 and the other

defendants in addition to the other elements of the common law claim." *Mach*, 2003 WI App 11,

¶ 13. Similarly, *Sack* teaches that courts should not impose liability for defamation by implication

claims "for public persons that do not pass the 'actual malice test'" or for "statements about private

plaintiffs who do not meet the applicable state-imposed standard of fault." *Sack*, § 2:4.5 Thus, the

degree of fault does not change merely because the claim asserts defamation by implication.

At the motion to dismiss stage, the Court cited to caselaw from the Seventh Circuit

(applying Indiana law) and Court of Appeals for the District of Columbia requiring that

"something more" be required where the claim asserts implied defamation. (Dkt. 32 at 36 (*quoting*

*Woods v. Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986) and *White v. Fraternal Order of*

*Police*, 909 F.2d 512 (D.C. Cir. 1990)) The Court did not find that Wisconsin law similarly requires

a showing of "something more." Instead, the Court said:

> As an initial matter, I note that in the cases cited above, the plaintiffs had to show
> actual malice, either because they were public figures (*White, Chapin*), or because
> state law required it (*Woods*). Although the parties in this case have not addressed
> this issue, it appears that Batterman is a private individual. In Wisconsin, private
> figures who bring defamation actions against the news media need only show
> negligence, *Denny v. Mertz*, 106 Wis. 2d 636, 657, 318 N.W.2d 141, 151 (1982),
> which suggests that Batterman need make a less rigorous showing than in the cases
> above.
>
> In any case, I am satisfied that Batterman's complaint plausibly states a claim for
> defamation by implication even under the more demanding standard required in
> actual malice cases.

(Dkt. 32 at 37) Thus, while Indiana and the District of Columbia may require actual malice or

"something more" in all defamation by implication claims, Wisconsin law does not so require. The

negligence standard set forth in *Denny* controls this action. *Denny*, 106 Wis. 2d at 657.

**B.      Gannett Was Negligent *And* Acted With Actual Malice.**

Even assuming *arguendo* that Plaintiffs had to establish actual malice—and they need only

establish negligence—Plaintiffs could readily do so for the following reasons:

> **i.      Gannett Endorsed The Defamatory Innuendo By Including A "RELATED" Hyperlink To A Story About Elder Abuse.**

As the Court found on the Motion to Dismiss, the inclusion of Gannett's statement that the

elder abuse article was "RELATED" is alone sufficient to establish that Gannett endorsed the

defamatory implication. (Dkt. 32 at 35 ("Here, the plaintiff points to an actual statement by the

publisher —its endorsement of a different article as 'Related'—as giving rise to the defamatory

implication."); *id.* at 37 ("But Gannett did something more: it told its readers in capitalized, bold

letters that another article about 'elder abuse' was 'related' to the story about Batterman."))

Indeed, by ***requiring*** reporters to link to "RELATED" stories, Gannett was inviting

defamation of plaintiffs such as Batterman. Gannett argues that "inclusion of the hyperlink was

consistent with the USA Today Network-Wisconsin's longstanding practice to use the terminology

'RELATED: [link]' to signify a link to a story that a reader might also be interested in – not

necessarily a story on the same exact topic as the one they are reading." (Dkt. at 56 at 22 (quoting

Def. PFOF ¶ 82)

However, Gannett's internal definition of "RELATED" matters not; the Court looks to the

plaint and ordinary meaning of the word" in a defamation claim. *Nixon v. Haag*, 497 F. App'x 659,

661 (7th Cir. 2012) (looking to Oxford English Dictionary definition to determine the ordinary

meaning). In the Oxford Dictionary, "Related" means "Belonging to the same family, group or

type; connected; associated with the specified item or process, especially causally." Lexico

powered by Oxford, https://www.lexico.com/en/definition/related (last accessed November 11,

2022); *see also Newell Brands, Inc. v. Kirsch Lofts, LLC*, 207 F. Supp. 3d 760, 767 (W.D. Mich.

2016), *aff'd sub nom. Newell Brands, Inc. v. Bosgraaf*, 690 F. App'x 393 (6th Cir. 2017) ("The ordinary meaning of the word 'related' is "connected by reason of an established or discoverable relation."). By stating that an article about elder abuse and financial exploitation are "RELATED," Gannett is associating, connecting and attributing to Plaintiffs elder abuse and financial exploitation.

