**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| FINANCIAL FIDUCIARIES, LLC, | ) | |
| a Wisconsin limited liability company, | ) | |
| and THOMAS BATTERMAN, | ) | |
| A Wisconsin resident, | ) | |
| | ) | Case No.  3:19-cv-0874 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Crocker, Presiding |
| | ) | |
| GANNETT CO., INC., | ) | |
| a foreign corporation, | ) | Jury Demanded |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO
GANNETT'S PROPOSED FINDINGS OF FACT IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT
AND
PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT**

Plaintiffs Financial Fiduciaries, LLC and Thomas Batterman, by and through their counsel of record, submit the following objections and responses to Defendant Gannett Co. Inc.'s Proposed Findings of Fact in support of its Motion for Summary Judgment and their supplemental proposed findings of fact, pursuant to the Court's Standing Order on Procedures to be Followed on Motions for Summary Judgment.

**I.     GANNETT'S PROPOSED FINDINGS OF FACT AND PLAINTIFFS' OBJECTIONS AND RESPONSES THERETO.**

1.     This is a defamation case concerning an article initially published on August 21, 2018 and updated on September 19, 2018 in the *Wausau Daily Herald* (the "Article") concerning a judicial proceeding in Marathon County Probate Court on September 9, 2015 (the "*Geisler Trust* litigation").  (Complaint ¶ 1; Declaration of Brian C. Spahn, November 2, 2020 ("Spahn Decl."), ¶ 2, Ex. 1.)

**OBJECTION**:  F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any online publication of Gannett. *Zirk v. Nationstar Mortg.*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017) (quoting *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006))("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56[ ] and the affiant must be a person through whom the exhibits could be admitted into evidence.")

**RESPONSE**:  Disputed in part.  The online publication that is identified in the complaint and is the subject of this defamation action was published on August 21, 2018.  (Dkt. 1, Compl. ¶¶ 1, 46; Dkt. 43.1 at 26 to 38)

2.     Plaintiff Financial Fiduciaries, LLC ("Fiduciaries") is and was at all times a Wisconsin limited liability company in Wausau, Marathon County, Wisconsin.  (Complaint ¶ 5 ("Compl.")

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

3.     Plaintiff Thomas Batterman is and was at all times a citizen and resident of Marathon County, Wisconsin. (Compl. ¶ 7.)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

4.     Defendant, Gannett Co., Inc. ("Gannett"), is a Delaware corporation headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107.  Gannett is alleged to own the *Wausau Daily Herald*.  (Compl. ¶ 8.)

**OBJECTION**:  Paragraph 4 contains the following footnote: "Although not a fact upon which this motion relies, Gannett is in actuality the ultimate parent company of the corporation

that operates the Wausau Daily Herald.  Should this matter proceed beyond summary judgment, Gannett reserves the right to move for substitution of the correct corporate defendant." (Dkt. 58 at 2) Gannett's reservation as to its status as the proper corporate defendant puts this Court's subject matter jurisdiction into question. If the "correct corporate defendant" is a Wisconsin citizen, then this Court does not enjoy subject matter jurisdiction to hear this case. Further objecting, Gannett's Proposed Findings of Fact fails to contain facts as to the Court's jurisdiction as required by the Court's Standing Order as to Summary Judgment Motions.  Standing Order ¶ B.3.

**RESPONSE**:  Undisputed.

5.      On June 1, 2020, the Court granted in part and denied in part Gannett's Fed. R. Civ. P. 12(b)(6) motion to dismiss.  (Dkt. No. 32.).  The Court ruled that –

> Even construed in the light most favorable to Batterman, Batterman doesn't have any plausible claim that the headline or any of the individual, allegedly defamatory statements in the Article are false. As the Article accurately reported, the Marathon County Circuit Court did find that he was responsible for carrying out and protecting the Geisler Trust, and the SEC did find that he had engaged in wrongdoing with respect to his handling of client assets. With respect to his defamation-by-implication claims, it is not plausible that an ordinary reader would understand from the Article that Batterman had committed fraud, theft or embezzlement with respect to the Geisler Trust, particularly given the Article's plain statement that no such finding had been made.  When read as a whole, the Article's "sting" is a substantially true account of what occurred in the *Geisler Trust* litigation.

**OBJECTION**: Paragraph 5 violates the Standing Order because it is not a statement of fact, nor is it supported by admissible evidence. Standing Order ¶ B.1 and 2.

**RESPONSE**:  Undisputed.

6.      In its June 1, 2020 Order, the Court also ruled that –

> However, the average reader *could* conclude that Batterman had financially exploited elders, especially when Gannett suggested as much by directing reader's attention to a "RELATED" article about

elder abuse.  Because Batterman has sufficiently alleged that the Article's implicit accusation that Batterman had engaged in elder abuse is both false and defamatory, Gannett is not entitled to dismissal on this claim.

(*Id.*)

**OBJECTION**: Paragraph 6 violates the Standing Order because is not a statement of fact, nor is it supported by admissible evidence. Standing Order ¶ B.1 and 2.

**RESPONSE**:  Undisputed.

7.     In 1988, Joseph Geisler established the Geisler Trust and designated himself as the primary trustee, with Vigil Asset Management Group as the successor trustee.  (Compl. ¶¶ 15-17.)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

8.     Vigil Asset Management Group was owned by Batterman.  (Compl. ¶ 17.)

**OBJECTION**:  None.

**RESPONSE**:  Disputed in part.  In 1999, Thomas Batterman had an ownership interest in Vigil Asset Management Group but sold that interest prior to Joe Geisler's incapacitation.  (Dkt. 20 (Batterman Aff. November 15, 2019) ¶¶ 11-15)

9.     The Geisler Trust provided that, upon Geisler's death, if Geisler's spouse did not survive him, the assets remaining in the Trust, together with any assets received into the Trust, should be distributed to four identified charities.  (Compl. ¶ 22.)

**OBJECTION**:  None.

**RESPONSE**:  Disputed in part as inaccurate.  Plaintiffs incorporate their response to paragraph 10 as though fully set forth herein.

10.    Specifically, Geisler instructed that $3 million be distributed equally – approximately $750,000 each to four charitable organizations – the Superior Diocese of the

Catholic Church; Bruce High School in northwestern Wisconsin; the Alzheimer's Association; and the American Cancer Society ("ACS"). (Spahn Decl. ¶ 4, Ex. 3, (List of Charitable Remainder Beneficiaries.))

**OBJECTION**: F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate the Giesler Trust. *Zirk*, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**: Disputed in part as inaccurate. The trust document originally provided that the secondary beneficiaries were: the Superior, Wisconsin, Diocese of Hie Catholic Church for educational purposes; Bruce High School, Bruce, Wisconsin, to fund scholarships for students who will be pursuing a college education; the Alzheimer's Association for research; the American Cancer Society for research. (Dkt. 20 (Batterman Aff. January 15, 2020) ¶ 17) Joe Geisler later amended the trust document to provide that the bequest to the American Cancer Society "will be paid through local fund-raising events such as Relay for Life in such manner and for such purposes as the organization sees fit." *Id.* at ¶ 19.

11.    Geisler died on December 27, 2014 at the age of 88, with his wife predeceasing him. (Compl. ¶ 26.)

**OBJECTION**: None.

**RESPONSE**: Undisputed.

12.    The Article concerns a judicial proceeding that, as of the date the Article was published, had been pending for nearly three years in Marathon County Circuit Court, involving a dispute over the Revocable Living Trust of Joseph R. Geisler (the "Geisler Trust"). *See In the Matter of the Joseph R. Geisler Revocable Trust*, Marathon County Circuit Court, Case No. 15-PR-32.

**OBJECTION**:  Paragraph 12 violates the Standing Order because it is not supported by admissible evidence. Standing Order ¶ B. 2.

**RESPONSE**:   Disputed in part.  The article that is identified in the complaint and is the subject of this defamation action was published on August 21, 2018.  (Dkt. 1 (Compl.) ¶¶ 1, 46) A copy of the publication at issue is found in the record at Dkt. 43-1 at 26 to 38. The publication primarily concerns Thomas Batterman and attempts to paint him in a bad light on a variety of topics.   The online publication concerns Batterman's relationship with Joe Geisler, his involvement in the Geisler Trust litigation, Batterman's recent OWI, Batterman and Financial Fiduciaries' past disputes with the SEC and Batterman and Financial Fiduciaries' supposed exploitation of elders such as Joe and John Geisler.  (Dkt. 43-1) The online publication asserts that Batterman and Financial Fiduciaries "mishandling $3 million", "put money in jeopardy," have repeatedly engaged in fraud, self-dealing, embezzlement and "elder abuse."  *Id*. The online publication states that Batterman and Financial Fiduciaries have engaged in "elder abuse" and contains a variety of statements that Batterman and Financial Fiduciaries have a history of exploiting the financial interests of elders, including Joe and John Geisler.  *Id*.

13.     On September 9, 2015, the ACS brought a verified petition in the Circuit Court for Marathon County seeking, among other things, to remove Vigil Trust as successor trustee of the Geisler Trust.  (Spahn Decl. ¶ 3, Ex. 2; ¶ 5, Ex. 4, at 41 (9/11/15 docket entry.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition of the Marathon County Court Docket.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the Marathon Court Docket is being offered for the truth of the matter asserted.  It is therefore inadmissible hearsay and not sufficiently reliable.  *Perry v. Zurich Ins*., 2010 WI App 46, ¶ 15, 324 Wis. 2d 307, 784

N.W.2d 183 ("The mistake occurred because some unknown person entered the wrong time of the hearing into CCAP."); *Miller v. Hanover Ins. Co*., 2010 WI 75, ¶ 59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508 (Reversing default judgment, because of, in part, "the numerous errors, procedural and otherwise, that were generated in part by plaintiff's counsel and the circuit court personnel who were responsible for listing Ratzel as Zurich's attorney of record into the CCAP system[.]").

> **RESPONSE**:  Undisputed.

14.    The ACS brought five claims:  1) breach of duty to administer trust in good faith; 2) breach of duty of loyalty; 3) breach of duty of prudent administration; 4) breach of duty to inform and report; and 5) removal of trustee.  (Spahn Decl. ¶ 3, Ex. 2 (ACS Petition ¶¶ 52-75.))

> **OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

> **RESPONSE**:  Undisputed.

15.    The School District of Bruce, Roman Catholic Diocese of Superior, and Alzheimer's Association each followed the ACS by filing their own petitions on October 2, 2015, October 5, 2015 and October 6, 2015, respectively.   (Spahn Decl. ¶ 5, Ex. 4 (Geisler Trust litigation case docket.))

> **OBJECTION**:   F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the Marathon County Court Docket. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the Marathon County Court Docket is being offered for the truth of the matter asserted and is therefore inadmissible hearsay.  Further, CCAP entries are erroneous from time to time and therefore insufficiently reliable. *Perry*, 2010

WI App 46, ¶ 15, 324 Wis. 2d 307, 784 N.W.2d 183; *Miller*, 2010 WI 75, ¶ 59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508.

**RESPONSE**:  Undisputed.

16.    Petitioners alleged that, as successor trustee, Vigil Trust, through Batterman, breached fiduciary duties owed to the Trust and its four charitable beneficiaries.  (Spahn Decl. ¶ 3, Ex. 2 (ACS Petition ¶¶ 52-75.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the allegations by ACS are offered for the truth of the matter asserted. Therefore, it is inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes v. Milwaukee Metropolitan Sewerage Dist*., 2006 WL 2691525 *2 (E.D. Wis. September 20, 2006), *quoting*, *Century 21 Shows v. Owens*, 400 F.2d 603, 609-610 (8th Cir.1968) ("The divorce petitions were properly refused into evidence as they constituted hearsay declarations").

**RESPONSE**:   Disputed.  Plaintiffs incorporate by reference their response to paragraph 17 as though set forth herein.

17.    ACS alleged in its petition that:

> Multiple red flags relating to Vigil Trust's administration of the Geisler Trust – ***both before and after Geisler's death*** – give ACS serious concern that Vigil Trust has inappropriately used assets for Batterman's and his corporate entities' own benefit and to the detriment of the remainder charitable beneficiaries.  (ACS Petition ¶ 20. (Emphasis added.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the allegation by ACS is offered for the truth of the matter asserted and is

therefore inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes v. Milwaukee Metropolitan Sewerage Dist*., 2006 WL 2691525 *2 (E.D. Wis. September 20, 2006), *quoting*, *Century 21 Shows v. Owens*, 400 F.2d 603, 609-610 (8th Cir.1968) ("The divorce petitions were properly refused into evidence as they constituted hearsay declarations").