Nor is the inclusion of the "RELATED" hyperlinks a "longstanding practice" as Gannett contends. At the earliest, Gannett began requiring links to "RELATED" stories in 2010. (Pl. PFOF ¶ 62; Dkt. 54 (Mentzer Dep.) 44:8-12) Gannett adopted this requirement "to try to drive traffic to other stories on our site or other Gannett sites." (Pl. PFOF ¶ 63; Dkt. 54 (Mentzer Dep.) 41:19-21) As a supervisor at Gannett, Mentzer was "often reminding reports that it was their role" to add the related hyperlinks "[b]ecause of the company initiative to—which was to require related links in all stories in order to try to improve time on the site." (Pl. PFOF ¶ 64; Dkt. 54 (Mentzer Dep.) 42:13-24) At Mentzer's current journalism job, he is not required to include hyperlinks to related stories, as he was required to do at Gannett. (Pl. PFOF ¶ 65; Dkt. 54 (Mentzer Dep.) 73:19-21)

      ii.      **Gannett Admits—And Emphatically Argues—The Article On Its Fact Evidences Elder Abuse.**

Here, Gannett maintains that it did not intend or endorse the notion that Plaintiffs' engaged in elder abuse. However, in the same brief, Gannett dedicated several pages to arguing that Batterman ***did commit*** elder abuse. (Dkt. 56 at 11-16) But Gannett goes further, citing quotes from the Article itself as evidence that Batterman did in fact engage in elder abuse. (Dkt. 56 at 15-16 (citing Def. PFOF ¶¶ 78, 55-56)) For example, Gannett argues that quotes in the article from "Joseph Geisler's own nephew, Gary *prove* that that Plaintiffs abuse elders. (Dkt. 56 at 16 (citing Def. PFOF ¶¶ 55-56)) Thus, it is evident on the face of the Article—as Gannett itself argues—that Gannett endorsed the implication that Plaintiffs abuse elders.

19

### iii.    Gannett Was On Notice, But Published—And Then Republished—The False Innuendo.

Even before Gannett published the original version of the Article, it had an understanding that Plaintiffs contended that the article they intended to write was not accurate. On July 27, 2018, Batterman wrote to Sam Wisneski to say: "If this is to be a fair and balanced article, I would think you would want perspectives from the other side, of which I believe I can offer some. So you probably should get some input from me on what I am able to talk about at this time before the article comes out." (Pl. PFOF. ¶ 42; Dkt. 57-10 at 6) Wisneski said that Batterman's message was "atypical" and therefore something he felt he "should talk to [his] editors about." (Pl. PFOF. ¶ 43; *see also* Dkt. 54 (Wisneski Dep.) at 233:9-18) He thought it was "atypical in the way that it was accusatory and questioning of the story." (*Id.*) Treinen, in turn, testified that as of July 27, 2018, he understood that Batterman had "some serious concerns about the nature of the article that [Treinen was] getting ready to finalize and publish[.]" (Pl. PFOF ¶ 44; Dkt. 52 (Treinen Dep.) at 68:5-9) However, Gannett proceeded with publishing the defamatory article on August 21, 2018.

Shortly thereafter, Plaintiffs sent Gannett a demand letter articulating the ways in which the Original Publication was false and defamatory. (Pl. PFOF ¶ 80; Dkt. 57-16) That demand letter warns that the Article "contains links to so-called 'Related' stories about elder abuse and embezzlement." (Pl. PFOF ¶ 81; Dkt. 57-16 at 7) The demand specifically identifies the "RELATED" hyperlink to the "Five ways to fight elder abuse" story, and states: "This link in the middle of the on-line article unfairly and irresponsibly suggests that Mr. Batterman and Financial Fiduciaries were somehow involved in 'elder abuse.'" (Pl. PFOF ¶ 82; Dkt. 57-16 at 11, ¶ 9) The demand letter further notes that the Original Publication's "innuendo is impossible to miss" and that it implies that Batterman "takes advantage of elders and cannot be trusted with other people's money." (Pl. PFOF ¶ 83; Dkt. 57-16 at 7)

Instead of retracting the defamatory innuendo, Gannett ***republished it*** on September 19, 2018 without removing the hyperlink or the other components contributing to the elder abuse theme. (Pl. PFOF ¶ 84; Dkt. 56-1) Because Gannett did so, this case must proceed to the jury.

"Republication of a statement after its falsity has been demonstrated to the publisher may, of course, constitute publication 'with knowledge of falsity.'" *Sack*, § 5:5.2[F]; *see also id.* at § 11:1 ("Continued publication of a falsehood after a retraction demand" constitutes "evidence of 'actual malice.'") (footnotes omitted).   Similarly, under Wisconsin law in "actions of slander, a repetition of the defamatory words [...] is admissible to show malice."). *Magmer v. Renk*, 65 Wis. 364, 27 N.W. 26, 27 (1886). Indeed, where the defamatory statement is repeated more than once, that fact alone necessitates presenting the malice question to a jury: "There being evidence of numerous repetitions of the defamatory charge, the question of express malice and of punitory damages was open to the jury." *Hacker*, 87 N.W. at 251.