**RESPONSE**:   Disputed in part.  It is undisputed that ACS made that allegation in its petition.  But the truth of the allegation is disputed.  Two months after ACS filed a lawsuit, the circuit court appointed a new successor trustee, Terrence Byrne, on November 11, 2015 to investigate the accusations of ACS. (Dkt. 20 at ¶ 38; Dkt. 20-2) In granting the petitions to remove Vigil Trust as trustee, the circuit court held:

> 12.  Nothing in this Order shall be deemed to be a finding by the Court, factually or at law, that Vigil Trust… and/or Thomas Batterman, has engaged in any wrongful or otherwise dishonest conduct, or breached any fiduciary duty.

(Dkt. 20-2 at 9) On February 18, 2016, Mr. Byrne reported to the beneficiaries that "[a] review of records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 40; Dkt. 20-3) Thereafter, the circuit court adopted the successor trustee's findings on September 18, 2017. (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 42; Dkt. 6-9 at 13:17-20). ACS abandoned the allegations of wrongdoing asserted in its petition because at the trial in the Geisler Trust litigation no evidence was offered to support such allegations.  (Dkt. 6-9 at 11:4-8)   Rather, the trial concerned only the timing of notification of the bequest to the beneficiaries. (*Id*. at 13:17-20)

> 18.   The ACS went on to allege that:
>
> > Contrary to the terms of the Trust, Vigil Trust through Batterman has treated the Geisler Trust as though it were a discretionary trust to distribute funds as Batterman wishes and ***in a manner to benefit Batterman.***  (ACS Petition ¶ 21 (Emphasis added.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the allegation by ACS is offered for the truth of the matter asserted, and therefore it is inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part.  Plaintiffs incorporate their response to paragraph 17 as though full set forth herein.

19.     The ACS petition also alleged that:

> The facts also evidence that, upon Geisler's death, Batterman ***concocted a plan*** to distribute ACS' funds over a 10-year period, rather than as an outright gift to ACS as required by the trust instrument.  Through this plan, Batterman would reap the benefit of long-term trustee and investment fees paid from the Trust, while his fiancée Richards, an ACS employee responsible for implementing the local Relay for Life events, would benefit from enhanced opportunities for salary increases through the Trust's stepped-up annual gifting.  (ACS Petition ¶ 23. (Emphasis added.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the allegation by ACS are offered for the truth of the matter asserted and are therefore inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part.  Plaintiffs incorporate their response to paragraph 17 as though full set forth herein.

20.     The ACS also alleged that:

> Given the numerous red flags related to Vigil Trust's administration of the Trust, Batterman's evasiveness and the inadequate documentation provided, ACS has no confidence that the numbers Batterman has provided to it constitute an accurate representation of ACS's interests. ***ACS is also concerned that Batterman misused Trust assets – both during the period of Geisler's incapacity and after his death***. Given these circumstances ACS is unwilling to sign a release with respect to Vigil Trust and Batterman's activities and has brought the present [state court] action. (Spahn Decl. ¶ 3, Ex. 2 (ACS Petition ¶ 44. (Emphasis added.))

**OBJECTION**: F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the allegation by ACS are offered for the truth of the matter asserted and are therefore inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:  Disputed in part.  Plaintiffs incorporate their response to paragraph 17 as though fully set forth herein.

21.     Finally, the ACS alleged that Batterman's misconduct and mishandling of clients' assets were not isolated events when alleging that research into Batterman and the various corporate entities associated with him had "revealed additional red flags relating to Batterman's past conduct – including his mishandling of clients' assets, failure to provide required disclosures, and fees charged to clients – conduct similar to that which Batterman has engaged in with ACS." (ACS Petition ¶ 45.)

**OBJECTION:**  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate ACS petition. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the allegation by ACS are offered for the truth of the matter asserted and are therefore inadmissible hearsay and may not be considered on summary judgment. *Friends of*

*Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE:**   Disputed in part.  Plaintiffs incorporate their response to paragraph 17 as though fully set forth herein.

22.     On October 27, 2015, after all of the beneficiaries of the Geisler Trust sought removal of the trustee, the Wisconsin Department of Justice ("DOJ") filed a Statement of Position in the *Geisler Trust* litigation.  (Spahn Decl. ¶ 6, Ex. 5, (Wisconsin Department of Justice Position Statement.))  As the DOJ noted, "[t]he proposed removal of the trustee affects the enforcement of the trust, making the Attorney General an interested party."  (*Id*. at 1.)

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate a Statement of Position authored by the Wisconsin Department of Justice. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the Statement of Position by the Wisconsin Department of Justice is offered for the truth of the matter asserted.  Therefore, the statement is inadmissible hearsay and may not be considered on summary judgment.  *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:  Undisputed.

23.     The DOJ stated to the court that:

> Vigil, through Mr. Batterman's affidavit, has admitted one act that is clearly *ultra vires*.  Exhibit 21, attached to the affidavit, is conclusive proof of that unauthorized act.
>
> In accordance with the Geisler trust's terms, the death of Helen Geisler, followed by the death of Joseph Geisler, entitled the four beneficiaries to equal shares of the Geisler trust by immediate distribution.  The trust contains no authorization for Vigil to continue to act, or to establish additional trusts out of the Geisler trust's corpus.

> The Batterman affidavit's exhibit 21 proves that Vigil seized power the Geisler trust did not confer.  By that exhibit, Vigil purported to have the original Geisler trust establish a completely new trust called the "Joseph Geisler Scholarship Trust, dated June 1, 2015," with Vigil also as the trustee for the new entity.
>
> The new trust could only be funded by diverting money to which the four beneficiaries hold an immediate entitlement. …

(Spahn Decl. ¶ 6, Ex. 5, at 3.)

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate a Statement of Position authored by the Wisconsin Department of Justice. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the Statement of Position by the Wisconsin Department of Justice is offered for the truth of the matter asserted. Therefore, the statement is inadmissible hearsay and may not be considered on summary judgment. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part. Plaintiffs do not dispute that the DOJ statement of position contains the quoted language.  Plaintiffs dispute that the statement is true.  The premise of the DOJ statement is an incorrect interpretation that the Geisler Trust "entitled the four beneficiaries to equal shares…"  The bequest to the Bruce School was for the stated purpose of providing college scholarships to graduating students. (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 17)(the Geisler Trust provided: "Bruce High School, Bruce, Wisconsin, to fund scholarships for students who will be pursuing a college education.")   Thus, the actual beneficiaries of the Bruce School bequest were not the Bruce School, but future graduating students with college aspirations.  Hence, Vigil Trust set up the Joseph Geisler Scholarship Trust dated June 1, 2015 after Joe Geisler's death for the purpose of assisting the Bruce School in awarding the bequest to Bruce School students on a going forward basis.  Later, Judge Moran noted that the creation of the Scholarship trust may have

been the appropriate and desired method to administer the bequest, but that Vigil Trust had failed to adequately communicate with the Bruce School before establishing the Scholarship trust. (Dkt. 6-9 at 16:18 to 17:8)

24.     On October 23, 2015, approximately one month after the ACS petition was filed, the Court removed Vigil Trust and Thomas Batterman as trustee of the Geisler Trust and appointed Terrance Byrne as the new trustee.   (Spahn Decl. ¶ 5, Ex. 4 at 37, Geisler Trust case docket, Oct. 23, 2015 Docket entry ("COURT grants motion, COURT removes Vigil Trust/Thomas Batterman as trustee and appoints new trustee as Terrance Byrne").)

**OBJECTION**: F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the Marathon County Court Docket. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).   Further, the content of the Marathon County Court docket is being offered for the truth of the matter asserted and is therefore inadmissible hearsay and not sufficiently reliable.  *Perry*, 2010 WI App 46, ¶ 15, 324 Wis. 2d 307, 784 N.W.2d 183; *Miller*, 2010 WI 75, ¶ 59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508)

**RESPONSE**:   Disputed.  While the circuit court held a hearing on October 25, 2015, on ACS's petition to remove Vigil Trust as trustee of the Geisler Trust, an order was not entered on that day.  The order of November 11, 2015 granted petitioners' motion and appointed Terrence Byrne as successor trustee and provided in part:

> 12.  Nothing in this Order shall be deemed to be a finding by the Court, factually or at law, that Vigil Trust… and/or Thomas Batterman, has engaged in any wrongful or otherwise dishonest conduct, or breached any fiduciary duty.

(Dkt. 20-2 at 9) The order removed Vigil Trust as trustee of the Geisler Trust.  The order did not remove Thomas Batterman as trustee of the Geisler Trust.  *Id*. at 1-2.

25.     In April and May, 2017, a multi-day trial was held in the *Geisler Trust* litigation. (Spahn Decl. ¶ 5, Ex. 4, at 23-25).

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the Marathon County Court Docket.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the content of the Marathon County Court docket is being offered for the truth of the matter asserted and is therefore inadmissible hearsay and not sufficiently reliable.  *Perry*, 2010 WI App 46, ¶ 15, 324 Wis. 2d 307, 784 N.W.2d 183; *Miller*, 2010 WI 75, ¶ 59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508)

**RESPONSE**:  Undisputed.

26.     On June 6, 2017, the Successor Trustee in the *Geisler Trust* litigation submitted a post-trial brief, a portion of which would later be quoted in the Article.  In that brief, the Successor Trustee stated:

> The inexplicable inconsistencies between the treatment of the beneficiaries, as well as the differences in the form and content of the notices that were provided, especially in light of the fact that no provision in the trust instrument authorizes different treatment among the beneficiaries, indicates that both Vigil and Batterman knew of their wrongdoing and that they intentionally attempted to deceive the beneficiaries in order to derive a different financial benefit.  In other words, both Vigil and Batterman placed their own financial interests before the interests of the beneficiaries.

(Spahn Decl. ¶ 7, Ex. 6 at 2 (Successor trustee Post-trial Brief.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).   Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay.  *Friends of*

*Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part.   Plaintiffs do not dispute that the successor trustee submitted the quoted statements in a post-trial brief.   Plaintiffs dispute that the statements are true. Specifically, the Geisler Trust bequests were different in quality and character from one another. The one bequest was for the benefit of unnamed Bruce School students who aspired to attend college.   Another bequest, to the ACS, specifically delineated that the funds were to be donated to specific Relay of Life events.   (Dkt. 20 (Batterman Aff. January 15, 2020) ¶¶ 17 and 19)   As a consequence, it was not "inexplicable" that the trustee would communicate with the beneficiaries differently.

27.     The Successor Trustee's post trial brief also noted that, "Mr. Batterman cannot rely upon § 701.1012 for protection against personal liability for the trustee's breach because Mr. Batterman failed to act in good faith in his dealings with the trustee and he knew, or should have known, that the trustee is acting beyond the scope of the trustee's powers.   After all, Batterman had personal knowledge of Vigil's wrongdoing because he was the person who communicated with the beneficiaries on behalf of Vigil."   (*Id*. at 2.)

**OBJECTION**:   F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief.   *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).   Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay.   *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:    Disputed in part.    Plaintiffs do not dispute that the successor trustee submitted the quoted statements in a post-trial brief.    Plaintiffs dispute that the statements are true. Specifically, the statements are legal arguments that turn on the interpretation of the Geisler Trust. Further, whether and to what extent the trustee was acting beyond the scope of its powers under the trust was disputed even as between the DOJ and the successor trustee, Terrence Byrne. (Compare Dkt. 57-6 with Dkt. 57-5)

28.    The Successor Trustee also emphasized that the paramount object of the trust's construction was to decipher Mr. Geisler's intent -

> If [Mr. Geisler] intended for the trust funds to be distributed in the manner Vigil and Mr. Batterman envisioned, [Mr. Geisler] would have dictated that a separate trust be created upon his death for the benefit of the graduating Bruce High School seniors or would have amended the trust termination language in such a manner as to provide for the continuation of the trust with respect to certain beneficiaries to whom the gift was to be made over a period of time. In 2011, when the first amendment to the trust was made, [Mr. Geisler] had the opportunity to do just that yet he did not.  Therefore, interpreting the language of the trust instrument as requiring anything other than a direct distribution to the Bruce School District is contrary to the clear and unambiguous language of the trust instrument and the intent of [Mr. Geisler.]

(*Id* at 3.)