And the Revised Publication undoubtedly constitutes a republication of the defamatory statement. As applicable to online publications:

> Modifications of a website, such as minor changes or addition of material irrelevant to the allegedly defamatory material, or changes in the matter in which the material may be accessed, do not ordinarily constitute a new publication. But if "the changes to the defamatory content of the original article were material and substantive, [they render] the modified article a republication" that restarts the running of the statute of limitations.

*Sack*, § 7:2:2; *id.* § 2:5.1 ("Every distinct publication of a liber or slander gives rise to a separate cause of action. Republication of a hardcover book in paperback form, for example, ordinarily is deemed to be a separate, potentially actionable publication."); *id.* § 2:7.1. ("When a statement is published a second or subsequent time [...] the statement has been republished."). Gannett says the revision came after "Treinen worked with Gannett's editing and legal staff to thoroughly

consider the concerns raised by Plaintiffs." (Dkt. 58, ¶ 72) Thus, it is beyond refute that Gannett repeatedly published the defamatory publication, evidencing actual malice.

Further, even after the Court denied Gannett's Motion to Dismiss as to the elder abuse theme, Gannett did not retract those portions of the publication. This provides futher evidence of negligence and malice: "Under certain circumstances, *failure* to retract may help establish 'actual malice.' § 11:1 (footnotes omitted; emphasis in the original).

### iv.    Gannett Failed To Supervise Its Intern-Author.

Treinen assigned the Batterman story to Wisneski within a month of him starting at Gannett. (PFOF ¶ 11; Wisneski Dep.) at 84:24-85:1) Wisneski was not qualified to write this story without significant oversight.

When Treinen asked Wisneski to investigate the Batterman case, he told Wisneski that he "received an anonymous tip today to look into Marathon County court case 15-PR-00032." (Pl. PFOF ¶ 12; Dkt. 53 (Wisneski Dep.) at 93:3-12; *see also* Dkt. 57-10 at 10) Wisneski does not know what the number "15" in the in the *Geisler Litigation* case number means. (*Id.*) Asked what a trustee is, Wisneski said "I can't speak exactly to what a trustee is. I don't feel qualified for that. To the best of my knowledge—you know, I'm going to stop there. I don't—I don't feel qualified to answer that." (Pl. PFOF ¶ 13; Dkt. 53 (Wisneski Dep.) at 75:8-14) Asked what a trust protector and a living trust are, Wisneski said as to both "I'm not sure." (Pl. PFOF ¶ 14; Dkt. 53 (Wisneski Dep.) at 77:17-21) Asked what a successor trustee is, he said "I can only speculate. I'm not sure exactly what that is." (Pl. PFOF ¶ 15; Dkt. 53 (Wisneski Dep.) at 78:2-7) Wisneski also has no recollection of discussing these trust-related terms with his supervisors at Gannett. (Pl. PFOF ¶ 16; Dkt. 53 (Wisneski Dep.) at 78:22-79:8)

At the time the story was published, Marathon County court records could not be accessed remotely, and Wisneski had to travel to the Clerk's office to view the records. (Pl. PFOF ¶ 17; Dkt. 53 (Wisneski Dep.) at 148:4-21) When Wisneski went to the Marathon County Clerk's Office to investigate this case, it was his first time ever going to the courthouse. (Pl. PFOF ¶ 18; Dkt. 53 (Wisneski Dep.) at 148:22-25)

Wisneski never printed or downloaded any records from the *Geisler Litigation.* (Pl. PFOF ¶ 19; Dkt. 53 (Wisneski Dep.) at 150:9-152:19) He did not do so because he had to pay to retrieve those records. (Pl. PFOF ¶ 20; Dkt. 53 (Wisneski Dep.) at 155:15-19) Instead, he took photographs of the computer screen at the clerk's office using his cell phone. (Pl. PFOF ¶ 21; Dkt. 53 (Wisneski Dep.) at 150:9-152:19) To the best of his recollection, those photographs "were on [his] cell phone and nowhere else." (Pl. PFOF ¶ 23; Dkt. 53 (Wisneski Dep.) at 150:9-152:19) Wisneski says he "might have showed [the court records] to Mark Treinen or Robert Mentzer." However, if he did so, it would have been by "thumbing through pictures on [his] cell phone." (Pl. PFOF ¶ 24; *see also* Dkt. 54 (Wisneski Dep.) at 152:1-14)[4]

### v.    Gannett Refused To Interview Batterman, In Violation Of Its Own Policies.

Gannett refused to interview Batterman, and then falsely reported that Batterman had not consented to an interview. Gannett cites *Crescenz* and *Kendrick* for the proposition that refusing to interview the subject of a story is not evidence of negligence. (Dkt. 56 at 25 (citing *Crescenz v. Penguin Grp. (USA), Inc.*, 561 F. App'x 173, 178 (3d Cir. 2014) and *Kendrick v. Fox Television*, 659 A.2d 814, 823 (D.C. 1995)) However, those cases are readily distinguishable.