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay.  *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part.   Plaintiffs do not dispute that the successor trustee submitted the quoted statements in a post-trial brief.  Plaintiffs dispute that the statements, which are purely legal arguments, are true.  In the quoted statement, the success trustee argued that Joe Geisler did not intend for his bequest to the Bruce School be for the benefit of graduating seniors with college aspiration because the Trust did not provide for the establishment of a trust for that purpose.  However, the Trust plainly stated that the purpose of the Bruce School bequest was "to fund scholarships for students who will be pursuing a college education." (Dkt. 20 (Batterman Aff. January 15, 2020) ¶ 17)  Hence, the intent of the trust settlor was not clear and unambiguous.

29.    After more than two years of litigation following Vigil Trust/Batterman's removal as trustee, the Geisler Trust litigation culminated with the state court issuing lengthy opinions from the bench.  (Spahn Decl. ¶¶ 5, 8, 9, Exs. 4, 7 and 8.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate the pleadings contained in the court file for the Geisler Trust litigation.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.  It is undisputed that a bench trial took place after which the circuit court issued rulings.  Plaintiffs dispute that Batterman was removed as trustee of the Geisler Trust.  The order appointing Terrence Byrne as successor trustee removes Vigil Trust as trustee, not Thomas Batterman.  (Dkt. 20-2)

30.    The Honorable Michael K. Moran noted it was alleged that Vigil committed numerous breaches of trust by breaching its duty of loyalty as well as the duty to inform and report. (Spahn Decl. ¶ 8, Ex. 7, Sept. 18, 2017 Tr. at 7.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate the pleadings contained in the court file for the Geisler Trust litigation.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.  Judge Moran held that ACS abandoned the allegations of wrongdoing asserted in its petition because at the trial in the Geisler Trust litigation no evidence was offered to support such allegations.  (Dkt. 6-9 at 11:4-8)  Rather, the trial concerned only the timing and content of notifications of the bequests to the beneficiaries. (*Id*. at 13:17-20)

31.   Judge Moran went on to state that:

> [I]t is not a question for this court whether it would have done things differently, but what the record before the court ultimately proves. The fact that Vigil failed to timely notice the beneficiaries within a reasonable time frame and offers no real reason for the delay than their interpretation of the language and basic disregard for the beneficiaries of this trust, the trustee had a duty to inform the beneficiaries, and they did not do that in a timely manner.  Vigil's argument is not persuasive and its actions constitute a breach of the trust pursuant to [Wis. Stat. §] 701.0813.

> Furthermore, Vigil owes each beneficiary a duty to inform and report.  Breach of this duty constitutes a breach of trust.  From the testimony, the court cannot help but find Mr. Batterman[/]Vigil, failed to provide the necessary information to several of the beneficiaries regarding the gift in a timely manner and upon request in which many ways has resulted in the extensive and arguably unnecessary litigation.

> This court finds that the manner in which Vigil failed to give the appropriate notice to the American Cancer [Society] and the manner in which a gift was set up for distribution not authorized within the trust document, often providing incomplete information and by setting up unilaterally disposition – or distribution plans which arguably favor Vigil's, constitute breach of loyalty and duty to inform and report.

> …

> [S]o much of this litigation could have been avoided had Vigil
> followed the plain language of the trust document or even attempted
> to communicate with the school district or other beneficiaries.
>
> …
>
> [T]he trustee in this case breached his trust and abused his discretion
> for the reasons I stated and it doesn't – it's not escaping this court
> that the beneficiaries would have this mistrust and would, based
> upon it, want to clarify and get more information and do due
> diligence to find out exactly what was going on here.

(Spahn Decl. ¶ 8, Ex. 7, Sept. 18, 2017 Tr. at 16-18.)

**OBJECTION**:  **OBJECTION**:  F.R.E. 602: Spahn lacks personal knowledge and is

incompetent to authenticate the pleadings contained in the court file for the Geisler Trust litigation.

*Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:  Undisputed.

32.    Later in the *Geisler Trust* litigation, the parties appeared again for a ruling on the

responsibility for paying the significant attorneys' fees incurred as a result of the litigation.  (Spahn

Decl. ¶ 5, Ex. 4 (Geisler trust docket.))

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent

to authenticate the Marathon County Court Docket. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970,

at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the Marathon County Court docket is being

offered for the truth of the matter asserted and is therefore inadmissible hearsay and not sufficiently

reliable.  *Perry*, 2010 WI App 46, ¶ 15, 324 Wis. 2d 307, 784 N.W.2d 183; *Miller*, 2010 WI 75, ¶

59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508)

**RESPONSE**:  Undisputed.

33.    Before that hearing, the Successor Trustee submitted another letter brief on issues

"that the Successor Trustee deems particularly important for the court to consider when

determining the amount of damages to be awarded for the breach of trust and the extent of liability

of Batterman and Vigil for the damages resulting from the breach." (Spahn Decl. ¶ 10, Ex. 9 at 1 (Byrne November 17, 2017 Letter Brief.))

**OBJECTION**: F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**: Undisputed.

34.     The Successor Trustee noted that, "[a]s a result of Vigil's and Batterman's misconduct, which misconduct was the driving factor behind this litigation, the trust res was significantly depleted because the trust incurred numerous damages and expenses[.]" (*Id.*)

**OBJECTION**: F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay. *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**: Disputed in part. Plaintiffs do not dispute that the successor trustee made the quoted arguments in a post-trial brief, but do dispute that such argument were true.

35.     The Successor Trust further noted for the court "that the trust incurred eighty-two thousand three hundred fifty-four dollars and ninety-six cents ($82,354.96) in damages that directly resulted from Vigil's and Batterman's breach of trust." (*Id.* at 2.)

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the successor trustee post trial brief.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, the content of the successor trustee post trial brief is being offered for the truth of the matter asserted and is therefore inadmissible hearsay.  *Friends of Milwaukee's Rivers and Alliance for Great Lakes*, 2006 WL 2691525 *2; *Century 21 Shows*, 400 F.2d at 609-610.

**RESPONSE**:   Disputed in part.  Plaintiffs do not dispute that the successor trustee made the quoted arguments in a post-trial brief, but do dispute that such argument were true.

36.    During the hearing on damages in the *Geisler Trust* litigation, the court ruled:

> [T]he petitioners have urged this court to find intentional fraud, bad faith or deliberate dishonesty on the part of Mr. Batterman.  This court has struggled, admittedly, with that issue since the beginning when the trustee was removed.
>
> I believe the manner in which this trustee acted in this case was certainly intentional.  I believe it clearly created mistrust among the beneficiaries and certainly caused them to feel as though the information they received when they finally received it well past the time, in the Court's Opinion they should have been given notice of the trust, was misrepresentative and deceptive.   I can certainly understand the position of the beneficiaries that there is a perception that the trustee engaged in self-dealing and was at times arrogant and exhibited an I-know-best approach to dealings with each of the beneficiaries.  I can see where there could be a perception that the trustee was dishonest in his handling of the trust.
>
> …
>
> Mr. Batterman's actions amounted to a significant breach of trust – of the trust.  The record is replete with instances where information was intentionally withheld and actions taken contrary to the plain language of the trust document, specifically with the Bruce School Districts and others.  Some of the beneficiaries were not notified of the trust for at least six months and only heard about the trust from others.  Bruce School District was treated as if they had no right to have any say whatsoever in a trust that left more directly to the District.
>
> …

[T]hese examples as well as others in this record certainly do not
amount to good faith dealing with the beneficiaries.   Are they
outrageous acts and do they evince an evil motive?   Is there
intentional dishonesty?   Is there fraud?   One can make a strong
argument that there is bad faith here.

…

[B]ased upon a review of the record in this case, the conduct of the
respondent was intentional and in the Court's opinion were, quote,
something of bad faith in dealings with the beneficiaries.   Note, bad
faith, fraud were deliberate dishonesty.   There is no requirement that
all three be found.   In my reading of it, bad faith – something of bad
faith, fraud or deliberate dishonesty means one of the three can be
found, and I find that there were something of bad faith in these
dealings, and under the case law cited would allow for a surcharge
under the court's equitable authority.

…

Mr. Batterman is the trust protector in this case.   He owed
independent duties to the beneficiaries, and, again, there was little
argument on the issue of which entity or whether Midwest Trust
Company, through Vigil and Thomas Batterman, is personally
liable.   The court is going to order each party shall be joint[ly] and
severally liable for the damages and attorneys' fees once final
numbers are provided.   So that means Midwest Trust Company, as
Vigil and Mr. Batterman, shall be jointly and severally liable for the
damages once we get those numbers together.

(Spahn Decl. ¶ 9, Ex. 8, July 11, 2018 Tr. at 14-18, and 26.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to

authenticate the pleadings contained in the court file for the Geisler Trust litigation.   *Zirk*, No. 16-

CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.   Plaintiffs do not dispute that Judge Moran made the

quoted oral findings.   Judge Moran's finding that Batterman was the "trust protector" was

erroneous. A "trust protector" can only be appointed by the settlor or by a court.   Wis. Stat.

701.0818(1). Here, Geisler did not name Batterman as a "trust protector" in his trust.   (Dkt. 57-3)

No court ever appointed Batterman to the office of trust protector and Batterman never consented

to the role of "trust protector" of the Geisler Trust.  (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 23)

37.    On June 28, 2018, Batterman and his affiliated companies filed their appeal of the court's order to pay the beneficiaries' legal fees.  (Spahn Decl. ¶ 5, Ex. 4, at 10-12 (Geisler trust docket.))  According to the Geisler Trust litigation docket, the appeal was dismissed on February 21, 2019.  (*Id*. at 6.)

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate the Marathon County Court Docket. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Further, the content of the Marathon County Court docket is being offered for the truth of the matter asserted and is therefore inadmissible hearsay and not sufficiently reliable.  *Perry*, 2010 WI App 46, ¶ 15, 324 Wis. 2d 307, 784 N.W.2d 183; *Miller*, 2010 WI 75, ¶ 59, 326 Wis. 2d 640, 669, 785 N.W.2d 493, 508.

**RESPONSE**:  Undisputed.

38.    On August 21, 2018, the *Wausau Daily Herald* reported on the judicial proceeding under the headline, "Wisconsin financial advisor accused of violating a dead man's trust, mishandling $3 million".  (Spahn Decl. ¶ 2, Ex. 1 at 1).   The Article was later updated on September 19, 2019.  *Id*.  The Article's introduction summarizes the events that led to the *Geisler Trust* litigation, stating that, "[w]hen [Mr. Geisler] died at 88 with over $3 million to his name, his final wish, detailed in his trust, was to leave it all to charities that were important to him."  *Id*.  The Article also states that, "the financial adviser Joe Geisler entrusted to administer his trust put that money in jeopardy, according to a lawsuit filed in Marathon County.  The adviser, Thomas Batterman of Wausau, was accused of defrauding the charities, committing numerous breaches of trust and conspiring with his fiancée to milk the fund for trustee fees."  *Id* at 2.

**OBJECTION**:  F.R.E. 602:  Spahn lacks personal knowledge and is incompetent to authenticate any online publication by Gannett.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  Further, paragraph 38 violated the Standing Order because paragraph 38 is not a single statement of fact as called for by the Court's Standing Order for Summary Judgement Motions, which calls for statements of fact in a single sentence. Standing Order ¶ B.1.

**RESPONSE**:   Disputed in part.  It is undisputed that the quoted statements appeared in the August 21, 2018 version of an online publication of the Wausau Dailey Herold. (Batterman Decl. 7/10/2020 Ex. 1, Dkt. 40-1) The truth of the quoted statements is disputed.