---

[4] Wisneski also indicated that it was possible that he emailed photographs of court records to his two editors, (Dkt. 52 (Wisneski Dep.) at 152:1-14), but Gannett has produced no such emails.

In *Kendirck*, the plaintiff alleged that Fox Television failed to comply journalistic principles and codes published by third-party organizations, but did "not provide[] source citations" for those principles and did not show that those "particular standards are customarily followed by journalists." *Kendrick*, 659 A.2d at 823. It was also "undisputed that the media defendants' reporters made good faith attempts to reach Kendrick before the initial broadcasts." *Id.* In *Crescenz*, the court found that there was nothing in "the record show[ing] that [the reporter] was ever informed during his research and writing that" the defamatory statement was false. *Crescenz*, 561 F. App'x at 178.

In the present case, Gannett's Principles of Ethical Conduct provide: "We will strive to include all sides relevant to a story. When news develops and we can't include important perspective immediately, we will share updates, including additional sources, when possible. We also will share attempts to reach sources who add value to the story." (Def. PFOF ¶ 50) These are principles published by a third-party that may or may not be applicable, like in *Crescenz.* According to Gannett, "[a]ll reporters and editors at Gannett, including at the *Wausau Daily Herald*, are guided by" these principles. (*Id.*) Moreover, this was a story where it was undisputedly important to secure Batterman's interview. After reading Wisneski's early draft of the article, Wisneski's editor, Robert Mentzer, thought that it would be important to conduct an interview with Batterman, and advised Wisneski as such. (Pl. Resp. Def. PFOF ¶ 64; Dkt. 54 (Mentzer Dep.) at 61:6-62:13; *id.* at 63:5-9)

Unlike the plaintiff in *Kendrick*, Plaintiffs steadfastly dispute that Gannett made "good faith attempts to reach" Batterman. *Kendrick*, 659 A.2d at 823. On the contrary, Batterman and Wisneski agreed on a date to conduct and interview, and then Treinen told Wisneski to make up a fake deadline and renege on his agreement with Batterman. (Pl. PFOF ¶ 38; Pl. Resp. Def. PFOF

¶¶ 50, 65, 68; *see also* Dkt 57-14; Dkt. 59 (Batterman Dec. November 19, 2020) ¶¶ 25-27) On Friday, July 27, 2018, Wisneski called Batterman, as instructed, and told him that they needed to speak immediately if Batterman wanted to be interviewed. (Pl. PFOF ¶ 40; Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 27) Batterman could not do so, as Financial Fiduciaries was scheduled to close on a merger with a larger financial management firm that week. (Pl. PFOF ¶¶ 39, 41; Dkt. 59 (Batterman Dec. November 19, 2020) ¶¶ 26-27) Nevertheless, Batterman offered to meet with Wisneski on August 6, 2018.  (Pl. Resp. Def. PFOF, ¶ 57; *see also* Dkt. 57-10 at 304) However, Wisneski did not interview Batterman.

Nor did Gannett abide by the illusory July 30, 2018 deadline. Gannett first published the story on August 21, 2018. Publication of the article simply was not time sensitive in any way. Judge Moran removed Vigil Trust as trustee on November 10, 2015. (Pl. PFOF ¶ 4; Dkt. 20 (Batterman Aff.) ¶ 38; *see also* Dkt. 20-2) The successor trustee issued his report on February 18, 2016. (Pl. PFOF ¶ 6; Dkt. 20 (Batterman Aff.) ¶ 39; *see also* Dkt. 20-3) But even if Gannett did—for some inexplicable reason—***have*** to publish the Article on August 21, 2018, then it Could have interviewed Batterman on August 6, 2018, as he proposed, and still had over two weeks to meet its deadline. Worse yet, when Gannett published the story, it falsely reported that Batterman refused to be interviewed: "In several emails and phone conversations over the course of three weeks, Batterman was offered the chance to respond to allegations in the case of Geisler's trust, but he has not yet consented to an interview on that issue." (Pl. Resp. Def. PFFF ¶ 57; Dkt. 40-1 at 11)

### vi.     Gannett Placed Profit Over All Else.

Gannett also was also singularly focused on generating a profitable story, even if it meant publishing an inaccurate story. For example:

*First,* Gannett placed relentless pressure on its staff to write stories that received many views, and therefore increased Gannett's profits. Gannett emailed reports with metrics on stories to everyone in the office. (Pl. PFOF ¶ 52; Dkt. 53 (Wisneski Dep.) at 49:3-7) Gannett also placed a TV screen over the Wausau Daily Herald newsroom that was "24/7 just showing […] the metrics about the Wausau Daily Herald stories on the website." (Pl. PFOF ¶ 53; Dkt. 53 (Wisneski Dep.) at 48:24-49:2) The screen was prominently placed over the pool of cubicles so that everyone in the office could see. (Pl. PFOF ¶ 54; Dkt. 53 (Wisneski Dep.) at 47:2-13) That screen mattered to Wisneski "[b]ecause the screen actively showed how well [his] stories were contributing to Gannett's goals." (Pl. PFOF ¶ 55; Dkt. 53 (Wisneski Dep.) at 49:20-21) Wisneski viewed that screen as important because it measured how "valuable" and how "profitable" of an employee he was. (Pl. PFOF ¶ 56; Dkt. 53 (Wisneski Dep.) at 49:22-50:6)

*Second,* Gannett employed Mentzer as a "Storytelling Coach" to help reporters like Wisneski write stories in ways that drove more profit. As a Storytelling Coach, it was Mentzer's job to "encourage reports to tell their stories in a way that would be engaging[.]" (Pl. PFOF ¶ 57; Dkt. 54 (Mentzer Dep.) at 12:25-13-3) After a story was published Mentzer would also debrief with the reporters and it "would be common to review metrics on a story, including pageviews and average engaged time, the amount of time that readers were responding on a story." (Pl. PFOF ¶ 58; Dkt. 54 (Mentzer Dep.) at 14:11-16)

*Third,* Mentzer coached Wisneski to craft the story in a way to generate as many clicks as possible. Menzer did not review any court records from the *Geisler Litigation*, any notes about court records, and he did not interview any witnesses for the Article. (Pl. PFOF ¶¶ 32-34; Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13) On July 10, 2018, however, Mentzer revised Wisneski's

draft of the story. Mentzer repeatedly criticized Wisneski's draft as "boring", "legalese", and

"bloodless":

> This lede is ***boring.*** The story is fascinating, but "ordered to pay part of the legal
> fees of four charities following years of litigation concerning mishandling of
> charitable trust" is ***super, super boring, nearly impenetrable.*** Why is that? It's
> because the lede is totally unmoored from any actual human being or human
> concern. It's ***bloodless and bureaucratic***, ***where the real story is about death and
> betrayal!***

(Pl. PFOF ¶ 26; Dkt. 57-13 at 6 (emphasis added))

> Above graf is fairly ***bloodless*** as well, 'conspired with fiance to distribute funds for
> her personal gain' is ***fairly legalese*** and does not give reader any real idea of what
> actually happened. Wrote her illegal checks? Made a giant bed of cash in a storage
> facility like in Breaking Bad?

(Pl. PFOF ¶ 27; Dkt. 57-13 at 7 (emphasis added))

> this is a ***really bloodless*** way of saying that he wanted to funnel money to his
> fiance's charity so that she would get bonuses, rather than just enacting ***the wishes
> of a poor, dead farmer.***

(Pl. PFOF ¶ 28; Dkt. 57-13 at 7 (emphasis added))

> ***bloodless, bloodless. They're accusing him of fraud, basically.*** Of taking the
> money he'd been entrusted by this farmer, who saved his whole life and wanted
> only to help others, and sitting on it like it was his own, moving it around as if he
> had the right to. "misrepresented the nature of the trust" is ***such a legalistic way to
> represent such a thing!***

(Pl. PFOF ¶ 29; Dkt. 57-13 at 7 (emphasis added)) Mentzer also suggested to Wisneski that he

could begin the story with the elder abuse theme as the lede:

> Start with Geisler. He's a farmer, but what type of farmer? What kind of guy was
> he? Focus on some detail about him as a person: "Joseph Geisler wore the same
> pair of overalls when he went to milk the cows each morning at 5 a.m., until the
> seams were literally coming apart. No one in his family knew he had $3 million in
> the bank."

(Pl. PFOF ¶ 30; Dkt. 57-13 at 6) He also encouraged further discussion of the Geisler nephews, saying "this seems too late to introduce these guys" and "good quote!" from them. (Pl. PFOF ¶ 31; Dkt. 57-13 at 6)

*Finally,* Mentzer's revision had the desired outcome. Mentzer considered anything over one thousand views of a story to be good. (Pl. PFOF ¶ 59; Dkt. 54 (Mentzer Dep.) at 72:12-20) The day after publication, Mentzer emailed Wisneski to tell him that the "Early returns are in." (Pl. PFOF ¶ 60; Dkt. 54 (Mentzer Dep.) at 69:1-21) Mentzer told Wisneski that the story metrics were "Pretty excellent" because it got "clearly a well above average page view number[.]" (Pl. PFOF ¶ 61; Dkt. 54 (Mentzer Dep.) at 73:22-74:11)

### vii.   Gannett's Litigation Conduct Provides Further Evidence That It Acted Negligently And With Actual Malice.

Gannett's conduct during this litigation further reflects Gannett cares not for Plaintiffs' rights. Rob Mentzer never received "a notice instructing [him] to preserve relevant documents for this lawsuit." (Pl. PFOF ¶ 103; Dkt. 54 (Mentzer Dep.) at 78:4-6) Wisneski and Treinen eventually received litigation hold notices, but those notices proved untimely and ineffective.