The headline is a double entendre that turns on the meaning of the word "trust."  Both meanings are false.  In regards to Thomas Batterman's loyalty to Joe Geisler, Batterman and Geisler were business partners.  (Dkt. 20 (Batterman Aff. January 15, 2019) ¶¶ 6 and 7) Batterman does not engage in elder abuse or financial exploitation and works to prevent others from doing so.  Accordingly, Batterman never violated Joe Geisler's trust, *i.e.* his confidence. (Dkt. 59 (Batterman Decl. November 17, 2020 ¶¶ 3-9)

In regards to the Geisler Revocable Trust, the successor trustee determined that there was no evidence that the trust corpus, the $3,000,000 was "mishandled."  On February 18, 2016, Mr. Byrne reported to the beneficiaries that "[a] review of records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff. January 20, 2019) ¶ 40; Dkt. 20-3) Thereafter, the circuit court adopted the successor trustee's findings on September 18, 2017. (Dkt 20 (Batterman Aff. January 15, 2019) ¶ 42; Dkt. 6-9 at 13:17-20). ACS effectively abandoned the allegations of wrongdoing asserted in its petition because at the trial in the Geisler Trust litigation

no evidence was offered to support such allegations.  (Dkt. 6-9 at 11:4-8) Rather, the trial concerned only the timing of notification of the bequest to the beneficiaries. (*Id*. at 13:17-20)

The statement: "the financial adviser Joe Geisler entrusted to administer his trust put that money in jeopardy, according to a lawsuit filed in Marathon County..." is false for several reasons. *First*, Vigil Trust, not Thomas Batterman, was responsible for the administration of the Geisler Trust.  (Dkt. 20-2) *Second*, financial advisors do not administer trusts.  Trustees administer trusts. Financial advisors invest and manage trust assets at the direction and supervision of the trustee. Here, the trustee was Vigil Trust Company *Id*. The beneficiaries never accused Financial Fiduciaries of putting the trust assets in jeopardy. (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 41) *Third*, the successor trustee was charged by the court to investigate the allegations of financial mismanagement and determined that "[a] review of records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 40; Dkt. 20-3)

The statement: "The adviser, Thomas Batterman of Wausau, was accused of defrauding the charities, committing numerous breaches of trust and conspiring with his fiancée to milk the fund for trustee fees…" was an accurate characterization of the ACS claims in 2015, but had long been disproven by the successor trustees' February 18, 2016 report that "[a] review of records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 40; Dkt. 20-3) As a consequence, the statement was false as of the date of publication on August 21, 2018 because the accusations had long before been disproven and abandoned by ACS.

39.    The *Wausau Daily Herald's* investigation into the *Geisler Trust* litigation was prompted by an anonymous tip received by Gannett's News Director for publications in Central/ East Wisconsin, Mark Treinen, on June 15, 2018.  (Spahn Decl. ¶ 9, Ex. 10, GANNETT000310).

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

40.     Mark Treinen has been a journalist, serving in a variety of reporting and editing positions, for over twenty-five years.  (Mark Treinen Dep. at 134, October 6, 2020, Dkt. No. 52 ("Trienen Dep.").)

**OBJECTION**:  F.R.E. 402: Treinen's reporting experience is not probative of any issue in the case.

**RESPONSE**:  Undisputed.

41.     Among Treinen's responsibilities in the summer of 2018 was the hiring, training and supervision of two paid college student interns who served as reporters for the *Wausau Daily Herald*.  (Treinen Dep. at 45-50.)  One of those interns was Sam Wisneski, a third-year student at the University of Wisconsin-Milwaukee.  (Samuel Wisneski Dep. at 20, October 7, 2020, Dkt. No. 53 ("Wisneski Dep.").)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

42.     After receiving the June 15, 2018 anonymous tip, Treinen assigned Wisneski to look into the *Geisler Trust* litigation.  (Spahn Decl. ¶ 11, Ex. 10, Treinen Dep. Ex. 10, GANNETT000310).  Treinen explained to Wisneski that the case involved Vigil Trust and Tom Batterman, "something to do with misappropriating a $3 million trust fund that was supposed to be divided among four charities/ nonprofits: the Roman Catholic Diocese of Superior, Alzheimer's Association, American Cancer Society and a tiny school district in Bruce, Wis."  (*Id.*)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

43.     As part of his oversight of Wisneski's activities while working at the *Wausau Daily Herald*, Treinen was responsible for ensuring that Wisneski received training on a number of journalism topics.  (Treinen Dep. at 47-48.)  Wisneski was trained by experienced journalists with the USA Today Network of Wisconsin.  (*Id.*)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

44.     Wisneski attended numerous meetings between the newspaper's interns and the people who oversaw the interns regarding rules and regulations and how things are done at the *Wausau Daily Herald*.  (Wisneski Dep. at 27.)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

45.     As part of his training at the beginning of his internship, Wisneski was provided materials about how to access and review Wisconsin court and criminal records.  (Wisneski Dep. at 32, Spahn Decl. ¶ 12, Ex. 11, Dep. Ex. 27.)

**OBJECTION**:     Fed.R.Civ.P.  56(c)(1)(A): Spahn Decl. Ex. 11 purports to be a supplemental interrogatory answer.   However, interrogatory answers must be "answered separately and fully in writing under oath."   Fed.R.Civ.P. 33(b)(3).  Therefore, the content of Spahn Decl. Ex. 11, which is not under oath, is not sufficient to support a statement of fact on summary judgment.

**RESPONSE**:  Disputed.  Wisneski could not recall what materials were provided to him and could not recall if the content contained in Plaintiffs' Deposition Ex. 27 itemized the materials provided to him.  (Dkt. 53 (Wisneski Dep.) at 30:13 to 31:17).  Essentially, Gannett provided something to Wisneski, but there is no evidence of what Gannett provided to Wisneski.

46.     Wisneski also received frequent on-the-job training throughout his internship, receiving frequent feedback on his work from his editors including both Treinen and Robert Mentzer, Gannett's Living and Storytelling Editor.  (Wisneski Dep. at 41-42, 34-35; Treinen Dep. at 45.)

**OBJECTION**:  None

**RESPONSE**:   Disputed.  The referenced testimony indicates that the witness does not remember what materials or topics he received training on apart form how to use CCAP or who provided the training.  (Dkt. 53 (Wisneski Dep.) at 34:3 to 35:25)

47.     Robert Mentzer worked at Gannett from July 2007 to April 2019.  (Robert Mentzer Dep. at 9, October 27, 2020, Dkt. No. 54 ("Mentzer Dep.").)  During the summer of 2018, Mentzer served as a storytelling coach with direct oversight over some reporters, and he had a secondary editing role for other pieces.  (Mentzer Dep. at 12.)

**OBJECTION**:  F.R.E. 402: The duration of Mentzer's time at Gannett is not probative of any issue in the case.

**RESPONSE**:  Undisputed.

48.     During Wisneski's internship with the *Wausau Daily Herald*, Mentzer served as a storytelling coach for Wisneski, regularly working with Wisneski and overseeing some of his work.  (Mentzer Dep. at 21-22.)  Wisneski, however, reported to Treinen.  (*Id.*)

**OBJECTION**:  None.

**RESPONSE**:  Disputed.  Mentzer did not work with Wisneski regularly.  Rather, Mentzer said: "I worked with him and oversaw some of his work.  He was not my direct report." (Mentzer Dep. 21:25 to 22:2)

49.     As part of the orientation process for his job with the *Wausau Daily Herald*, Wisneski was instructed to review the USA TODAY NETWORK Principles of Ethical Conduct for Newsrooms.  (Wisneski Dep. at 59-60, Ex. 9, Spahn Decl. ¶ 13, Ex. 12.)  Wisneski reviewed those Principles with his supervisor, Treinen.  (Treinen Dep. 50-52.)

**OBJECTION**:  None.

**RESPONSE**:   Undisputed.

50.     All reporters and editors at Gannett, including at the *Wausau Daily Herald*, are guided by the USA TODAY NETWORK'S Principles of Ethical Conduct for Newsrooms.  Those Principles include a section titled, "Exercising Fair Play" which reads –

- We will treat people with respect and compassion.
- We will correct errors promptly.
- We will strive to include all sides relevant to a story.  When news develops and we can't include important perspective immediately, we will share updates, including additional sources, when possible.  We also will share attempts to reach sources who add value to the story.
- We will explain to audiences our journalistic processes to promote transparency and engagement.
- We will give particular attention to fairness in relations with people unaccustomed to dealing with the news media.
- We will use confidential sources as the sole basis for published information only as a last resort and under specific procedures that best serve the public's right to know.

(Spahn Decl. ¶ 13, Ex. 12, GANNETT000300.)

**OBJECTION**:  Standing Order ¶ B.2:  Gannett has not offered any admissible evidence to support that proposition that "All reporters and editors at Gannett, including at the Wausau Daily Herald, are guided by the USA TODAY NETWORK'S Principles of Ethical Conduct for Newsrooms."

**RESPONSE**:   Disputed in part.  It is undisputed that Dep. Ex. 9 is the USA TODAY NETWORK'S Principles of Ethical Conduct for Newsrooms.  However, there is no testimony or other admissible evidence in the record that "all reporters and editors at Gannett…are guided by" the Principles.  Further, Treinen and Mentzer do not adhere to the Principles.  For example, the first principle of Gannett's Principles is "We will be honest in the way we gather, report and present news…"  On July 27, 2018, Batterman offered to meet with Wisneski on August 6, 2018 so that Wisneski could get Batterman's side of the story. (Dkt. 57-10 at 304) Wisneski asked Treinen for advice on how to respond to Batterman's offer to meet on August 6.  Treinen advised Wisneski to lie to Batterman as to Wisneski's deadline:   "I think you can reply that you will need to wrap up the story by Tuesday [July 31] , and that you feel you have enough Information from him and from voluminous court records on the trust matter if he's unable to meet in person by then." (Dkt. 57-10 at 304) The story was not "wrapped up" until August 21, 2018.

The same principle requires that Gannett reports and editors will be "fair minded." (Dkt. 57-12) Mentzer reviewed Wisneski's first draft of the story about Batterman on July 10, 2018.  At the time, Mentzer had not read any of the court records from the Geisler Trust litigation. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13) Yet, Mentzer substantially rewrote Wisneski's story and told Wisneski:

> This lede is boring. The story is fascinating, but "ordered to pay part of the legal fees of four charities following years of litigation concerning mishandling of charitable trust" is super, super boring, nearly impenetrable. Why is that? It's because the lede is totally unmoored from any actual human being or human concern. It's bloodless and bureaucratic, where the real story is about death and betrayal!
>
> ***
>
> Above graf is fairly bloodless as well, 'conspired with fiance to distribute funds for her personal gain' is fairly legalese and does not give reader any real idea of what actually happened. Wrote her illegal checks? Made a giant bed of cash in a storage facility like in Breaking Bad?

\*\*\*

this is a really bloodless way of saying that he wanted to funnel money to his fiance's charity so that she would get bonuses, rather than just enacting the wishes of a poor, dead farmer.

\*\*\*

bloodless, bloodless. They're accusing him of fraud, basically. Of taking the money he'd been entrusted by this farmer, who saved his whole life and wanted only to help others, and sitting on it like it was his own, moving it around as if he had the right to. "misrepresented the nature of the trust" is such a legalistic way to represent such a thing!

(Dkt. 57-13 at 6 and 7) Mentzer instructed Wisneski how to revise the draft:

Start with Geisler. He's a farmer, but what type of farmer? What kind of guy was he? Focus on some detail about him as a person: "Joseph Geisler wore the same pair of overalls when he went to milk the cows each morning at 5 a.m., until the seams were literally coming apart. No one in his family knew he had $3 million in the bank."

(Dkt. 57-13 at 6)

51.     After being asked to look into the *Geisler Trust* litigation, Wisneski familiarized himself with the complex trust and legal issues involved in the case.  (Wisneski Dep. at 73.)  He traveled to the Marathon County Courthouse fifteen or more times to review hundreds of court records and conducted numerous interviews, including an interview of John Herbers, a shareholder in Reinhart Boerner Van Duren's Trusts and Estates Practice in Milwaukee.  (Wisneski Dep. at 98, 106, 148.)

**OBJECTION**:  None.

**RESPONSE**:  Disputed in part. When asked about his "investigative file", Wisneski stated that he did not know what an investigative file was.  (Dkt. 53 (Wisneski Dep.) at 71:10 to 72:7) Wisneski did investigate, such as using the internet "to search for information to familiarize myself with what a trust is, and you know, information like that." (*Id*. at 73:22-25) To this day, Wisneski

cannot explain what a trust is.  (*Id*. at 74:3-24) Wisneski used CCAP to access the Geisler Trust court documents and took screen shots of certain, unidentified pages.  (*Id*. at 72:23-25) Wisneski does not know what a trustee protector is. (*Id*. at 77:17-21)

52.     Wisneski specifically reached out to Attorney Herbers to learn more about how a trust or estate should be properly distributed.  (Wisneski Dep. at 106.)