Wisneski and Treinen were well-aware, even before the Original Publication, that Plaintiff thought that the story they intended to write were defamatory. (Pl. PFOF. ¶ 93; *see also* Dkt. 54 (Wisneski Dep.) at 233:9-18; Dkt. 52 (Treinen Dep.) at 68:5-9) Wisneski indicates that he received a litigation hold notice when he learned of this lawsuit (*i.e.* over a year after Plaintiffs demanded pursuant to Wis. Stat. § 895.05(2) that Gannett retract the story). (Dkt. 53 at 208:23-25; 201:15-202:4) Treinen received a litigation hold notice in late 2019. (Pl. PFOF ¶ 94; Dkt. 52 (Treinen Dep.) at 154:1-154:22)

Gannett allowed Wisneski's laptop to be wiped within days of the publication. (Pl. PFOF ¶ 96; *see also* Dkt. 40-6, ¶ 9 (The laptop was "repurposed following the conclusion of his internship

on or around August 24, 2018.")) Treinen took no steps to ensure the work product on Wisneski's computer was preserved. (Pl. PFOF ¶ 97; Dkt. 52 (Treinen Dep.) at 69:21-25) That laptop contained much of Wisneski's investigative file for the Article. For example, he "had a specific way of gathering files from the court computer where [he] would – [he] would take pictures of court records with my phone and then transfer those over to the computer." (Pl. PFOF ¶ 98; *see also* Dkt. 54 (Wisneski Dep.) at 269:18-22) Back up audio recordings of Wisneski's interviews for the Article, if any, were on the deleted laptop. (Pl. PFOF ¶ 99; *see also* Dkt. 54 (Wisneski Dep.) at 219:1-219:24; *id.* at 65:25-66:9)

Wisneski also lost his digital recording device and purchased a new phone sometime around October 2019. (Pl. PFOF. ¶ 100; *see also* Dkt. 54 (Wisneski Dep.) at 218:2-221:10) His interview with Joe Geisler's nephews was recorded on one of those two devices. (*Id.*) He was not able to find the interview on either the digital recorder or his phone. (*Id.*) Gannett discontinued use of software called Chartbeat, which contains data related to the Article in early 2020. (Pl. PFOF ¶ 101; Dkt. 52 (Treinen Dep.) at 152:1-154:3) Treinen had already received the litigation hold notice at that time, but did not take steps to preserve the data from Chartbeat, is not aware of any other person taking such steps, and can no longer access that data. (Pl. PFOF ¶ 102; Dkt. 52 (Treinen Dep.) at 154:1-154:22)

Plaintiffs do not currently seek to assert spoliation claims, however Gannett's utter failure to preserve evidence at the heart of this dispute supports Plaintiffs' claim that Gannett acted recklessly and with malice. *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 264, 94 S. Ct. 2770, 2771, 41 L. Ed. 2d 745 (1974) (Defining actual malice to include "gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff."). In intellectual property cases, the "infringer's

behavior as party to the litigation" is a "factor to be weighed in assessing whether an infringer's conduct was willful[.]" *Fromson v. RBP Chem. Corp.*, No. 82-C-0431, 1990 WL 357248, at *15 (E.D. Wis. June 5, 1990) (quotation omitted); *accord Oscar Mayer Foods Corp. v. Conagra, Inc.*, 869 F. Supp. 656, 667 (W.D. Wis.), *aff'd,* 45 F.3d 443 (Fed. Cir. 1994). The same principle applies here.

## V.     The Defamatory Statements Were Of And Concerning The Plaintiffs.

Gannett argues that the defamatory statement is not "of and concerning" Plaintiffs because "neither the hyperlink nor the linked article references Plaintiffs in any way." (Dkt. 56 at 27) The Court should reject this argument for three reasons.