**OBJECTION**:  None.

**RESPONSE**:  Disputed in part.  Wisneski did communicate with Attorney Herbers, but does not remember how they communicated, whether Wisneski sent Herbers documents to review or whether it was more than once or what they discussed.  (Dkt. 53 (Wisneski Dep.) at 106:10 to 107:18)

53.     In addition to Mark Treinen, Wisneski received feedback on drafts of the Article from Gannett's Storytelling Coach, Robert Mentzer.  (Mentzer Dep. at 34).  For example, a draft of the Article that Mentzer reviewed on July 10, 2018 included the sentence, "In this process, Batterman conspired with his fiancé to distribute funds for her personal gain, failed to communicate the existence of the trust to the charities within a reasonable period of time and illegally established a scholarship fund without Bruce School District's knowledge."  (Spahn Decl. ¶ 14, Ex. 13, at GANNETT000349.)  In response, Mentzer noted for Wisneski that Wisneski was "going to need to source these claims.  According to a judge's order? According to prosecutors? According to court documents?"  (*Id*.)

**OBJECTION**:  Standing Order: The statement does not consist of a single fact, "limited as nearly as possible to a single factual proposition."  Standing Order ¶ B.1.

**RESPONSE**:  Disputed in part.  On July 10, 2018, Mentzer radically revised Wisneski's draft of the Article. (Dkt. 57-13) Mentzer made the following comment on Wisneski's draft:

This lede is boring. The story is fascinating, but "ordered to pay part of the legal fees of four charities following years of litigation concerning mishandling of charitable trust" is super, super boring, nearly impenetrable. Why is that? It's because the lede is totally unmoored from any actual human being or human concern. It's bloodless and bureaucratic, where the real story is about death and betrayal!

(Dkt. 57-13 at 6)  Mentzer commented on Wisneski's draft:

Above graf is fairly bloodless as well, 'conspired with fiance to distribute funds for her personal gain' is fairly legalese and does not give reader any real idea of what actually happened. Wrote her illegal checks? Made a giant bed of cash in a storage facility like in Breaking Bad?

(Dkt. 57-13 at 7) And again:

this is a really bloodless way of saying that he wanted to funnel money to his fiance's charity so that she would get bonuses, rather than just enacting the wishes of a poor, dead farmer.

***

bloodless, bloodless. They're accusing him of fraud, basically. Of taking the money he'd been entrusted by this farmer, who saved his whole life and wanted only to help others, and sitting on it like it was his own, moving it around as if he had the right to. "misrepresented the nature of the trust" is such a legalistic way to represent such a thing!

(Dkt. 57-13 at 7) Mentzer instructed Wisneski how to revise the draft:

Start with Geisler. He's a farmer, but what type of farmer? What kind of guy was he? Focus on some detail about him as a person: "Joseph Geisler wore the same pair of overalls when he went to milk the cows each morning at 5 a.m., until the seams were literally coming apart. No one in his family knew he had $3 million in the bank."

(Dkt. 57-13 at 6)

Although Mentzer transformed the article for Wisneski, Mentzer did not review any court records from the Geisler Litigation. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13) Mentzer did not review any notes about court records from the Geisler Litigation. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13) Mentzer did not interview any witnesses for the Article. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13)

34

54.     Mentzer made his comment to Wisneski that he was ""going to need to source these claims" because they were "serious claims, and it's important to be transparent with readers about where they are coming from, what our – what the sources are."  (Mentzer Dep. at 56).  Providing such transparency is considered a tenet of journalistic integrity.  (*Id.*)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

55.     Wisneski also interviewed two of Joseph Geisler's nephews as part of his reporting on the *Geisler Trust* litigation. In describing the *Geisler Trust* litigation, Gary Geisler is quoted in the Article as stating, "You just expect that everyone is doing the right thing."  (Spahn Decl. ¶ 2, Ex. 1 at 7).  The Article goes on to state, "They said that Joe Geisler didn't have anyone to make sure he was making good financial decisions."  (*Id.*)   Gary Geisler is also quoted in the Article as stating, "You think about his intentions for that money that he saved up: He wanted it to go to good causes, and instead someone else was taking advantage of that."  (*Id.*, at 7).

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). The statements made by the Geisler nephews are offered for the truth of the matter asserted and are therefore inadmissible double hearsay. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993), *certified question answered*, 418 Mass. 615, 638 N.E.2d 33 (1994) (Stating that a newspaper article "should have been stricken" and that "the newspaper account is hearsay within hearsay."); *Louisiana ex rel. Dep't of Transp. & Dev. v. Kition Shipping Co*., 653 F. Supp. 2d 633, 648–49 (M.D. La. 2009) ("Statements in newspapers often constitute double hearsay[.]") (citation omitted); *State v. Grahn*, 21 Wis. 2d 49, 53, 123 N.W.2d 510, 512 (1963) ("Cases generally hold that newspaper articles, when introduced to prove the truth of statements

therein, are inadmissible as hearsay[.]").The statement also violates Section B.1 of the Standing Order.

**RESPONSE**:   Disputed in part.  It is undisputed that Wisneski interviewed Joe Geisler's nephews (the sons of John Geisler). The truth of the statements made by the Geisler nephews are disputed.  *First*, the implication of the statement "You just expect that everyone is doing the right thing" with regard to the Geisler Trust is false.   The successor trustee specifically found: "[a] review of records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 40; Dkt. 20-3) Also, there is no indication that the Geisler nephew had any personal knowledge as to the oversight of the Geisler Trust.

*Second*, the statement that "Joe Geisler didn't have anyone to make sure he was making good financial decisions" is false.  All allegations that the Trust corpus was mishandled were disproven.  ((Dkt. 20 (Batterman Aff. January 15, 2019) at ¶ 40; Dkt. 20-3) No one ever alleged that the Trust corpus was improperly invested.

*Third*, the statement: "You think about his intentions for that money that he saved up: He wanted it to go to good causes, and instead someone else was taking advantage of that" is false. The Geisler Trust corpus did go to the "good causes" and the corpus was made available for distribution to the beneficiaries by the middle or end of August 2015. ((Dkt. 20 (Batterman Aff. January 15, 2019) at ¶ 32) The successor trustee determined that no one took advantage of the funds that would be given to the charitable beneficiaries. (Dkt. 20 (Batterman Aff. January 15, 2019) at ¶ 40; Dkt. 20-3)

56.    Gary Geisler is also quoted in the Article as stating, "I would tell anybody that has older parents, older relatives getting financial advice, that they should be checking in on it an getting second opinions just like I did."  (*Id*. at 7).

**OBJECTION**:  F.R.E. 602 and 802: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).  The statements made by the Geisler nephews are offered for the truth of the matter asserted and are therefore inadmissible double hearsay. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993), *certified question answered*, 418 Mass. 615, 638 N.E.2d 33 (1994); *Louisiana ex rel. Dep't of Transp. & Dev. v. Kition Shipping Co.*, 653 F. Supp. 2d 633, 648–49 (M.D. La. 2009); *State v. Grahn*, 21 Wis. 2d 49, 53, 123 N.W.2d 510, 512 (1963).

**RESPONSE**:  Disputed in part.  The statement falsely implies that Gary Geisler did get a second opinion as to Batterman and Financial Fiduciaries' handling of John Geisler's assets and found that Batterman and Financial Fiduciaries were not making "good financial decisions with respect to John Geisler's assets.  But in fact, Financial Fiduciaries' investments of John Geisler's assets were outperforming the comparable market indexes. (Dkt. 59 (Batterman Dec. November 17, 2020) at ¶¶ 14-18)

57.     As the Article states, Wisneski also made several attempts to interview Batterman as part of his story.  "In several emails and phone conversations over the course of three weeks, Batterman was offered the chance to respond to allegations in the case of Geisler's trust, but he has not yet consented to an interview on that issue."  (*Id.* at 7).

**OBJECTION**:  F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication.  *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:  Disputed.  The statement is false.  Batterman consented to an interview on August 6, 2020.  (Dkt. 57-10 at 304)

58.     The Articles states, "[i]n an email to USA TODAY NETWORK-Wisconsin, Batterman said that [Financial Fiduciaries] had hired compliance professionals who found no problem with their handling of funds, but the SEC disagreed. 'No client was harmed in any way by the matters involved in the fine,' Batterman said." (*Id.* at 7).

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Undisputed.

59.     The Article also states that, "[t]he SEC declined to comment on whether the fines and violations were related to the Geisler trust." (*Id.* at 7).

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Undisputed.

60.     In his July 10, 2018 edit of the Article, Mentzer explicitly suggested to Wisneski that he question Batterman about whether Batterman "sincerely thought he had freedom to distribute funds as he saw fit?" (Spahn Decl. ¶ 14, Ex. 13, GANNETT000350; Mentzer Dep. at 60-61, 63-64.)

**OBJECTION**:  None.

**RESPONSE**:   Undisputed.

61.     As of July 10, 2018, Mentzer believed "[i]t was important to give Tom Batterman the opportunity to speak on the record to our reporter for the purpose of including a good faith representation of his views on this case in the story.  And at the time that I wrote this comment, I

was under the assumption that we would have that on-the-record conversation."  (Mentzer Dep. at 63.)

     **OBJECTION**:  None.

     **RESPONSE**:  Undisputed.

     62.     On July 26, 2018, Wisneski spoke to Batterman about the issues he hoped to discuss with him.  Wisneski later reported to Treinen that Batterman told Wisneski that he would get back to him the following week to setup a time to talk further.  (Spahn Decl. ¶ 15, Ex. 14, Wisneski Dep. Ex. 10, GANNETT000307.)

     **OBJECTION**:  None.

     **RESPONSE**:  Disputed.  On July 27, 2018, Batterman sent an email to Wisneski indicting that Batterman could meet in person with Wisneski on August 6, 2018. (Dkt. 57-10 at 304) Batterman explained that he was unavailable the week of July 30th.  *Id*. In fact, Batterman was scheduled to be in Minneapolis on Monday July 30th.  The closing of Financial Fiduciaries' sale to Savant was scheduled for August 1 and the remainder of the week would be dedicated to post-closing activities.  (Dkt. 59 (Batterman Dec. November 17, 2020) ¶ 26) Batterman agreed to an in-person interview on August 6, 2018. (Dkt. 57-10 at 304)

     63.     Wisneski and Batterman exchanged text and email messages on July 26 and 27, 2018 regarding the issues Wisneski hoped to discuss with Batterman and potential dates for an in-person interview.  (*Id.*, GANNETT000304-306.)

     **OBJECTION**:  None.

     **RESPONSE**:  Undisputed.

     64.     Based on Batterman's messages to him, Wisneski felt that he needed to speak to his supervising editors because of the accusatory nature of Batterman's message.  (Wisneski Dep.

at 133-134.)  Wisneski had been working closely with his editors throughout the summer, and this was "something that [Wisneski] wanted to make sure [he] handled correctly."  (*Id.* at 134).  Wisneski, therefore, wanted to bring the issue of Batterman's potential interview to Treinen and Mentzer who had more experience.  (*Id.*)

**OBJECTION**:  None.

**RESPONSE**:  Disputed.  Wisneski's deposition testimony is self-serving and inconsistent with the contemptuous communications with Batterman and Treinen. An in-person interview of Batterman was required by Gannett's Principles and important according to Mentzer.  (Spahn Decl. ¶ 13, Ex. 12, GANNETT000300; Dkt. 54 (Mentzer Dep.) at 63:4-11) Yet, Treinen and Wisneski created and communicated a false pretense to Batterman that his interview needed to take place before July 30, 2018.  They did so in order to avoid with an in-person interview of Batterman. (Dkt. 57-10 at 304-307)

65.    Ultimately, the lead editor responsible for the Article, Treinen, "didn't believe that a completed interview [of Batterman] was going to happen, or if it was going to happen, it was [not] going to happen in a reasonable time frame."  (Treinen Dep. at 56.)  Treinen gave Wisneski a Tuesday, July 31, 2018, deadline to complete the story.  (Treinen Dep. at 125, Spahn Decl. ¶ 15, Ex. 14, Dep. Ex. 10, GANNETT000304).)

**OBJECTION**:  None.

**RESPONSE**:  Disputed.  Treinen's deposition testimony is self-serving and inconsistent with the contemptuous communications with Batterman and Treinen. An in-person interview of Batterman was required by Gannett's Principles and important according to Mentzer.  (Dkt. 57 (Spahn Decl.) ¶ 13; Dkt. 57-12, GANNETT000300 and Dkt. 54 (Mentzer Dep.) at 61:6-62:13; *id.* at 63:5-9) Yet, Treinen and Wisneski created and communicated a false pretense to Batterman that

his interview needed to take place before July 30, 2018.  They did so in order to avoid with an in-person interview of Batterman.  (Dkt. 57-10 at 304-307)

66.     At that point, on July 27, 2018, Treinen "felt that it was not essential to understanding what took place or even Mr. Batterman's view, because that existed within the court records that the reporter had access to."  (Treinen Dep. at 61.)