*First,* a "victim of defamation need not be identified by name." *Wildes v. Prime Mfg. Corp.*, 160 Wis. 2d 443, 448, 465 N.W.2d 835, 838 (Ct. App. 1991); *accord Bowman v. Gruenwald*, 119 Wis. 2d 899, 350 N.W.2d 741 (Ct. App. 1984) "A statement does not need to explicitly name a particular individual to be defamatory as long as it 'refers to a person whose identity is ascertainable.'" *Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1112 (W.D. Wis. 2017) (quoting *Wildes v. Prime Mfg. Corp.*, 160 Wis.2d 443, 448, 465 N.W.2d 835 (Ct. App. 1991)).

*Second,* Gannett's argument is premised on the notion that the *only* part of the Article that is to be considered is the hyperlink itself. As set forth in Section I(c) above, that position flies in the face of Wisconsin law and the Court's ruling at the motion to dismiss stage.

*Third,* construing the Article as a whole, there is simply no doubt that it is of and concerning Plaintiffs. The Article refers to "Batterman" *fifty-five* times and "Financial Fiduciaries" three times. (Pl. PFOF. ¶ 10; *see also* Dkt. 57-1) The Article also includes two photographs of Batterman and two photographs of Financial Fiduciaries' offices. (Pl. PFOF. ¶ 10; *see also* Dkt. 57-1)

**VI.   The Court Should Permit Plaintiffs To Proceed To Trial Based On The Original Publication, As Published on August 21, 2018.**

On July 15, 2020, Plaintiffs moved to amend their complaint. (Dkt. 43) Plaintiffs did so because the Court decided Gannett's Motion to Dismiss, (Dkt. 32), based on Gannett's September 19, 2018 version (the "Revised Publication") of the defamatory article, and Plaintiffs later identified a copy of the article, as published on August 21, 2018 (the "Original Publication"). (Dkt. 43; *see also* Dkt. 43-3 (Batterman Declaration of July 15, 2020)) Importantly, that Gannett's original publications did not include the following statement (hereinafter the "Disclaimer"), which was added to the Revised Publication:

> Although a judge later found that Batterman had not committed fraud, theft or embezzlement, he ruled that the financial advisor had engaged in multiple acts of "bad faith" and ordered him to be removed from handling the Geisler Trust and to pay part of the charities' legal fees.

(Pl. PFOF 47; Dkt. 20-1; *see also* Dkts. 40-1)[5] Gannett repeatedly asserted the Disclaimer in its Motion to Dismiss. (*E.g.* Dkt. 5 at 2-3, 18, 22) The Court repeatedly relied on the Disclaimer in ruling on the motion. (*E.g.* Dkt. 32 at 27 ("[T]his statement expressly negates any implication that Batterman had embezzled or stolen trust funds[.]"))

On September 9, 2020, this Court denied Plaintiffs' Motion for Leave to Amend Their Complaint, finding that plaintiffs had failed to show the requisite diligence. (Dkt. 49) The Court ordered:

> This case will proceed on the original complaint as framed by *both* parties and as narrowed by the court's June 1 order, namely, whether an ordinary reader would understand the on line version of the Article, as updated on September 19, 2018, to

---

[5] Even the Disclaimer is not entirely accurate.  Judge Moran removed Vigil Trust and appointed a successor trustee because all the beneficiaries so requested.  The order appointing the successor trustee stated:  "Nothing in this Order shall be deemed to be a finding by the Court, factually or at law, that Vigil Trust… and/or Thomas Batterman, has engaged in any wrongful or otherwise dishonest conduct, or breached any fiduciary duty." (Pl. PFOF ¶ 48; Dkt. 20-2 at 9)

imply that plaintiffs committed elder abuse, whether that implication is false, and whether plaintiffs sustained damages as a result.

(Dkt. 49 at 11-12)

Respectfully, that ruling was in error for the reasons set forth in Dockets 43 and 46, and Plaintiffs should be permitted to proceed based on the Original Publication. Even though the Court denied Plaintiffs' motion for leave to amend, the Original Publication *is* the defamatory statement of which Plaintiff complain. (Dkt. 1 at ¶¶ 1, 46) Plaintiffs did not attach any version of the publication to the complaint, as they were not required to do so. "Under Wisconsin law, defamation claims require that 'the particular words complained of shall be set forth in the complaint.'" *Rabideaux v. Clean Power*, No. 09-C-680, 2009 WL 2432367, at *3 (E.D. Wis. Aug. 6, 2009) (quoting Wis. Stat. § 802.03); *accord Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). As long as the complaint is specific and identifies the "particular words" complained of, the "plaintiff need not plead *verbatim* the defamatory remarks made about him[.]" *Schindler v. Marshfield Clinic*, No. 05-C-705 C, 2007 WL 60924, at *11 (W.D. Wis. Jan. 4, 2007) (emphasis in the original). Where a plaintiff "describe[es] in his complaint the content of the statements allegedly made by defendants, [he] has met the requirements of both § 802.03(6) and Rule 8." *Id.* (citing Wis. Stat. § 802.03(6) and Fed.R.Civ.P. 8).