**OBJECTION**:  None.

**RESPONSE**:   Disputed.  Plaintiffs incorporate their response to paragraph 65 as though fully set forth herein.

67.     Treinen also believed, based on "[y]ears of experience, stories of this nature," that the delays in being able to speak to Batterman were intentional on Batterman's part.  (Treinen Dep. at 61-62.)

**OBJECTION**:  None.

**RESPONSE**:   Disputed.  Plaintiffs incorporate their response to paragraph 65 as though fully set forth herein.

68.     As the Article notes, "[i]n several emails and phone conversations over the course of three weeks, Batterman was offered the chance to respond to allegations in the case of Geisler's trust, but he has not yet consented to an interview on that issue."  (Spahn Decl. ¶ 2, Ex. 1 at 7.)

**OBJECTION**:   F.R.E. 602:  Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed.  Batterman did consent to an interview.  (Dkt. 57-10 at  304) Batterman proposed that the interview take place on August 6, 2018.  To avoid having to be fair to Batterman and include Batterman's side of the story, Treinen instructed Wisneski to lie to

Batterman by telling Batterman that Wisneski's story deadline was July 31, 2018. (Dkt. 57-10 at 304-307)

69.     The Article was published on August 21, 2018, after being prepared in a manner consistent with the established practices of journalism in general and Gannett in particular. (Mark Treinen, June 26, 2020 Decl., Dkt. No. 37 ("Treinen Decl.") ¶ 4.)

**OBJECTION**:   Fed.R.Civ.P. 56(e): The statement is not supported by admissible evidence.   Treinen's affidavit, and paragraph 4 in particular, is a conclusory generalization. Unsupported, conclusory statements are not recitations of "'fact' to which an affiant is competent to testify." *Drake v. Minnesota Mining & Manufacturing Company*, 134 F.3d 878, 887 (7th Cir.1998). According to the Seventh Circuit, "[a] court must not consider parts of an affidavit that fail to meet the standards of Rule 56(e)." *Cooper–Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429 (7th Cir.2004).  Fed.R.Civ.P. 26(a)(2): The statement is an opinion that requires expertise in the area of reporting and news publication generally.  Gannett did not disclose any opinion witnesses in this matter.  Therefore, the statement is inadmissible.

**RESPONSE**:   Disputed.  Gannett did not give Batterman an opportunity to voice his position or explain the facts from his perspective. (Dkt. 57-10 at 304-307) The editors, Treinen and Mentzer, did not review the underlying court papers prior to publication. (Dkt. 52 (Treinen Dep.) at 62:9 to 64:23, 88:5-10, 96:3-16, 97:23 to 98:3;[1] Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13) Related links were incorporated by mandatory company directive regardless of whether they

---

[1] Treinen does not remember if he reviewed the court documents prior to publication of the article. (Dkt. 52 (Treinen Dep.) 62:9 to 64:23, 88:5-10) After Batterman's retraction demand, Treinen searched for the court records but could not locate any anywhere. (Dkt.52 (Treinen Dep.) at 96:3-16.  So he had to go the court house to review the court records.  Id. at 97:23 to 98:3.

are related.  (Dkt. 54 (Mentzer Dep.) 41:19-21) Other news agencies, such as Wisconsin Public Radio, do not require the inclusion of "related links. (Dkt. 54 (Mentzer Dep.) at 73:19-21)

70.    Before publication, the Article was reviewed internally by both Treinen and Mentzer, editors with a combined 35 years of experience.  (Treinen Decl. ¶ 5, Treinen Dep. at 138.)

**OBJECTION**: F.R.E. 402.  The fact that Wisneski's superiors "reviewed" the draft article is of no relevance absent detail as to when such review took place or the depth or degree of the review preformed.

**RESPONSE**:   Disputed.  As for Mentzer, his substantive input was to review Wisneski's initial draft in early July and to substantially change the article from a "bloodless" news piece about the trust litigation into a hit piece against Batterman and Financial Fiduciaries about "fraud," "death and betrayal." (Dkt. 57-13 at 6 and 7) Mentzer never read or reviewed the underlying court documents upon which most of the article was based. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13)

As for Treinen, he reviewed numerous drafts of the online publication, but never read or reviewed the underlying court documents until after publication and receipt of Batterman and Financial Fiducaiaries' retraction demand.  Only then did Freinen attempt to review the underling court papers. (Dkt.52 (Treinen Dep.) at 62:9 to 64:23, 88:5-10, 96:3-16, 97:23 to 98:3)

The context required a thorough review on the underlying court documents by the editors because the author, Sam Wineski was a collage intern with no meaningful experience in investigative reporting.  (Dkt. 52 (Treinen Dep.) 45:22 to 46:22) (Dkt. 53 (Wisneski Dep.) at 20:18 to 21:5)

71.     Gannett uses "tags" with its articles that are published online, which are keywords that get applied to the online article for search engine optimization purposes.  (Treinen Dep. at 160, 168; Mentzer Dep. at 25-28)  In this case the Article's "tags" were "Legal Proceeding" and "Trust Holdings."  (Spahn Decl. ¶ 16, Ex. 15, Mentzer Dep. Ex. 40, GANNETT000500.)

**OBJECTION**:  None.

**RESPONSE**:   Disputed.  Gannett used sixteen "keywords" or "tag[s]" that Gannett associated with the Article.  (Dkt. 59 (Batterman Dec. November 17, 2020) at 10 and 11.  They are: Legal Proceedings, Trust Holdings, Poverty Welfare and Charity, Law Enforcement, Sadness, Trust, Hope, Court proceedings, American Cancer Society, Law Enforcement, Charity, Overall Positive, Conspiracies, Lawsuits,  Theft,  Fraud. *Id*.

72.     After the Article was published on August 21, 2018, Plaintiffs sent Gannett a retraction demand.  (Spahn Decl. ¶ 17, Ex. 16.)  After receiving that demand, Treinen worked with Gannett's editing and legal staff to thoroughly consider the concerns raised by Plaintiffs. (Treinen Decl., Dkt. No. 37 ¶ 6.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate Exhibit 16. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.  After receiving the demand, Treinen attempted to locate the court records from the Geisler Trust lawsuit in order to review them to see if the demand was well taken. Treinen had not previously reviewed the court records prior to publication.  Treinen could not located them, so he communicated with Weisneski as to the court records where abouts. Weineski did not have them and only maintained copies of certain court records on the laptop that Gannett has provided Weineski for his summer internship.  But Weinseski's records had been

removed from the laptop.  Ultimately, Treinen spent an afternoon at the courthouse reviewing, for the first time, the court records from the Geisler lawsuit.  (Dkt. 52 (Treinen Dep.) at 62:9 to 64:23, 88:5-10, 96:3-16, 97:23 to 98:3) Thereafter, he sought legal advice as to what to do.  (Dkt. 52 (Treinen Dep.) at 108:9-17)

73.    Gannett determined that no retraction was warranted.  To continue its accurate reporting, however, Gannett updated the online version of the Article on September 19, 2018 to note the court's ruling on allegations against Batterman, provide updated information about a drunken-driving case against Batterman, and more precisely describe Batterman's role with the trust in a graphic attached to the Article.  (*See id*.)

**OBJECTION**:  Fed.R.Civ.P. 56 and Standing Order ¶B.1: The statement is not supported by admissible evidence.  The reference to Treinen Declaration, Dkt. 37 at ¶6 only states: "After Gannett received a retraction demand from Plaintiffs, I worked with Gannett's editing and legal staff to thoroughly consider the concerns raised by Plaintiffs."

**RESPONSE**:    Disputed.    The successor trustee's and the court's conclusions that Batterman had committed no fraud, theft or embezzlement as falsely alleged in the ACS petition were not included in the original online publication on August 21, 2018.  (Dkt. 43-1) Therefore: (1) the original publication was not accurate; and (2) adding the statement, "Although a judge later found that Batterman had not committed fraud, theft or embezzlement, he ruled that the financial advisor had engaged in multiple acts of 'bad faith' and ordered him to be removed from handling the Geisler Trust and to pay part of the charities' legal fees," did not constitute an "update" since the trustee's and the court's findings of were made long before the original publication date. Further, the refence to review by counsel (paragraph 72) supports the reasonable inference that Gannett made the material correction upon the advice of counsel.

74.     The electronic version of the Article contains several hyperlinks including a hyperlink that reads, "RELATED: Five ways to fight elder abuse, financial exploitation".  (Spahn Decl. ¶ 2, Ex. 1 at 4.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:  Undisputed.

75.     The hyperlink that reads "RELATED: Five ways to fight elder abuse, financial exploitation" is contained within the section of the Article underneath the header "What has been alleged".  (*Id*.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:    Disputed in part. The section Gannett refers to states "According to accusations ***and judgments*** made in the court documents, this is what happened:" (Dkt. 57-1 (emphasis added))

76.     The hyperlink takes the reader to an article from the *Manitowoc Senior News* titled, "Manitowoc senior news: Five ways to fight elder abuse, neglect, financial exploitation" (the "Manitowoc article").  (Spahn Decl. ¶ 18, Ex. 17.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate a Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017). Moreover, Spahn Decl. ¶18 merely attempts to authenticate an article from the Manitowoc Senior News.  It does not in anyway support the statement: "The hyperlink

takes the reader to an article from…" in violation Rule 56(e) and this Court's Standing Order ¶ B.1.

**RESPONSE**:  Undisputed.

77.    Neither Plaintiffs, Joseph Geisler, nor the Geisler Trust litigation are mentioned in the Manitowoc article.  (*Id.*)

**OBJECTION**:   F.R.E. 602: Spahn is incompetent to authenticate a Gannett online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:  Undisputed.

78.    Immediately above the hyperlink that reads "RELATED: Five ways to fight elder abuse, financial exploitation," the Article summarizes the petitioners' allegations against Batterman in the *Geisler Trust* litigation in stating:

> A payout over 10 years could have earned Batterman tens of thousands in fees. From Geisler's death to Nov. 9, 2015, when Batterman and Vigil were removed as trustees, they collected about $30,000 in fees from the trust, according to Batterman's affidavit.
>
> And that's the essence of the charities' case against Batterman: They say he sought to hold on to Geisler's money for as long as he could in order to profit from it through monthly fees.

(Spahn Decl. ¶ 2, Ex. 1 at 3.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate any version of Gannett's online publications. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.  What appears above the "Elder Abuse hyperlink the hyperlink that reads "RELATED: Five ways to fight elder abuse, financial exploitation," depends upon the version of the publication.  As to the one available copy of the original publication, the

statement is undisputed.  (Dkt. 40-1 at 8) As to a later publication of the online article, a photograph of Financial Fiduciaries' front door with its name and logo appear immediately above the hyperlink. (Dkt. 43.1 at 54)

79.   The Article explicitly states that "[n]either Batterman nor Richards has been charged with any criminal wrongdoing in the Geisler case."  (Id at 6.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate the online publication. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed.  The original online publication provided: "Neither Batterman nor Richards has been charged with any wrongdoing in the Geisler case." (Dkt. 40-1 at 10) The statement is buried near the end of the publication and is contradicted by numerous statements in the prior portions of the article that Richards and Batterman engaged in self-dealing, "defrauding the charities" and attempted to "milk the fund for trustee fees."  *Id*. at 4.  Also, the statement appears under the heading "Run-ins with the law." *Id*. at 10.

80.   The August 30, 2018 retraction demand sent by Plaintiffs' counsel acknowledged that the August 21, 2018 version of the Article stated that Mr. Batterman had not been charged with any criminal wrongdoing in the *Geisler Trust* litigation.  (Spahn Decl. ¶ 17, Ex. 16.)

**OBJECTION**:   F.R.E. 602: Spahn lacks personal knowledge and is incompetent to authenticate documents in Gannett's document production. *Zirk*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017).