As was the case in *Schindler*, Plaintiffs may rely on the Original Publication for purposes of summary judgment, even though it was not attached to the Complaint. *Schindler*, 2007 WL 60924. In *Schindler*, a neurosurgeon brought claims against the Marshfield Clinic, alleging that various clinic employees had made defamatory statements about his performance while an employee of the clinic. *Id.* at *11. One of the many allegedly defamatory statements was a written report that the clinic submitted to the National Practitioner Data Bank (a database that tracks physicians who have underperformed or engaged in misconduct). *Id.* at *7. While Judge Crabb

32

ultimately found that the clinic was entitled to immunity under the statute that created the database, she considered the written report on summary judgment over the clinic's objection that the report was not adequately set forth the complaint:

> In their reply brief, defendants contend vigorously that plaintiff did not plead this claim in his complaint. Although it is true that plaintiff did not summarize this claim in the portion of his complaint entitled "Claim IX-Defamation," in paragraph 96 of the complaint plaintiff identifies the report and alleges that, by filing it, defendants "were passing on information which was directly harmful to Dr. Schindler's good name, reputation, livelihood and opportunities to continue his career." Defendants complain that plaintiff did not parse out the specific words in the report of which he was complaining, and that he therefore failed to plead his libel claim with the requisite particularity. However, it is clear from plaintiff's complaint that he believes the ***entire report*** conveys the false implication that he is a dangerous surgeon whose patients' best interests were best served by his permanent termination. Although plaintiff could have drafted his complaint more carefully, his failure to do so is not fatal. Plaintiff's allegations regarding the June 2004 report were adequate to put defendants on notice that he was pursuing this claim against them; that defendants ignored his claim is no reason for this court to do the same.

*Schindler*, 2007 WL 60924, at *14 (emphasis by the Court).

Here too, Plaintiffs' original complaint—even with the Court having denied the amendment—adequately alleges that Gannett defamed Plaintiffs by publishing the Original Publication. Indeed, the very first paragraph of the Complaint provides: "This is a defamation case concerning an article initially published on August 21, 2018 in the Wausau Daily Herald concerning a petition filed in Marathon County Probate Court on September 9, 2015, almost three years earlier." (Dkt. 1, ¶ 1)

The Original Publication was undisputedly published. Indeed, it was the version of the Article that the overwhelming majority of readers (*i.e.* over 90%) viewed. (Dkt. 43, ¶ 27; Dkt. 43-1, ¶¶ 90-92) The Court should not ignore that reality. This is particularly true, given that Gannett now attempts to use the revision as both a sword and a shield, arguing that it establishes Gannett's good faith: "After receiving that demand, Treinen worked with Gannett's editing and legal staff to

thoroughly consider the concerns raised by Plaintiffs." (Dkt. 58 (Def. PFOF) ¶ 72; *see also id.*, ¶ 73)

Thus, while Plaintiffs understand that the Court has denied their Motion for Leave, Plaintiffs contend that the Original Publication is the operative defamatory statement in this case. The Original Publication does not contain the Disclaimer and it is false, defamatory, and unprivileged for the reasons set forth in Plaintiffs' Combined Response to Defendant's Motion to Dismiss and Memorandum of Law In Support of Their Motion for Summary Judgment As To Liability. (Dkt. 18) Plaintiffs therefore respectfully request that the Court deny Gannett's motion for summary judgment, and allow the case to proceed to trial based on the Original Publication.

## CONCLUSION

For the reasons set forth above, plaintiffs Financial Fiduciaries, LLC and Thomas Batterman respectfully request that the Court: (1) deny Gannett's Motion for Summary Judgment; (2) permit Plaintiffs to proceed to trial based on the Original Publication; and (3) award such further relief as this Court deems just and proper.

Dated:  November 23, 2020                    Respectfully submitted:

/s/ Charles L. Philbrick
Charles L. Philbrick (Wisconsin Bar No. 1106755)
David P. Hollander (Wisconsin Bar No. 1107233)
Rathje Woodward LLC
10 E. Doty Street, Suite 507
Madison, WI 53703
(608) 960-7430
cphilbrick@rathjewoodward.com
dhollander@rathjewoodward.com

*Attorneys for plaintiffs Financial Fiduciaries, LLC and Thomas Batterman*

**<u>CERTIFICATE OF SERVICE</u>**

I, Charles L. Philbrick, certify that I caused to be served on all parties on November 23, 2020, Plaintiffs' Response To Defendant's Motion For Summary Judgment, via the Court's ECF system.


<u>/s/ Charles L. Philbrick</u>
Charles L. Philbrick