**RESPONSE**:   Disputed in part.  The August 21, 2018 online publication provides: "Neither Batterman nor Richards has been charged with any wrongdoing in the Geisler case." (Dkt. 40-1 at 10) It is undisputed that the August 30, 2018 retraction demand from acknowledged

such language in the online publication.  However, the online publication also makes repeated, false statements of "wrongdoing" by Batterman and Financial Fiduciaries' part.  For instance: Batterman "put that money in jeopardy;" Batterman "is accused of defrauding the charities, committing numerous breaches of trust and conspiring with his fiancé to milk the fund for trustee fees." (Dkt. 40-1)

81.     While neither Treinen, Wisneski nor Mentzer recall who initially suggested adding the hyperlink referencing "elder abuse, financial exploitation," as the editor responsible for the Article, Treinen ultimately decided to include the hyperlink in the Article to another source. (Treinen Decl., Dkt. No. 37, ¶ 9, Treinen Dep. at 135.)

**OBJECTION**:  None.

**RESPONSE**:  Undisputed.

82.     It has been the longstanding practice of the USA Today Network-Wisconsin websites, such as the *Wausau Daily Herald's* site, to use the terminology "RELATED: [link]" to signify a link to a story that a reader might also be interested in – not necessarily a story on the same exact topic as the one they are reading.  (Treinen Dep. at 120; Treinen Decl., Dkt. No. 37, ¶ 7; Mentzer Dep. at 49.)

**OBJECTION**:  None.

**RESPONSE**:   Disputed in part.  Mentzer's testimony makes clear that a "RELATED" link is appropriate for articles that involve similar subject matter.  (Mentzner Dep. at 50:19 to 51:6)

83.     From Wisneski's perspective, the purpose of the hyperlinks embedded in the Article was to allow people who were interested in the Article to read other stories related to a similar subject.  (Wisneski Dep. at 140.)

**OBJECTION**:  F.R.E. 402 and 701; Fed.R.Civ.P. 26(a)(2): Wisneski's opinion as to the purpose of hyperlinks is irrelevant and undisclosed.  Further, Wisneski, a college age intern, is not qualified to provide such opinion testimony.

**RESPONSE**:  Undisputed.

## II.   PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT.

### The *Geisler Litigation*

1)     As reasons for the removal of the Geisler Trust trustee, American Cancer Society alleged that Mr. Batterman engaged in theft, embezzlement, and falsification of records. (Dkt. 20 (Batterman Aff.) ¶ 35)

2)     The allegations in the American Cancer Society petition that Batterman and the companies associated with him engaged in theft, embezzlement, and falsification of records were false. (Dkt. 20 (Batterman Aff.) ¶ 36)

3)     Mr. Batterman filed a 16-page affidavit with 146 pages of supporting documentation highlighting inaccuracies in the petition and disputing American Cancer Society's claims.  (Dkt. 20 (Batterman Aff.) ¶ 37)

4)     Following a hearing on October 23, 2015, Judge Moran signed an order on November 10, 2015 that removed Vigil Trust as trustee and appointed a new successor trustee, Terrence Byrne, to assume the administration of the Geisler Trust and to investigate the accusations of the American Cancer Society. (Dkt. 20 (Batterman Aff.) ¶ 38; *see also* Dkt. 20-2)

5)     Mr. Byrne retained a certified public accountant to assist with the investigation. (Dkt. 20 (Batterman Aff.) ¶ 39)

6)      On February 18, 2016, Mr. Byrne reported to the beneficiaries and later to Judge Moran that, "[a] review of the records shows no theft, embezzlement, or false records of any nature." (Dkt. 20 (Batterman Aff.) ¶ 40; *see also* Dkt. 20-3)

7)      Bruce Schools filed an amended petition seeking to add Financial Fiduciaries, WTC and Thomas Batterman personally as parties to be potentially liable for the beneficiaries' attorney's fees claims. Judge Moran subsequently dismissed both Financial Fiduciaries and WTC from the lawsuit. (Dkt. 20 (Batterman Aff.) ¶ 41)

8)      Judge Moran ruled on September 18, 2017, that Vigil Trust failed to provide notice as required by Wisconsin's statutes, and took issue with some other administrative actions of the trustee, but he found no evidence of theft, embezzlement, fraud or false records of any nature. (Dkt. 20 (Batterman Aff. January 15, 2019) ¶ 42)

9)      Judge Moran stated at a later hearing: "This Court acknowledges that there were concerns voiced concerning potential criminal activity at the onset of the litigation but that was not the focus of this case and that was not the issues that were litigated at the court trial." (Dkt. 6-9 (Spahn Aff.) at Ex. 9, 11:4-8; *see also* Dkt. 5 at 7)

10)     The Article refers to Judge Moran (by time or title) six times, while referring to "Batterman" *fifty-five* times and "Financial Fiduciaries" three times. (Dkt. 40-1) The Article also includes two photographs of Batterman and two photographs of Financial Fiduciaries' offices. (Dkt. 57-1)

### Gannett's Investigation Of The Article

11)     At earliest, Wisneski started at Gannett in mid-May 2018. (Dkt. 53 (Wisneski Dep.) at 84:24-85:1) Treinen assigned Wisneski to the story on June 15, 2018. (Dkt. 57-10 at 10) Treinen therefore assigned the Batterman story to Wisneski within a month of him starting at Gannett. (*Id.*)

12)     When Treinen asked Wisneski to investigate the Batterman case, he told Wisneski that he "received an anonymous tip today to look into Marathon County court case 15-PR-00032." (Dkt. 53 (Wisneski Dep.) at 93:3-12; *see also* Dkt. 57-10 at 10) Wisneski does not know what the number "15" in the in the *Geisler Litigation* case number means. (*Id.*)

13)     Asked what a trustee is, Wisneski said "I can't speak exactly to what a trustee is. I don't feel qualified for that. To the best oy my knowledge—you know, I'm going to stop there. I don't—I don't feel qualified to answer that." (Dkt. 53 (Wisneski Dep.) at 75:8-14)

14)     Asked what a trust protector and a living trust are, Wisneski said as to both "I'm not sure." (Dkt. 53 (Wisneski Dep.) at 77:17-21)

15)     Asked what a successor trustee is, he said "I can only speculate. I'm not sure exactly what that is." (Dkt. 53 (Wisneski Dep.) at 78:2-7)

16)     Wisneski also has no recollection of discussing the trust-related terms with his supervisors at Gannett. (Dkt. 53 (Wisneski Dep.) at 78:22-79:8)

17)     At the time the story was published, Marathon County court records could not be accessed remotely, and Wisneski had to travel to the Clerk's office to view the records. (Dkt. 53 (Wisneski Dep.) at 148:4-21)

18)     When Wisneski went to the Marathon County Clerk's Office to investigate this case, it was his first time going to the courthouse. (Dkt. 53 (Wisneski Dep.) at 148:22-25)

19)     Wisneski did not print or download any records from the *Geisler Litigation.* (Dkt. 53 (Wisneski Dep.) at 150:9-152:19)

20)     He did not do so because you had to pay to retrieve those records. (Dkt. 53 (Wisneski Dep.) at 155:15-19)

21)     Instead, he took photographs of the computer screen at the clerk's office using his cell phone. (Dkt. 53 (Wisneski Dep.) at 150:9-152:19)

22)     Through all his visits, Wisneski took somewhere around 50-100 photographs of court records. (Dkt. 53 (Wisneski Dep.) at 155:6-14)

23)     To the best of his recollection, the photographs Wisneski took of court records "were on [his] cell phone and nowhere else." (Dkt. 53 (Wisneski Dep.) at 150:9-152:19)

24)     Wisneski says he "might have showed [the court records] to Mark Treinen or Robert Mentzer." However, if he did so, it would have been by "thumbing through pictures oh [his] cell phone." (Dkt. 53 (Wisneski Dep.) at 152:1-14)

25)     On July 10, 2018, Mentzer revised Wisneski's draft of the Article. (Dkt. 57-13)

26)     Mentzer made the following comment on Wisneski's draft:

This lede is ***boring.*** The story is fascinating, but "ordered to pay part of the legal fees of four charities following years of litigation concerning mishandling of charitable trust" is ***super, super boring, nearly impenetrable.*** Why is that? It's because the lede is totally unmoored from any actual human being or human concern. It's ***bloodless and bureaucratic***, ***where the real story is about death and betrayal!***

(Dkt. 57-13 at 6 (emphasis added))

27)     Mentzer made the following comment on Wisneski's draft:

Above graf is fairly ***bloodless*** as well, 'conspired with fiance to distribute funds for her personal gain' is ***fairly legalese*** and does not give reader any real idea of what actually happened. Wrote her illegal checks? Made a giant bed of cash in a storage facility like in Breaking Bad?

(Dkt. 57-13 at 7 (emphasis added))

28)     Mentzer made the following comment on Wisneski's draft:

this is a ***really bloodless*** way of saying that he wanted to funnel money to his fiance's charity so that she would get bonuses, rather than just enacting ***the wishes of a poor, dead farmer.***

(Dkt. 57-13 at 7(emphasis added))

29)     Mentzer made the following comment on Wisneski's draft:

***bloodless, bloodless. They're accusing him of fraud, basically.*** Of taking the money he'd been entrusted by this farmer, who saved his whole life and wanted only to help others, and sitting on it like it was his own, moving it around as if he had the right to. "misrepresented the nature of the trust" is ***such a legalistic way to represent such a thing!***

(Dkt. 57-13 at 7 (emphasis added))

30)     Mentzer made the following comment on Wisneski's draft:

Start with Geisler. He's a farmer, but what type of farmer? What kind of guy was he? Focus on some detail about him as a person: "Joseph Geisler wore the same pair of overalls when he went to milk the cows each morning at 5 a.m., until the seams were literally coming apart. No one in his family knew he had $3 million in the bank."

(Dkt. 57-13 at 6)

31)     Mentzer encouraged further discussion of the Geisler nephews, saying "this seems too late to introduce these guys" and "good quote!" from them. (Dkt. 57-13 at 6)

32)     Mentzer did not review any court records from the *Geisler Litigation*. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13)

33)     Mentzer did not review any notes about court records from the *Geisler Litigation*. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13)

34)     Mentzer did not interview any witnesses for the Article. (Dkt. 54 (Mentzer Dep.) at 34:15-22; 55:7-13)

35)     When Plaintiffs sent their retraction demand letter, Treinen had to go to the Marathon County courthouse to retrieve records because Gannett did not have any records from the *Geisler Litigation* in its possession. (Dkt. 52 (Treinen Dep.) at 97:23 to 98:3)

### Gannett's Refusal To Interview Batterman

36)    Batterman first heard from Sam Wisneski on July 11, 2018, at which point Wisneski explained that he wanted to have a discussion about the Geisler Trust litigation. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 24)

37)    On Thursday, July 26, 2018 had another phone conversation during which he relayed the list of topics he wanted to discuss. During that call, Wisneski and Batterman agreed that they would have an in-depth discussion within the next two weeks. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 25)

38)    Wisneski and Batterman agreed upon that timeline because Financial Fiduciaries was scheduled to close on a merger with a larger financial planning and asset management company, called Savant Wealth Management. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 26)

39)    That transaction was scheduled to close on Tuesday July 31, 2020, and Batterman anticipated having several meetings and other commitments as part of that transition. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 26)

40)    On Friday, July 27, 2018, Wisneski reneged on the agreed schedule of getting together over the next couple weeks. Wisneski told Batterman they needed to talk immediately if Batterman wanted an opportunity to be interviewed. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 27)

41)    Batterman was not immediately available, so Wisneski indicated that he thought he had enough information and that he would be publishing the article without interviewing Batterman. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 27)

42)     On July 27, 2018, Batterman wrote to Sam Wisneski to say: "If this is to be a fair and balanced article, I would think you would want perspectives from the other side, of which I believe I can offer some. So you probably should get some input from me on what I am able to talk about at this time before the article comes out." (Dkt. 57-10 at 6)

43)     Wisneski said that this response was "atypical" and therefore something he felt he "should talk to [his] editors about." (Dkt. 54 (Wisneski Dep.) 233:9-18) He thought it was "atypical in the way that it was accusatory and questioning of the story." (*Id.*)

44)     Mark Treinen, in turn, testified that as of July 27, 2018, he understood that Batterman had "some serious concerns about the nature of the article that [Treinen was] getting ready to finalize and publish[.]" (Dkt. 52 (Treinen Dep.) at 68:5-9)

45)     On August 21, 2018, Gannett published the first version of the Article (the "Original Publication").  (Dkt. 40 (Batterman Dec. July 10, 2020) ¶ 3; Dkt. 40-1)

46)     Gannett revised and republished the Article on September 19, 2019 (the Revised Publication"). (Dkt. 20 (Batterman Aff. January 15, 2020) ¶ 2; Dkt. 20-1)

47)     The follow sentence (the "Disclaimer") is in the Revised Publication but is not in the Original Publication:

> Although a judge later found that Batterman had not committed fraud, theft or embezzlement, he ruled that the financial advisor had engaged in multiple acts of "bad faith" and ordered him to be removed from handling the Geisler Trust and to pay part of the charities' legal fees.

 (*Compare* Dkt. 20-1 *with* Dkt. 40-1)

48)     Even the Disclaimer is not entirely accurate.  Judge Moran removed Vigil Trust and appointed a successor trustee because all the beneficiaries so requested.  The order appointing the successor trustee stated:  "Nothing in this Order shall be deemed to be a finding by the Court,

factually or at law, that Vigil Trust… and/or Thomas Batterman, has engaged in any wrongful or otherwise dishonest conduct, or breached any fiduciary duty." (Dkt. 20-2 at 9)

49)    Batterman was contacted by an investigative journalist for WSAW-TV Channel 7 News, Emily Davies, who indicated that she was investigating a story about my and Financial Fiduciaries' involvement in the *Geisler Litigation*. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 21)

50)    Batterman conducted an interview with Emily Davies at the Financial Fiduciaries office, which lasted approximately two hours. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 22)

51)    During that in-depth interview, Batterman explained the true facts surrounding the *Geisler Litigation*, after which, to Batterman's knowledge, Channel 7 never proceeded with broadcasting any story about Batterman or Financial Fiduciaries' involvement in the *Geisler Litigation*. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 22)

### Gannett's Business Practices

52)    Gannett emailed reports with metrics on stories to everyone in the office. (Dkt. 53 (Wisneski Dep.) at 49:3-7)

53)    Gannett also placed a TV screen over the Wausau Daily Herald newsroom that was "24/7 just showing the – the—the metrics about the Wausau Daily Herald stories on the website. (Dkt. 53 (Wisneski Dep.) at 48:24-49:2)

54)    The screen was prominently placed over the pool of cubicles so that everyone in the office can see. (Dkt. 53 (Wisneski Dep.) at 47:2-13)

55)    That screen mattered to Wisneski "[b]ecause the screen actively showed how well [his] stories were contributing to Gannett's goals." (Dkt. 53 (Wisneski Dep.) at 49:20-21)

56)     Wisneski viewed that screen as important because it measured how "valuable" and how "profitable" of an employee he was. (Dkt. 53 (Wisneski Dep.) at 49:22-50:6)

57)     As a Storytelling Coach, it was Mentzer's job to "encourage reports to tell their stories in a way that would be engaging[.]" (Dkt. 54 (Mentzer Dep.) at 12:25-13-3)

58)     After a story was published Mentzer would also debrief with the reports and it "would be common to review metrics on a story, including pageviews and average engaged time, the amount of time that readers were responding on a story." (Dkt. 54 (Mentzer Dep.) at 14:11-16)

59)     Mentzer considered anything over one thousand views of a story to be good. (Dkt. 54 (Mentzer Dep.) at 72:12-20)

60)     The day after publication, Mentzer emailed Wisneski to tell him that the "Early returns are in." (Dkt. 54 (Mentzer Dep.) at 69:1-21)

61)     Mentzer told Wisneski that the story metrics were "Pretty excellent" because it got "clearly a well above average page view number[.]" (Dkt. 54 (Mentzer Dep.) at 73:22-74:11)

62)     Gannett has not always required reports to include hyperlinks to "RELATED" stories. (Dkt. 54 (Mentzer Dep.) 44:8-12) At the earliest, Gannett imposed that requirement in 2010. (*Id.*)

63)     Gannett adopted the hyperlink requirement "to try to drive traffic to other stories on our site or other Gannett sites." (Dkt. 54 (Mentzer Dep.) 41:19-21)

64)     As a supervisor at Gannett, Mentzer was "often reminding reports that it was their role" to add the related hyperlinks "[b]ecause of the company initiative to—which was to require related links in all stories in order to try to improve time on the site." (Dkt. 54 (Mentzer Dep.) 42:13-24)

65)     Mentzer currently works for Wisconsin Public Radio, where he is not required to include hyperlinks to related stories, as he was required to do at Gannett. (Dkt. 54 (Mentzer Dep.) 73:19-21)

### The Elder Abuse Theme

66)     The photographs of Joe Geisler in his later years in the Article were not obtained from the *Geisler Litigation*, but were instead provided "Courtesy of Gary Geisler." (Dkt. 57-1 at 2, 7)

67)     The statements in the Article from Joe Geisler's nephews suggesting that "Joe Geisler didn't have anyone to make sure he was making good financial decisions" and that Batterman was "taking advantage" of Geisler's good intentions were not based on court records. (Dkt. 57-1 at 7)

68)     The statements in the Article about Joe Geisler's work ethic were not based on Court records, but were instead based on an interview with Gary Geisler, who said "Joe worked hard, saved his money[.]" (Dkt. 57-1 at 1)

69)     The headline of the article states that Batterman is accused of "violating a dead man's trust" and "mishandling $3 million" (Dkt. 57-1 at 1)

70)     The Article also includes an extensive discussion of Joe Geisler's brother, John Geisler. (Dkt. 57-1 at 7)

71)     Article says: "Batterman handled funds for their father, John Geisler, for years, but when the brothers were concerned about the returns their father was getting, they got a second opinion. When that financial adviser was concerned about Batterman's investment strategy, the brothers tired Batterman, They said the returns have increased drastically since then." (Dkt. 59 (Batterman Dec) ¶ 12; Dkt. 57-1 at 7)

72)     There is no indication that the Geisler nephews had any personal knowledge of what occurred with the *Geisler Litigation*. On the contrary, the article reports that they were "surprised and disappointed to hear about this legal battle." (Dkt. 57-1 at 7)

73)     Financial Fiduciaries managed John Geisler's assets from 2008 to early 2015. When John Geisler came to Financial Fiduciaries, it was the peak of the financial crisis, and he was 87 years old. (Dkt. 59 (Batterman Dec) ¶ 14)

74)     Financial Fiduciaries provided quarterly statements to John Geisler and his wife, Zola, and their son, Jerry Geisler, attended many of their meetings with Batterman. (Dkt. 59 (Batterman Dec) ¶ 14)

75)     John Geisler asked—as is overwhelmingly considered the best approach for a person of his age—for a conservative, but low-risk, approach. (Dkt. 59 (Batterman Dec) ¶ 15)

76)     For the six years during which John Geisler was a Financial Fiduciaries client, he outperformed the market for similar investment approaches by approximately 10%.  (Dkt. 59 (Batterman Dec) ¶ 15)

77)     The Oxford Dictionary defines "Related" to mean "Belonging to the same family, group or type; connected; associated with the specified item or process, especially causally." Lexico powered by Oxford, https://www.lexico.com/en/definition/related (last accessed November 11, 2022).

78)     The words "elder" and "exploit*" do not appear ***anywhere*** in the *Geisler Litigation* documents attached to Gannett's motion. (Dkt. 57-2 through 57-9)

79)     Article is not "related to elder abuse" because "it's a story about financial management following a person's death" and "elder abuse is abuse of a person who is living." (Dkt. 54 (Mentzer Dep.) at 48:18-49:4)

**Plaintiffs' Demand For Retraction**

80)     Shortly after the Original Publication, Plaintiffs sent Gannett a demand letter articulating the ways in which the Original Publication was false and defamatory. (Dkt. 57-16)

81)     That demand letter warns that the Article "contains links to so-called 'Related' stories about elder abuse and embezzlement." (Dkt. 57-16 at 7)

82)     The demand specifically identifies the "RELATED" hyperlink to the "Five ways to fight elder abuse" story and states: "This link in the middle of the on-line article unfairly and irresponsibly suggests that Mr. Batterman and Financial Fiduciaries were somehow involved in 'elder abuse.'" (Dkt. 57-16 at 11, ¶ 9)

83)     The demand letter further notes that the Original Publication's "innuendo is impossible to miss" and that it implies that Batterman "takes advantage of elders and cannot be trusted with other people's money." (Dkt. 57-16 at 7)

84)     Instead of retracting the Article, Gannett republished it on September 19, 2018 without removing the hyperlink or the other components contributing to the elder abuse theme. (Dkt. 56-1)

**Plaintiffs Do Not Engage In Elder Abuse**

85)     Plaintiffs do not engage in elder abuse or financial exploitation. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 3)

86)     On the contrary, Batterman and Financial Fiduciaries have spent a significant amount of time and resources contributing to or volunteering with organizations focused on enhancing financial literacy, such as the National Association of Personal Financial Advisors Consumer Education Foundation and a financial education hotline operated by the personal finance magazine Kiplinger. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 3)

87)     Batterman has never physically abused an elderly person, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 4)

88)     Batterman has never emotionally abused an elderly person, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 5)

89)     Batterman has never sexually abused an elderly person, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 6)

90)     Batterman has never provided medication or medical treatment to an elderly person without consent, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 7)

91)     Batterman has never unreasonably confined or constrained an elderly person, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 8)

92)     Batterman has never deprived an elderly person of basic need for food, shelter, clothing, or personal or health care, nor been accused of doing so. (Dkt. 59 (Batterman Dec. November 19, 2020) ¶ 9)

### Gannett's Failure To Preserve Relevant Evidence

93)     Wisneski and Treinen were well-aware, even before the Original Publication, that Plaintiff thought that the story they intended to write were defamatory. (Dkt. 54 (Wisneski Dep.) at 233:9-18; Dkt. 52 (Treinen Dep.) at 68:5-9)

94)     Wisneski indicates that he received a litigation hold notice when he learned of this lawsuit (*i.e.* over a year after Plaintiffs demanded pursuant to Wis. Stat. § 895.05(2) that Gannett retract the story). (Dkt. 53 (Wisneski Dep.) at 208:23-25; 201:15-202:4)

95)     Treinen received a litigation hold notice in late 2019. (Dkt. 52 (Treinen Dep.) at 154:1-154:22)

96)     Gannett allowed Wisneski's laptop to be wiped within days of the publication. (Dkt. 40-6, ¶ 9 (The laptop was "repurposed following the conclusion of his internship on or around August 24, 2018."))

97)     Treinen took no steps to ensure the work product on Wisneski's computer was preserved. (Dkt. 52 (Treinen Dep.) at 69:21-25)

98)     That laptop contained much of Wisneski's investigative file for the Article. For example, he "had a specific way of gathering files from the court computer where [he] would – [he] would take pictures of court records with my phone and then transfer those over to the computer." (Dkt. 54 (Wisneski Dep.) at 269:18-22)

99)     Back up audio recordings of Wisneski's interviews for the Article, if any, were on the deleted laptop. (Dkt. 54 (Wisneski Dep.) at 219:1-219:24; *id.* at 65:25-66:9)

100)    Wisneski also lost his digital recording device and purchased a new phone some time around October 2020. (Dkt. 54 (Wisneski Dep.) at 218:2-221:10) His interview with Joe Geisler's nephews was recorded on one of those two devices. (*Id.*) He was not able to find the interview on either the digital recorder or his phone. (*Id.*)

101)    Gannett discontinued use of software called Chartbeat, which contains data related to the Article in early 2020. (Dkt. 52 (Treinen Dep.) at 152:1-154:3)

102)    Treinen had already received the litigation hold notice at that time, but did not take steps to preserve the data from Chartbeat, is not aware of any other person taking such steps, and can no longer access that data. (Dkt. 52 (Treinen Dep.) at 154:1-154:22)

103)    Rob Mentzer never received "a notice instructing [him] to preserve relevant documents for this lawsuit." (Dkt. 54 (Mentzer Dep.) at 78:4-6)

Dated:  November 23, 2020               Respectfully submitted:

/s/ Charles L. Philbrick
Charles L. Philbrick (Wisconsin Bar No. 1106755)
David P. Hollander (Wisconsin Bar No. 1107233)
Rathje Woodward LLC
10 E. Doty Street, Suite 507
Madison, WI 53703
(608) 960-7430
cphilbrick@rathjewoodward.com
dhollander@rathjewoodward.com

*Attorneys for plaintiffs Financial Fiduciaries, LLC*
*and Thomas Batterman*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles L. Philbrick, certify that I caused to be served on all parties on November 23, 2020, Plaintiffs' Response To Defendant's Proposed Findings of Fact in Support of Defendant's Motion for Summary Judgment and Supplemental Proposed Findings of Fact, via the Court's ECF system.

<u>/s/ Charles L. Philbrick</u>
Charles L. Philbrick